# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER SCOCCO, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:26-cv-01124 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| UNIQURE N.V., MATTHEW KAPUSTA, CHRISTIAN KLEMT, WALID ABI-SAAB, and SARAH TABRIZI, | |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Christopher Scocco ("Plaintiff") alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by uniQure N.V. ("uniQure" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

I.     **NATURE OF THE ACTION AND OVERVIEW**

1.     This is a federal class action on behalf of a class of all persons and entities who purchased or otherwise acquired uniQure ordinary shares between September 24, 2025, and October 31, 2025, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.     uniQure is a biotechnology company developing gene therapies for rare diseases, including Huntington's disease ("HD"), amyotrophic lateral sclerosis ("ALS") caused by mutations in superoxide dismutase 1, refractory mesial temporal lobe epilepsy, and Fabry disease.  uniQure is incorporated in The Netherlands with its principal executive offices in Amsterdam, The Netherlands.  Its ordinary shares trade on The Nasdaq Stock Market LLC under the ticker symbol "QURE."

3.     The Company's leading drug candidate is AMT-130, a novel gene therapy being developed to slow the progression of HD, a usually fatal, inherited genetic disorder that causes nerve cells in the brain to break down, leading to problems with movement and thinking, as well as psychiatric issues.  There is no existing cure or approved means for slowing the progression of the disease.  Some drugs can address certain HD symptoms, but do not halt its progression to a usually fatal outcome.

4.     AMT-130 is one of a very few drugs in testing intended to slow the progression of HD.  In March 2022, uniQure completed patient enrollment for two, ongoing multi-center, dose-escalating Phase I/II clinical trials for AMT-130 called the

Pivotal Phase I/II Study of AMT-130 in patients with Huntington's Disease (the "Pivotal Study").

5.    According to the Defendants, the U.S. Food and Drug Administration ("FDA") previously agreed that uniQure's Pivotal Study would not include any placebo comparator, but instead, the Pivotal Study results could be compared to an external historical data set, known as Enroll-HD or ENROLL-HD,[1] and the analysis derived from such comparison potentially could serve as the basis for uniQure's Biologics License Application ("BLA") submission to the FDA for approval to use AMT-130 to treat patients with HD.

6.    Indeed, on June 2, 2025, Defendant Matthew Kapusta, the Company's Chief Executive Officer, assured investors that the FDA had agreed that the "primary efficacy analysis" will be based on the three-year change in the composite Unified Huntington's Disease Rating Scale ("cUHDRS") between "high-dose AMT-130 patients" and a "propensity score adjusted external control group derived from the ENROLL-HD natural history database."   cUHDRS combines four assessments to obtain a composite score.   The four measurements include: (1) Total Functional Capacity ("TFC"), which measures one's ability to perform daily activities; (2) Total Motor Score ("TMS"), which measures the severity of motor skill impairment; (3) Symbol Digits Modalities Test ("SDMT"), which measures one's processing ability, visual attention, and visuomotor integration; and (4) Stroop Word Reading ("SWR"),

---

[1]    ENROLL-HD is the world's largest observational study for HD consisting of more than 20,000 people throughout Europe, North America, Australasia, and Latin America.  ENROLL-HD is also a clinical research platform and open resource for patients, researchers, healthcare professionals, and others to further the understanding of HD.

which measures cognitive function, attention, concentration, and psychomotor processing.

7.     Defendants also reassured investors of the Company's alignment with the FDA during uniQure's second quarter 2025 earnings call on July 29, 2025. During the call, Defendant Kapusta rejected any notion that "FDA senior leadership [would] renege on what's already been communicated to the company," claiming that "[a]ll of our interactions with the FDA have been very encouraging and very supportive" and that "we have very clear and unambiguous feedback with the FDA."

8.     The Class Period begins on September 24, 2025, when the Company announced topline results of the Pivotal Study.  Specifically, uniQure announced that AMT-130 generated a "statistically significant 75% slowing of disease progression as measured by cUHDRS," thereby meeting the study's primary endpoint.  Additionally, uniQure highlighted that AMT-130 generated a "statistically significant 60% slowing of disease progression as measured by TFC," which met the study's secondary endpoint.  AMT-130 also saw "[f]avorable trends in other secondary endpoint measures of motor and cognitive function," including with respect to TMS, SDMT, and SWR.

9.     Notably, the Company emphasized that AMT-130 saw a "mean reduction from baseline in cerebrospinal neurofilament light protein" ("CSF NfL")— which uniQure asserted was "a well-characterized, supportive biomarker of neurodegeneration."  Accordingly, uniQure explained that "[e]levation in CSF NfL has been shown to be strongly associated with greater clinical severity of [HD]."

Thus, based on the totality of the results and as compared to data from ENROLL-HD, investors were led to believe that AMT-130 was effective in slowing the neurodegeneration in patients with HD and that uniQure would file for accelerated approval of a BLA for AMT-130 in the near-term.

10.    During the related investor conference held that same day, Defendant Kapusta touted the study results and asserted that "we believe these findings provide compelling and clinically meaningful evidence of AMT-130 disease modifying potential."

11.    Additionally, Defendant Walid Abi-Saab reminded investors that uniQure previously discussed the trial design with the FDA and that the FDA agreed that "cUHDRS could serve as an acceptable registrational, intermediate clinical endpoint for accelerated approval." Moreover, he stated that "[t]he FDA also agreed that ENROLL-HD . . . may be acceptable as the external control dataset for the primary analysis, with each dose matched the corresponding controls based on their baseline characteristics."

12.    Thus, investors were led to believe that there was a high likelihood that AMT-130 would receive accelerated approval from the FDA after the Company's planned BLA submission in the first quarter of 2026.

13.    The market acted accordingly and, in response to Defendants' statements, the price of the Company's ordinary shares jumped from a close of $13.66 per share on September 23, 2025, to close at $47.50 per share on September 24, 2025,

a nearly 250% increase.  By October 29, 2025, uniQure ordinary shares were trading above $70.00 per share.

14.    Capitalizing on the substantial increase in the value of uniQure ordinary shares, the Company publicly offered more than 5.7 million uniQure ordinary shares, and more than 500,000 pre-funded warrants to purchase ordinary shares, over the next several days after the release of the Pivotal Study results (the "September 2025 Offering").

15.    Despite the fact that AMT-130's future remained uncertain pending uniQure's discussion of the Pivotal Study results with the FDA, in the prospectus supplement to the September 2025 Offering (the "Prospectus"), uniQure explained that it was engaging in the September 2025 Offering in order to "fund our commercialization readiness activities" and "the potential commercial launch of AMT-130 and related commercialization activities."  Through the September 2025 Offering, uniQure generated approximately $345 million in proceeds (before expenses).

16.    Investors learned the truth about the Company's prospects and the BLA timeline for AMT-130 on November 3, 2025, when uniQure revealed that "the FDA currently no longer agrees that the data from the Phase I/II studies of AMT-130 in comparison to an external control, as per the prespecified protocols and statistical analysis plans shared with the FDA in advance of the analyses, may be adequate to provide the primary evidence in support of a BLA submission."  Although the Company "plan[ned] to urgently interact with the FDA to find a path forward for the

timely accelerated approval of AMT-130," uniQure admitted that "the timing of the BLA submission for AMT-130 is now unclear."

17.    On this news, the price of uniQure ordinary shares plummeted $33.40 per share, or more than 49%, from a close of $67.69 per share on October 31, 2025, to close at $34.29 per share on November 3, 2025.

18.    On December 4, 2025, after the end of the Class Period, uniQure confirmed that it received the final meeting minutes from the FDA regarding the agency's review of data from the Pivotal Study.  According to the Company, "the FDA conveyed that data submitted from the Phase I/II studies of AMT-130 are currently unlikely to provide the primary evidence to support a BLA submission."

19.    This Complaint alleges that, pursuant to Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business and operations.  Specifically, Defendants misrepresented and/or failed to disclose that: (1) the design of uniQure's Pivotal Study—including comparison of the Pivotal Study results to the ENROLL-HD external historical data set—was not fully approved by the FDA; (2) Defendants downplayed the likelihood that, despite purportedly highly successful results from the Pivotal Study, uniQure would have to delay its BLA timeline to perform additional studies to supplement its BLA submission; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

20.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's ordinary shares, Plaintiff and other members of the Class (defined below) have suffered significant damages.

## II.    **JURISDICTION AND VENUE**

21.     Plaintiff's claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa because uniQure's ordinary shares are traded on The Nasdaq Stock Market LLC, and many of the acts and conduct that constitute the violations of law complained of herein, occurred in this District.

24.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    **PARTIES**

25.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased uniQure ordinary shares at artificially inflated prices during the Class Period and has been damaged thereby.

26.     Defendant uniQure N.V. is incorporated in The Netherlands and is headquartered at Paasheuvelweg 25a, 1105 BP Amsterdam, The Netherlands.

27.     Defendant Matthew Kapusta ("Kapusta") has served as the Company's Chief Executive Officer at all relevant times.

28.     Defendant Christian Klemt ("Klemt") has served as the Company's Chief Financial Officer at all relevant times.

29.     Defendant Walid Abi-Saab ("Abi-Saab") has served as the Company's Chief Medical Officer at all relevant times.

30.     Defendant Sarah Tabrizi ("Tabrizi") is a professor of clinical neurology, director of the University College London Huntington's Disease Centre and joint head of the department of neurodegenerative disease.  Tabrizi also served as the lead investigator for the Company's Pivotal Study and attended the relevant investor calls during the Class Period, during which Tabrizi actively responded to questions from investors and discussed the Phase I/II study and AMT-130.

31.     Defendants Kapusta, Klemt, Abi-Saab, and Tabrizi are collectively referred to herein as the "Individual Defendants."

32.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of uniQure's reports to the SEC, press releases, and/or presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the

Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

33.    uniQure and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

34.    uniQure is incorporated in The Netherlands with its principal executive offices in Amsterdam, The Netherlands.  It is a biotechnology company developing gene therapies for rare diseases, including HD, ALS caused by mutations in superoxide dismutase 1, refractory mesial temporal lobe epilepsy, and Fabry disease. uniQure's ordinary shares are registered on The Nasdaq Stock Market LLC under the ticker symbol "QURE."

35.    uniQure's leading drug candidate is AMT-130, a "novel gene therapy candidate" designed to treat HD that utilizes the Company's proprietary "gene-silencing" platform in conjunction with micro ribonucleic acid (miRNA) and is "designed to silence the huntingtin gene and the potentially highly toxic exon 1 protein fragment."  HD is a rare, often genetic disorder that causes nerve cells in one's brain to decay over time, affecting one's movement, motor skills, thinking ability, and overall health.  Although symptoms can persist at any time during one's life, they often manifest in a person's 30s or 40s.

36.    In March 2022, the Company completed enrollment of twenty-six patients in the first two cohorts of its Pivotal Study to examine the safety and efficacy

signals of AMT-130.  These patients were randomized into different study groups: six patients received low-dose treatment, ten patients received high-dose treatment, and ten patients received "an imitation (sham) surgical procedure."  According to the Company, "[t]he U.S. study consist[ed] of a blinded 12-month core patient study period followed by an unblinded long-term follow-up period of five years."  An additional four patients in the control group eventually were moved into the treatment groups.

37.     uniQure also enrolled thirteen patients in the first two cohorts of its European study in June 2023, with six patients receiving low-dose treatment and seven patients receiving high-dose treatment.[2]

38.     Prior to the start of the Class Period, Defendants repeatedly assured the market of the Company's alignment with the FDA on "key components of the primary statistical analysis plan and [Chemistry, Manufacturing, and Controls] requirements to support a BLA submission planned for the first quarter of 2026."

39.     For example, during a Company investor call held on June 2, 2025, Defendant Kapusta relayed to investors that "the FDA also agreed that the primary efficacy analysis will be based on the three-year change in cUHDRS in high-dose AMT-130 patients, compared to a propensity score adjusted external control group derived from the ENROLL-HD natural history database."

---

[2]     In February 2025, the Company completed enrollment of twelve patients in the U.S. and U.K. in a third study cohort to "further investigate both does of AMT-130 together with perioperative immunosuppression."  uniQure is also currently enrolling patients in a fourth, U.S.-based cohort that is designed to "evaluate the safety of the high-dose administration of AMT-130 in up to six patients with lower striatal volumes compared to those of patients enrolled in previous cohorts with higher striatal volumes."

40.    Additionally, on July 29, 2025, during uniQure's second quarter 2025 earnings call, in response to an investor's questions regarding whether "FDA senior leadership [would] renege on what's already been communicated to the company," Defendant Kapusta reassured investors that "[a]ll of our interactions with the FDA have been very encouraging and very supportive" and that "we have very clear and unambiguous feedback with the FDA."

41.    The results of the Pivotal Study were planned to be released in September 2025, and, on September 5, 2025, the market was informed of the Company's outlook regarding what would be considered a successful outcome for the Pivotal Study.  Specifically, Guggenheim Securities, LLC ("Guggenheim") published a report outlining Defendant Tabrizi's expectations for the Pivotal Study, which included: "(1) a clinically meaningful Year 3 outcome in cUHDRS would be a statistically different, $\geq 50\%$ difference vs. ENROLL-HD; (2) positive trends in TFC; and (3) CSF NfL below baseline."  Critically, Guggenheim informed investors that, due to "Dr. Tabrizi's advisory relationship with the FDA," investors should understand that: "(1) the FDA is comfortable with the [external control ("EC")] and any [placebo]/training effect should be *de minimis* by Year 3; (2) the agency sees TFC as an important component along with cUHDRS and may want to see positive trends related to the EC; and (3) may find three year safety as an acceptable surrogate for a larger drug-exposure population."

### B.    Defendants' False and Misleading Statements

42.    The Class Period begins on September 24, 2025, to coincide with uniQure's announcement of its topline results for the Pivotal Study.  uniQure touted

its "positive topline data from the [Pivotal] study of AMT-130," which met primary and secondary endpoints as "compared to a propensity score-matched external control."

43.    Specifically, uniQure highlighted that AMT-130 generated a "statistically significant 75% slowing of disease progression as measured by cUHDRS (p=0.003), which met the primary endpoint of the study" and a "statistically significant 60% slowing of disease progression as measured by TFC (P=0.033), which met a key secondary endpoint of the study." Furthermore, uniQure noted "[f]avorable trends in other secondary endpoint measures of motor and cognitive function, including "[a]n 88% slowing of disease progression as measured by SDMT (p=0.057)," "[a] 113% slowing of disease progression as measured by SWRT (p=0.002)," and " [a] 59% slowing disease progression as measured by TMS (p=0.174)," as well as a "mean reduction from baseline in [CSF NfL]" of -8.2%.

44.    Additionally, the press release quoted Defendant Tabrizi as claiming that "these groundbreaking data are the most convincing in the field to date and underscore the potential disease-modifying effects in Huntington's disease."

45.    During the accompanying investor call held that same day, Defendant Kapusta touted the study results and asserted that "we believe these findings provide compelling and clinically meaningful evidence of AMT-130 disease modifying potential." Kapusta also claimed that "[w]e believe th[at] AMT-130 has the potential to be the first treatment to truly modify the course of Huntington's disease."

46.     During the investor call, Defendant Abi-Saab discussed the design of the

Pivotal Study.  Critically, he explained:

> Earlier this year, we held a Type B meeting with the FDA
> to discuss the proposed use of external control data and we
> prospectively defined statistical analysis plan, or SAP, in
> support of a planned BLA resubmission for AMT-130.
>
> The FDA agreed that the cUHDRS could serve as an
> acceptable registrational, intermediate clinical endpoint
> for accelerated approval.  Additionally, the FDA agreed
> that the primary efficacy analysis for the BLA would
> evaluate the three-year change in cUHDRS and the high
> dose AMT-130 patients compared to a propensity score
> adjusted external control arm.  In agreement with the
> FDA's recommendation, we selected propensity score
> matching for the primary analysis.
>
> The FDA also agreed that ENROLL-HD[,] a large
> prospective longitudinal natural history study of
> Huntington's disease[,] may be acceptable as the external
> control dataset for the primary analysis, with each dose
> matched the corresponding controls based on their baseline
> characteristics.

47.     After highlighting the topline results for the Pivotal Study, Abi-Saab

asserted that "[t]hese results suggest a slowing of neurodegeneration" and noted that

"AMT-130 has remained generally well-tolerated with a manageable safety profile at

both doses."

48.     Similarly, Defendant Tabrizi characterized the study results as

"impressive" and claimed that "these results"—which she reiterated were compared

to the external ENROLL-HD historical study as approved by the FDA—"indicate that

AMT-130 could have a significant impact on slowing disease progression and offer

the potential to improve and lengthen quality of life in HD patients."  Moreover,

Tabrizi emphasized that "these data are the first to provide clear evidence of an investigational therapy inducing Huntington's disease modifications," characterizing uniQure's clinical trials as "an immensely exciting development for the Huntington's field."

49.    According to Tabrizi, the Pivotal Study results are "game changing data [that] really offer a beacon of hope for patients and their families, and represents a significant step towards delivering a licensed disease modifying therapy for Huntington's disease."

50.    During the question-and-answer portion of the call, an analyst asked Tabrizi whether "there [were] any shortcoming to these data . . . that would give you a pause," to which Defendant Tabrizi plainly responded, "No, I don't think there's any shortcomings." She further explained that "I have run many different clinical trials, I've developed . . . drugs. But when the data was so clear to me that this drug was working, the effect size was huge."

51.    Defendants were later asked about uniQure's comparison of the Pivotal Study data to the ENROLL-HD dataset due to the large size of the historical data set (with more than 20,000 patients, as compared to just several dozen patients enrolled in the Pivotal Study), and Defendant Abi-Saab stated that the size of the ENROLL-HD data was "actually . . . one of the strengths" because "we can really maximize the selection of which [patients] would be a good match," thereby reducing the risk of error. He also underscored that "I'm very convinced that this is really a great way to be able to compare to and I'm confident in the results."

52.    Accordingly, Defendant Abi-Saab explained that the Company would hold "a pre-BLA meeting with the FDA to present these updated data and to discuss the content and format of the forthcoming BLA" in the fourth quarter of 2025, and emphasized that "we expect to submit a BLA for AMT-130 with a request for priority review" in the first quarter of 2026.

53.    On the news of AMT-130's purportedly successful results, the price of the Company's ordinary shares substantially jumped from a close of $13.66 per share on September 23, 2025, to close at $47.50 per share on September 24, 2025, a nearly 250% increase.

54.    Capitalizing on the substantial increase in the Company's stock price, on September 25, 2025, pursuant to an automatic shelf registration statement filed on January 7, 2025, uniQure publicly offered over 5.7 million Company ordinary shares (at $47.50 per share) and over 500,000 pre-funded warrants to purchase ordinary shares (at $47.4999 per warrant).  Through the September 2025 Offering, uniQure generated approximately $345 million in proceeds (before expenses).

55.    The Prospectus accompanying the September 2025 Offering included key data from the Company's Pivotal Study and explained that, "[b]ased on interactions with the FDA, it was agreed that data from cohorts 1 and 2 in the Phase I/II clinical trials could be compared to a propensity score-matched external control derived from the Enroll-HD natural history data set, under a prespecified statistical analysis plan, which may serve as the primary basis for a BLA submission."

56.    The Prospectus further stated that uniQure primarily "intend[s] to use the net proceeds from the sale of our securities offered hereby to fund our commercialization readiness activities" and "the potential commercial launch of AMT-130 and related commercialization activities."

57.    The above statements identified in paragraphs 42-56 were materially false and misleading, and failed to disclose material adverse facts, about the Company's business and operations.  Specifically, Defendants misrepresented and/or failed to disclose that: (1) the design of uniQure's Pivotal Study—including comparison of the Pivotal Study results to the ENROLL-HD external historical data set—was not fully approved by the FDA; (2) Defendants downplayed the likelihood that, despite purportedly highly successful results from the Pivotal Study, uniQure would have to delay its BLA timeline to perform additional studies to supplement its BLA submission; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

### C.    The Truth Emerges

58.    Plaintiff and other investors began to learn the truth about the Company's prospects on November 3, 2025, when uniQure announced that it had received feedback from the FDA about AMT-130's path to BLA approval.  Critically, uniQure revealed that the FDA "currently no longer agrees that the data from the Phase I/II studies of AMT-130 in comparison to [the ENROLL-HD] external control, as per the prespecified protocols and statistical analysis plans shared with the FDA in advance of the analyses, may be adequate to provide the primary evidence in support of a BLA submission."

59.     As a result, uniQure stated that "the timing of the BLA submission for AMT-130 is now unclear," but that uniQure "plans to urgently interact with the FDA to find a path forward for the timely accelerated approval of AMT-130."

60.     On this news, the price of uniQure ordinary shares plummeted $33.40 per share, or more than 49%, from a close of $67.69 per share on October 31, 2025, to close at $34.29 per share on November 3, 2025.

**D.     Post-Class Period Events**

61.     On November 10, 2025, uniQure hosted its third quarter 2025 earnings call.  During the call, Defendant Abi-Saab noted that the FDA's recent feedback regarding AMT-130 "has introduced uncertainty into the path forward, but we believe in our data and we are focused on working with the agency to define the next steps."

62.     On December 4, 2025, uniQure, after receiving the final meeting minutes from the FDA's meetings regarding AMT-130's BLA, confirmed that "the FDA conveyed that data submitted from the Phase I/II studies of AMT-130 are currently unlikely to provide the primary evidence to support a BLA submission." uniQure also noted that it "is carefully evaluating the feedback and plans to urgently request a follow-up meeting with the FDA to take place in the first quarter of 2026."

## V.     <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

63.     Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired uniQure ordinary shares during the Class Period (the "Class"). Excluded from the Class are Defendants, their agents, directors and officers of uniQure, and their families and affiliates.

64.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

65.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether the Defendants violated the Exchange Act;

b.    Whether the Defendants omitted and/or misrepresented material facts;

c.    Whether the Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    Whether the Defendants knew or recklessly disregarded that their statements were false and misleading;

e.    Whether the price of uniQure ordinary shares were artificially inflated; and

f.    The extent of damage sustained by members of the Class and the appropriate measure of damages.

66.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

67.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions. Plaintiff has no interests that conflict with those of the Class.

68.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.    <u>APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE</u>

69.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    a.    The Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.    The omissions and misrepresentations were material;

    c.    The Company's ordinary shares traded in an efficient market;

    d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ordinary shares; and

    e.    Plaintiff and the Class purchased uniQure ordinary shares between the time the Company and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

70.    At all relevant times, the market for the Company's ordinary shares was efficient because: (1) as a regulated issuer, the Company filed periodic public reports

with the SEC; and (2) the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII.  <u>NO SAFE HARBOR</u>

71.    Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII.  <u>LOSS CAUSATION/ECONOMIC LOSS</u>

72.    The Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The prices of Company ordinary shares significantly declined when the misrepresentations made to the market,

and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of uniQure ordinary shares during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## IX.    SCIENTER ALLEGATIONS

73.    During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, the Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Company securities during the Class Period.

## X.    CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against All Defendants**

74.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

75.    During the Class Period, the Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Company securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

76.     Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

77.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

78.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

79.     The Individual Defendants acted as controlling persons of uniQure within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and/or disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content

and dissemination of the various false and/or misleading statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.    Additionally, as executive officers of the Company, Defendants Kapusta, Klemt, and Abi-Saab had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular accounting practices giving rise to the securities violations as alleged herein, and exercised the same.

81.    As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Company securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants,

jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## XI.    **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 10, 2026                    Respectfully submitted,

*S/ Naumon A. Amjed*
Naumon A. Amjed
**KESSLER TOPAZ**
    **MELTZER & CHECK, LLP**
Ryan T. Degnan
Geoffrey C. Jarvis
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com
gjarvis@ktmc.com

*Attorneys for Plaintiff Christopher Scocco*

## CERTIFICATION

I, Christopher Scocco, declare that:

1.      I have reviewed the Class Action Complaint and authorize its filing.

2.      I did not purchase and/or acquire the securities that are the subject of this action at the direction of my counsel nor in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including giving testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Certification.

4.      My Class Period transaction(s) in the uniQure N.V. securities that are the subject of this action are attached in Schedule A.  I have complete authority to bring a suit to recover for investment losses for all securities set forth in Schedule A.

5.      During the three years prior to the date of this Certification, I have not sought to serve nor served as a representative party for a class in an action filed under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: ___2/4/2026_____

DocuSigned by:

___27DD7359803549C..._____

Christopher Scocco

**SCHEDULE A**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Ordinary Shares | Buy | 9/26/2025 | 14.72175 | $50.9450 |