**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>UNIQURE N.V., MATTHEW KAPUSTA, WALID ABI-SAAB, and SARAH TABRIZI,<br><br>Defendants. | Case No. 1:26-cv-01124-JPC-GS<br><br>Hon. John P. Cronan<br><br>**<u>CLASS ACTION</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ... 2

II. JURISDICTION AND VENUE ... 12

III. PARTIES ... 13

A. Lead Plaintiff ... 13

B. Defendants ... 13

1. uniQure ... 13

2. The Individual Defendants ... 14

IV. SUMMARY OF THE FRAUD ... 15

A. Pre-Class Period Background ... 15

1. Huntington's Disease and uniQure's AMT-130 ... 15

2. Clinical Development Programs for Potential Gene Therapies ... 16

3. The FDA Approval Process for Gene Therapies ... 22

4. uniQure Submits AMT-130 IND and Begins Exploratory U.S. and E.U. Phase I/II Trials ... 27

5. uniQure Initially Focused Its Public Statements Regarding the U.S. Phase I/II Trial on Data Related to Surrogate Biomarker Endpoints ... 32

6. June 2023 and December 2023 Interim Data Updates from Phase I/II Trials Disappoint uniQure Investors ... 34

7. Shift Towards Regulatory Flexibility and Accelerated Approval for Gene Therapy Begins in Earnest in 2023 with Marks as Champion ... 40

8. uniQure Reports Positive July 2024 Interim Results Focused on Intermediate Clinical Endpoints for the Phase I/II Trials ... 44

9. uniQure's Late November 2024 Type B Meeting Leads to Purported Agreements with the FDA on a Regulatory Pathway for AMT-130 ... 49

10. Changes at FDA and CBER Lead to Concern for Gene Therapies Like AMT-130 ........ 63

11. uniQure Receives Breakthrough Therapy Designation for AMT-130, Soothing Investor Concerns about the Impact of CBER Turmoil ........ 66

12. Prasad's Appointment as CBER Director Creates Additional Uncertainty for AMT-130 Given His Views on RCTs and Use of Accelerated Approval ........ 68

13. uniQure Executives Rely on Late April 2025 Type B Meeting to Quell Investor Concern about Changes at FDA and CBER ........ 75

14. Further Turmoil at CBER and Adverse Regulatory Decisions for Other Gene Therapies Lead to Uncertainty for uniQure's AMT-130 ........ 79

15. Prasad Resigns and Is Reinstated; Analysts Look to uniQure's 3Q25 Update on Phase I/II Trials Data ........ 87

B. Defendants Misleadingly Reaffirm Agreement with FDA and Tout U.S. and E.U. Phase I/II Trials as "Pivotal" and the Related Data as "Clear Cut" ........ 89

C. The Market Reacted Positively to Defendants' Statements about the U.S. and E.U. Phase I/II Trials Data and Prior Purported Agreements with the FDA ........ 92

D. Defendants Immediately Profit from uniQure's September 24 Disclosures ........ 96

E. Defendants' September 24 and October 30 Statements Were Materially False and Misleading ........ 97

1. The U.S. and E.U. Phase I/II Trials Were Not "Pivotal" and cUHDRS Was Not a "Primary" Endpoint ........ 98

2. AMT-130's Phase I/II Data Suffered from Significant Flaws, Biases, and Limitations ........ 100

3. uniQure and the FDA Had Not Aligned on Numerous Key Aspects of the Company's AMT-130 BLA Submission ........ 113

4. Personnel Changes at CBER and Adverse Regulatory Decisions Undermined Defendants' Statements Regarding uniQure's Purported Agreement with the FDA ........ 116

F. The Relevant Truth Is Revealed ........ 119

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 125

VI. LOSS CAUSATION ........ 142

VII. SUMMARY OF ADDITIONAL SCIENTER ALLEGATIONS ........ 144

A. Defendants Were Aware of the Regulatory Risks Associated with AMT-130 ........ 145

B. Defendants Had Contemporaneous Knowledge of uniQure's Discussions with the FDA Regarding AMT-130 ........ 151

C. Defendants Were Financially Motivated to Commit Fraud ........ 153

D. Defendants' Fraud Concerned the Most Important Aspect of uniQure's Business ........ 156

VIII. CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS ........ 157

IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE ........ 159

X. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ........ 161

XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........ 162

XII. PRAYER FOR RELIEF ........ 166

XIII. JURY TRIAL DEMANDED ........ 166

Court-appointed Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiff"), by and through its undersigned counsel, brings this federal securities class action individually and on behalf of all other similarly situated persons and entities who purchased or otherwise acquired the common stock of uniQure, N.V. ("uniQure" or the "Company") between September 24, 2025, and October 31, 2025, inclusive (the "Class Period"), and were injured thereby (the "Class"). Lead Plaintiff asserts claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants uniQure, Matthew Kapusta ("Kapusta"), Walid Abi-Saab ("Abi-Saab"), and Sarah Tabrizi ("Tabrizi") (collectively, "Defendants"). Defendants Kapusta and Abi-Saab are collectively referred to as the "Executive Defendants." The Executive Defendants and Tabrizi are collectively referred to as the "Individual Defendants."

Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based upon, among other things, the ongoing investigation that Court-appointed Lead Counsel is conducting under Lead Plaintiff's supervision. This investigation includes, but is not limited to, reviewing and analyzing: (i) documents that uniQure filed with the SEC; (ii) securities and financial analysts' reports about uniQure; (iii) transcripts of uniQure investor calls; (iv) uniQure press releases and presentations; (v) press and media reports, including online news sources and other journalistic sources; and (vi) public material obtained in connection with the continuing investigations discussed herein. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This action arises from Defendants' misstatements and omissions regarding the import and viability of data from the exploratory Phase I/II trials of uniQure's most important gene therapy candidate, AMT-130, and its available pathway to regulatory approval. AMT-130 is a potential treatment for patients suffering from Huntington's disease, a rare genetic disorder with no cure.

2. Gene therapies like AMT-130 are regulated by the U.S. Food and Drug Administration's ("FDA") Center for Biologics Evaluation and Research ("CBER"). Gene therapy sponsors like uniQure first submit an Investigational New Drug ("IND") application to the FDA. Once the FDA approves it, the sponsor may test the safety and efficacy of the therapy in humans via clinical trials. Clinical trials can be exploratory—i.e., intended to generate hypotheses, estimate the effects of the therapy, or inform the design of later trials—or confirmatory—i.e., adequately controlled trials with pre-specified endpoints and analyses that are expressly designed to confirm efficacy and safety of therapy. According to regulatory guidelines, while data from exploratory trials typically "cannot be the basis of the formal proof of efficacy, such data may contribute to the total body of relevant evidence."

3. If a clinical trial generates "substantial evidence of effectiveness," or "potency" (the statutory finding the FDA must make to approve a therapy for use), the sponsor can submit a Biologics License Application ("BLA") seeking full approval or accelerated approval. Accelerated approval requires at least one adequate and well-controlled trial establishing that the product has an effect on a surrogate biomarker or an intermediate clinical endpoint. If granted, it is conditioned on the successful completion of a confirmatory trial, and it can be revoked if the data from the confirmatory trial does not support safety and efficacy.

4. Randomized, controlled trials ("RCTs") have the strongest ability to demonstrate safety and efficacy because they can separate the effect of the therapy from the effects caused by other factors such as the natural progression of the disease or the placebo effect. Blinding—the process of withholding information about which participants in a study are receiving which treatment—is also critical to eliminating conscious or unconscious bias that could skew the results of a clinical trial.

5. For trials that utilize an external control, i.e., a group of patients drawn from an external source, FDA guidelines provide that "[r]educing the potential for bias . . . is best addressed in the design phase" in a study protocol that is finalized before the trial begins. The FDA guides sponsors like uniQure to "prespecify in the protocol [] before conducting the externally controlled trial" "well-defined and clinically meaningful endpoints, cogent analytic plans, and approaches to minimize missing data and sources of bias." When these design elements are not prespecified or are changed based on "accumulating data" from interim trial results, it is more difficult to interpret the data from the trial. Moreover, "[k]nowledge of accumulating data . . . can adversely affect . . . endpoint assessment, compromising the ability of the trial to reliably achieve its objective in a timely manner.

6. uniQure enrolled its first patient in its exploratory Phase I/II clinical trial to assess the safety, tolerability, and efficacy of AMT-130 (the "U.S. Phase I/II Trial") in June 2020. By March 21, 2022, uniQure had completed enrollment for the U.S. Phase I/II Trial. uniQure subsequently began an open-label Phase Ib/II study of AMT-130 in Europe (the "E.U. Phase I/II Trial," and together with the U.S. Phase I/II Trial, the "U.S. and E.U. Phase I/II Trials"), enrolling its first patients in 2H21.

7. Except for one part of the U.S. Phase I/II Trial, the U.S. and E.U. Phase I/II Trials were not RCTs. Instead, they were primarily single-arm (where all participants received the same treatment), open-label (i.e., unblinded) studies. The U.S. and E.U. Phase I/II Trials also used an external natural history control that was not pre-specified, the trial protocols did not pre-specify hypotheses, primary endpoints, or analyses, and as explained below, uniQure changed design elements of the studies based on accumulated data and conducted interim analyses of the trials.

8. Before interim data releases in June 2023 and December 2023, uniQure executives, including Defendant Kapusta and then-head of research, Ricardo Dolmetsch ("Dolmetsch"), touted the possibilities of the U.S. Phase I/II Trial's exploratory biomarker endpoints, including the levels of the mutant huntingtin protein ("mHTT") and neurofilament light chain proteins ("NfL") in cerebral spinal fluid ("CSF") and total brain volume as measured through volumetric MRI. However, in June and December 2023, uniQure released interim data from the U.S. and E.U. Phase I/II Trials that revealed disappointing results for those biomarkers and caused precipitous declines in the price of uniQure's common stock.

9. Instead of acknowledging that this interim data undermined the reliability of efficacy results for AMT-130, uniQure attempted to move the goalposts to fit the data. In particular, the Company began de-emphasizing the biomarkers it once touted in its public statements, telling the market to focus instead on exploratory intermediate clinical endpoints, including a composite assessment of four clinical measurements known as the composite Unified Huntington's Disease Rating Scale ("cUHDRS"). It worked. When uniQure announced positive results for cUHDRS in June 2024, uniQure's stock price soared.

10. That was not the only time uniQure shifted gears mid-trial. Throughout the course of the U.S. and E.U. Phase I/II Trials, uniQure changed the external natural history control multiple

times—from one database of Huntington patient data known as TRACK-HD, to TRACK-HD and another database known as PREDICT-HD, and to yet another known as ENROLL-HD—as more data became available, particularly the disappointing data related to volumetric MRI. Critically, while TRACK-HD and PREDICT-HD included MRI data, ENROLL-HD did not.

11. Given these significant issues with the design and execution of the U.S. and E.U. Phase I/II Trials, uniQure executives repeatedly acknowledged that the trials were merely exploratory in nature and that a confirmatory study had to be conducted to obtain FDA approval for the therapy. For example, during a June 2021 Annual General Meeting, Defendant Kapusta confirmed that the U.S. Phase I/II Trial's efficacy endpoints were "proof-of-concept" and explained that uniQure had started an "open-label study" in Europe that was "design[ed] to augment [uniQure's] ability to detect a signal in Phase [I/II] and enable us to find a dose to go to Phase [III]."

12. However, by 2023, a unique set of circumstances occurred within the FDA and, more specifically, CBER, that gave Defendants hope that uniQure could potentially short-circuit the FDA approval process. In particular, the head of CBER, Dr. Peter Marks ("Marks"), had begun advocating for "regulatory flexibility" when reviewing cell and gene therapies like AMT-130. This "regulatory flexibility" included the potential use of accelerated approval based on smaller studies with single-arms or that used external natural history controls and surrogate biomarker and/or intermediate clinical endpoints—the same features present in the U.S. and E.U. Phase I/II Trials.

13. In 2024, uniQure sought to capitalize on Marks' willingness to exercise regulatory flexibility when reviewing gene therapies like AMT-130. On December 10, 2024, uniQure disclosed a series of agreements it had purportedly reached with the FDA and, more specifically, the Marks-led CBER in a late November 2024 multi-disciplinary meeting. These agreements

supposedly included the following: (i) "that data from the ongoing Phase I/II studies, compared to a natural history external control, may serve as the primary basis for a BLA submission under the Accelerated Approval pathway, avoiding the need for an additional pre-submission study"; (ii) that cUHDRS "may be used as an intermediate clinical endpoint"; and (iii) "that reductions in neurofilament light chain (NfL) measured in cerebrospinal fluid (CSF) may serve as supportive evidence of therapeutic benefit in the application for accelerated approval."

14. During a subsequent Type B meeting regarding a statistical analysis plan ("SAP") for the three-year data from the U.S. and E.U. Phase I/II Trials, which occurred in late April 2025, the FDA supposedly "continued to support its prior agreement that" cUHDRS "may serve as an acceptable registrational, intermediate clinical endpoint for accelerated approval" and uniQure purportedly reached the following additional agreements with the FDA: (i) "the primary efficacy analysis for the BLA will evaluate the 3-year change in cUHDRS in high-dose AMT-130 patients compared to a propensity score-adjusted external control arm"; and (ii) "ENROLL-HD . . . may be acceptable as the external control dataset for the primary analysis of the trial data."

15. Kapusta admitted that he was "pleasantly surprised" by the FDA's willingness to enter into these agreements with uniQure, and he praised the FDA for "leaning in to really try[ing] to work with sponsors to find expedited pathways of bringing these transformational therapies to patients." Following the disclosure of the results of the late November 2024 meeting, uniQure's stock price increased, and analysts began discussing the timing of a BLA submission and potential approval and commercialization of AMT-130. For instance, in a December 10, 2024 report, a Raymond James analyst concluded that "[b]ased on today's update, we expect a BLA filing of AMT-130 in 2025, and are confident that the existing cUHDRS data (along with CSF NfL

reductions) will support accelerated approval," upgrading uniQure's common stock to a "Strong Buy" and "increasing [its] PT [price target] to $52."

16. Yet by the spring of 2025, a storm was brewing inside the FDA and CBER. Shortly after Robert F. Kennedy, Jr. took over at the U.S. Department of Health and Human Services ("HHS") in February and Dr. Marty Makary ("Makary") was sworn in as the new FDA Commissioner in March, Marks was forced to resign as the head of CBER. On May 6, 2025, Dr. Vinay Prasad ("Prasad"), a vocal critic of Marks' use of accelerated approval for gene therapies like AMT-130, was appointed head of CBER.

17. While Prasad initially paid lip service to Marks' "regulatory flexibility" mantra, he proceeded to take action throughout 2025 that directly undermined it. For example, in June, Prasad placed the head of the Office of Therapeutic Products ("OTP"), Dr. Nicole Verdun ("Verdun"), and her deputy, Rachael Anatol ("Anatol"), who had advocated alongside Marks for increased use of accelerated approvals for cell and gene therapies, on administrative leave. Thereafter, he took several negative actions against other gene therapy programs, some of which directly contradicted agreements previously made by the Marks-led CBER. This included taking adverse steps related to Elevidys, a therapy developed by Sarepta Therapeutics ("Sarepta") for Duchenne muscular dystrophy ("DMD"), and the issuance of three complete response letters ("CRLs")—official notices from the FDA indicating that a product cannot be approved—related to cell and gene therapies. Two of these CRLs stated the FDA's position that it could not approve pending BLAs ***notwithstanding*** prior agreements that data from those trials ***could*** support BLA submissions.

18. After each of these events, Defendants Kapusta and Abi-Saab expressed their confidence in the data from the U.S. and E.U. Phase I/II Trials and in agreements they had purportedly obtained from the FDA in the late November 2024 meeting and, subsequently, the late

April 2025 meeting. When challenged by analysts about the risks posed by turmoil at the FDA, Kapusta and Abi-Saab were sanguine, claiming that AMT-130 was different from these other therapies, and, due to the purported strength of the U.S. and E.U. Phase I/II Trials' data, uniQure's agreements with the FDA and its Breakthrough Therapy Designation ("BTD"), AMT-130 would not suffer the same fate as Sarepta or the companies that had received CRLs. Analysts credited Kapusta's and Abi-Saab's statements and repeated them in pre-Class Period reports. As a result, leading up to the start of the Class Period, investors believed that if the Company's next release of AMT-130 data was consistent with prior updates, uniQure could submit a BLA for accelerated approval in short order.

19. On the first day of the Class Period, September 24, 2025, uniQure disclosed three-year data from its U.S. and E.U. Phase I/II Trials, stating that the Trials "met [a] prespecified primary endpoint, with high-dose AMT-130 demonstrating a statistically significant slowing of disease progression as measured by the [cUHDRS] at 36 months compared to a propensity score-matched external control," "met a key secondary endpoint by achieving statistically significant slowing of disease progression as measured by [TFC] at 36 months compared to a propensity score-matched external control," and showed "[f]avorable trends in other secondary endpoint measures of motor and cognitive function."

20. In addition to reporting the results, Defendants used regulatory terms of art to describe the U.S. and E.U. Phase I/II Trials (i.e., describing them as "***pivotal***"), the cUHDRS endpoint (i.e., describing it as the "***primary endpoint of the stud[ies]***"), and the data (i.e., "***compelling and clinically meaningful evidence***"). Defendants also referenced uniQure's "***planned BLA submission***" and represented that uniQure's purported agreements with the FDA remained intact, stating that the agency had "***agreed that data from . . . the Phase I/II studies . . .***

***may serve as the primary basis for a BLA submission***" and the FDA would not "***require that we start that [confirmatory] trial***" or "***have it 50% recruited***" before accelerated approval. Additionally, when asked about the "considerable changes" at the FDA "in the months since uniQure [purportedly] reached agreement on the terms for AMT-130's submission package," Kapusta stated in a same-day interview with STAT News: "'We're confident in our data. . . . We've had a great relationship with the FDA so far. We've had very constructive interactions with unambiguous feedback.'"

21. Once the market opened on September 24, 2025, investors drove the price for uniQure's common stock to new heights, from $13.66 per share at the close of trading on September 23, 2025, to $47.50 per share at the close of trading on September 24, 2025. uniQure's share price continued to rise over the ensuing days and months, reaching $59.40 at the close of trading on September 29, 2025, and a Class Period high of $70.59 per share at the close of trading on October 29, 2025. Analysts attributed these increases to Defendants' September 24 statements.

22. However, Defendants' September 24, 2025 misstatements and omissions misled investors in several respects. For instance, the U.S. and E.U. Phase I/II Trials were not designed as "***pivotal***" studies and did not list cUHDRS as a "***primary endpoint***" and the purported agreements between the FDA and uniQure—which were limited—could not and did not change the Trials' design. Likewise, Defendants' statements that the U.S. and E.U. Phase I/II Trials' data did not have "***shortcomings***" and was "***compelling and clinically meaningful evidence***" and "***clear evidence of an investigational therapy inducing Huntington's disease modification***," and made it "***clear***" that AMT-130 was "***working***" with "***a huge effect size***" failed to account for the fact that the Trials were exploratory, not confirmatory, and "confirmatory trials are necessary to provide firm evidence of efficacy." These statements also were misleading because they omitted

the risk that a Prasad-led CBER would not view the Trials as "***pivotal***," cUHDRS as a "***primary endpoint***," and the results as "***evidence***" of efficacy.

23. Additionally, Defendants' statements referring to the Company's "planned BLA submission," reaffirming uniQure's purported agreements with the FDA, and stating that the FDA would not require enrollment of a confirmatory trial before approving AMT-130 were false and misleading because the purported agreements were made when CBER was led by Marks or before it was led by Prasad, critical aspects of a BLA submission (including its contents) and a confirmatory trial had not been discussed or agreed-to, and after the end of the Class Period, a senior FDA official believed to be Prasad stated that he had asked CBER staff "to look for any written or verbally transcribed or minutes of a meeting that document such a promise, and there is no such promise made."

24. Moreover, these misstatements and omissions collectively created at least two misleading impressions. *First*, that the U.S. and E.U. Phase I/II Trials were adequate and well-controlled studies, and that the resulting data demonstrated substantial evidence of effectiveness and was sufficient to be the primary support for a BLA seeking accelerated approval. *Second*, that specific leadership changes at the FDA and adverse regulatory decisions for other gene therapies before September 2025 would not impact uniQure's ability and plan to submit a BLA for AMT-130.

25. uniQure and Kapusta wasted no time profiting from their September 24 misstatements. During trading hours on September 24, 2025—the same day uniQure issued its AMT-130 disclosures—Kapusta pocketed nearly $8 million from the sale of uniQure common stock. Later that same day, uniQure announced that it was conducting a follow-on public offering

of common stock and warrants. The Company received more than $280 million in proceeds from that offering, which closed just days later on September 29, 2025.

26. By no later than October 27, 2025, two days before its scheduled Type B pre-BLA meeting with the FDA, uniQure privately received written feedback from the FDA that "focused heavily on methodological and statistical caveats related to open-label designs and post hoc analyses, rather than addressing the extensive propensity-matching and sensitivity analyses uniQure had prespecified and shared with the FDA over the past year." Thereafter, on October 29, 2025, the FDA informed uniQure during the pre-BLA meeting that it "no longer agrees that data from the Phase I/II studies of AMT-130 in comparison to an external control, as per the prespecified protocols and statistical analysis plans shared with the FDA in advance of the analyses, may be adequate to provide the primary evidence in support of a BLA submission."

27. Yet ***the next day***, October 30, 2025, during a webinar presentation regarding AMT-130, Defendants Abi-Saab and Tabrizi acted as if the pre-BLA meeting had not occurred and the FDA's written feedback had not been received. In fact, Abi-Saab made repeated statements that misled investors into believing that the pre-BLA meeting had not yet happened (i.e., "***hav[ing] a meeting with the FDA in the fourth quarter [of 2025]***"), uniQure had yet to discuss results of the Trials with the agency (i.e., we have not "***reviewed***" "***the data themselves***"), the FDA was "***willing to . . . consider [the results of the Trials] for approval***", and the Company did not "***know what the FDA will say in their meeting***" or "***what that outcome will be***." Additionally, Tabrizi described the results presented on September 24, 2025 as "***convincing evidence that the course of Huntington's disease can be modulated***" even though the FDA had communicated that it no longer agreed that the data was sufficient to be the primary support for a BLA.

28. Days later, on November 3, 2025, the relevant truth regarding the material facts and risks concealed by Defendants' false and misleading statements were revealed to the market. On that day, uniQure disclosed that based on an October 2025 pre-BLA meeting with the FDA, the agency "no longer agrees that data from the Phase I/II studies of AMT-130 in comparison to an external control, as per the prespecified protocols and statistical analysis plans shared with the FDA in advance of the analyses, may be adequate to provide the primary evidence in support of a BLA submission." The price of uniQure common stock declined more than 49% in response to this news, from a close of $67.69 per share on October 31, 2025 to close at $34.29 on November 3, 2025.

29. Market participants were shocked by this news and recognized that it revealed significant regulatory risk that called into question uniQure's AMT-130 timeline. Analysts also linked uniQure's November 3, 2025 disclosure back to Defendants' September 24 representations, acknowledging that it raised questions about the veracity of those prior statements. For example, on November 6, 2025, Baptista Research stated that "[w]hile UniQure insists it had 'clear and unambiguous' feedback from the FDA, ***it now faces a credibility gap with investors and analysts***" because its November 3 disclosure "***introduce[s] significant regulatory risk and call[s] into question the company's previous guidance and preparedness for commercialization***."

30. As a result of Defendants' false and misleading statements and other fraudulent conduct, Lead Plaintiff and other Class members suffered significant damages.

## II. <u>JURISDICTION AND VENUE</u>

31. Lead Plaintiff's claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

32. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

33. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because uniQure's ordinary shares are traded on The Nasdaq Stock Market LLC ("Nasdaq"), and many of the acts and conduct that constitute the violations of law complained of herein, occurred in this District.

34. In connection with the acts, conduct, and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

35. Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") is a public pension fund that administers retirement benefits to firefighters in Oklahoma. Oklahoma Firefighters manages over $4 billion in assets. As stated in the certification attached hereto as Exhibit A, Oklahoma Firefighters purchased uniQure ordinary shares at artificially inflated prices during the Class Period and was damaged thereby.

### B. Defendants

#### 1. uniQure

36. Defendant uniQure is incorporated in The Netherlands and maintains its corporate headquarters at Paasheuvelweg 25a, 1105 BP Amsterdam, The Netherlands. The Company's U.S. headquarters and primary clinical manufacturing operations are located at 1 Hartwell Place, Lexington, Massachusetts. During the Class Period, uniQure's common stock traded in an efficient market on the Nasdaq under the ticker symbol, "QURE."

37. Defendant uniQure is liable for the acts of its executives, directors, officers, and agents under the doctrine of respondeat superior and common law because all the wrongful acts complained of herein were carried out within the scope of their employment. The scienter of uniQure's executives, directors, officers, and agents is similarly imputed to uniQure under agency principles.

**2. The Individual Defendants**

38. Defendant Kapusta has served as the Company's Chief Executive Officer ("CEO") since December 2016 and serves on the Board of Directors. Before becoming CEO, he was the Company's Chief Financial Officer from January 2015 through December 2016. Kapusta signed the Company's SEC filings, and during the Class Period, was responsible for day-to-day management, including controlling and directing uniQure's business and activities, and speaking regularly with investors and securities analysts about the Company.

39. Defendant Abi-Saab has served as the Company's Chief Medical Officer since June 2023. In this role, he is responsible for leading clinical research and development, regulatory affairs, and program management at uniQure. During the Class Period, Abi-Saab spoke regularly with investors and securities analysts about the Company.

32. Defendant Tabrizi is a Professor of Clinical Neurology & Neurogenetics at the University College London ("UCL"), Director of the UCL Huntington's Disease Centre, and Joint Head of Department of Neurodegenerative Disease at the UCL Queen Square Institute of Neurology. Tabrizi served as the lead investigator for uniQure's AMT-130 trials, and during the Class Period, spoke regularly with investors and securities analysts about the Company.

33. The Executive Defendants, because of their positions within the Company, possessed the power and authority to control the contents of uniQure's reports to the SEC, press releases, and/or presentations to securities analysts, money and portfolio managers, and

institutional investors, i.e., the market. Each Executive Defendant was provided with copies of the Company's reports alleged herein to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

## IV. SUMMARY OF THE FRAUD

### A. Pre-Class Period Background

#### 1. Huntington's Disease and uniQure's AMT-130

34. uniQure develops, markets, and sells proprietary gene therapies for severe diseases. Human gene therapies seek to modify or manipulate the expression of a gene or to alter the biological properties of living cells for therapeutic use. To date, uniQure has secured regulatory approval for its hemophilia B gene therapy and currently is developing therapies for Huntington's disease, refractory temporal lobe epilepsy, and Fabry disease.

35. Huntington's disease, or HD, is an inherited, progressive neurodegenerative disease caused by a mutation in the huntingtin ("HTT") gene, which provides instructions for making the HTT protein. This mutation leads to the buildup of abnormal proteins, mHTT, resulting in the breakdown of nerve cells or neurons. When the neurons break down, they release neurofilament light chain proteins (NfL) into cerebral spinal fluid (CSF) and the loss of these nerve cells causes severe motor, cognitive, and psychiatric symptoms. These symptoms typically present in individuals carrying the HTT gene mutation between the ages of 30 and 50. Individuals with Huntington's disease usually live 15 to 20 years after symptoms first appear. There is no cure for Huntington's disease.

36. uniQure began developing AMT-130, a gene therapy, to treat Huntington's disease more than 10 years ago. AMT-130 uses a virus, known as AAV5, to deliver new DNA deep into a patient's brain structures via injections completed during a multi-hour brain surgery. Once it has been injected into a patient's brain, the new DNA manufactures artificial microRNA that effectively mutes the production of all HTT proteins, including mHTT. By blocking the creation of or "knocking down" mHTT, AMT-130 aims to prevent the loss of additional neurons and, thus, slow the progression of HD in the treated patient.

**2. Clinical Development Programs for Potential Gene Therapies**

37. Gene therapies are regulated as biologic products by the FDA via the CBER under Section 351 of the Public Health Service Act. From 2016 until April 5, 2025, Marks was the head of CBER. In May 2025, Prasad took over as head of CBER. Excluding a brief period between July 29, 2025 and August 9, 2025 in which he temporarily left the role, Dr. Prasad was the CBER head from May 6, 2025 to May 2026. *See supra* Sections IV.A.10-15 (CBER discussion).

38. Biological product sponsors like uniQure use clinical development programs to determine whether a therapy is safe and effective for treating a specific disease or patient population. These programs typically consist of "an ordered program of clinical trials, each with its own specific objectives."

39. According to the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use ("ICH"), an organization that brings together regulatory authorities, such as the FDA, and the pharmaceutical industry to discuss drug registration processes, clinical trials can be "exploratory" or "confirmatory."

40. Exploratory trials generate hypotheses, estimate effects of the product, and inform the design of later trials. These trials may employ "a more flexible approach to design so that changes can be made in response to accumulating results" and their analyses may entail "data

exploration" in which the choice of hypothesis is data-dependent. Exploratory endpoints also are used to further explain or to support study findings or to explore new hypotheses for later research." As a result, under ICH guidance, exploratory trials "cannot be the basis of the formal proof of efficacy, although they may contribute to the total body of relevant evidence."

41. In contrast, confirmatory trials are adequately controlled studies in which hypotheses are stated in advance and evaluated in a pre-specified manner. Confirmatory trials are expressly designed to confirm efficacy and safety in the target population using randomization and a control arm so that any treatment effect can be distinguished from other influences. "As a [general] rule, confirmatory trials are necessary to provide firm evidence of efficacy or safety."

42. Whether a trial is exploratory or confirmatory impacts the design of the trial "which in turn impact[s] the strength of a study to support regulatory decisions and clinical practice." That is because the trial design (or the trial itself) may create or control for bias.

43. Bias in the context of clinical trials refers to "the systematic tendency of any factors associated with the design, conduct, analysis, and interpretation of the results of clinical trials to make the estimate of a treatment effect . . . deviate from its true value." Per the ICH guidance, "[t]he presence of bias may seriously compromise the ability to draw valid conclusions from clinical trials." As such, "[i]t is important to identify potential sources of bias as completely as possible so that attempts to limit such bias may be made" and ensure that the "study design [] address[es] potential sources of bias that can undermine the reliability of results."

44. There are several ways to mitigate bias in clinical trials, including through the use of controls, randomization, and blinding. How these tools are used within a trial's design indicate whether the trial can provide substantial evidence of efficacy as required by the FDA. *See infra.*

For instance, trials that do not include a control, randomization or blinding have less ability to demonstrate efficacy that include them.

45. To that end, studies with the strongest ability to demonstrate efficacy are randomized, concurrently controlled, and blinded trials. Among these trials, the top-ranked trial is a placebo-controlled, randomized, and double-blind study. That is because trials that include these features can separate the effect (if any) of the biological product from the effects of other factors including the natural course of the disease, other medical care trial participants receive, observer expectations, and patient expectations.

46. One common patient expectation is known as the placebo effect, i.e., where the patient reports improvement in their physical or mental health based on their belief in the effectiveness of the treatment. Use of an internal control—a group of patients within a study that receive a placebo—allows the sponsor of the study to measure and account for this effect. While it is possible to measure and account for the placebo effect with an external control—a group of patients drawn from an external source including past studies, medical records, or patient registries—it is not the most reliable method. Indeed, the use of an external control may be insufficient to measure or account for the placebo effect and it may exacerbate the impact of observers'—i.e., the trial sponsor's or the trial investigators'—expectations.

47. Observer expectations include those held by trial subjects (i.e., if the trial has a self-reporting feature), the treating clinician, the outcome assessor (i.e., if the trial uses subjective clinician-rated scales), or the persons responsible for adjudicating or analyzing the data generated by the trial. Internal controls help address observer expectation bias by "ensur[ing] that the only differences between treatment groups are due to the treatment they receive and not due to

differences in the selection of participants, the timing and measurement of study outcomes, or other differences" that typically occur when using an external control.

48. Observer expectation bias also is mitigated through randomization, which, when deployed as part of the trial design, "ensure[s] comparability of treatment groups, thereby minimizing the possibility of bias in treatment assignment." Randomization further "provides a sound statistical basis for the quantitative evaluation of the evidence relating to treatment effects" when the trial data is analyzed.

49. Moreover, concealing the treatment assignments, or blinding, usually limits the conscious or unconscious bias in conducting and interpreting a clinical trial including with respect to at least the following: (i) assessment of endpoints, particularly when the endpoint is subjective; (ii) the exclusion of data from analysis, particularly when those decisions are not made before the trial; (iii) the recruitment and allocation of subjects; and (iv) subsequent care of patients. According to the ICH guidance, the aim of blinding "is to prevent identification of the treatments until all such opportunities for bias have passed."

50. When blinding is impossible, an open-label study is conducted. In an open-label, or nonblinded, study, both the trial investigator and the patient enrolled in the trial are aware of the administered treatment. Open-label designs are the most vulnerable to the observer and patient expectation biases discussed above and, as such, they are typically employed in early and exploratory trials.

51. Separate from the clinical trial designs discussed above, the lowest level of clinical trials, or studies that have the weakest ability to demonstrate efficacy, typically do not have a concurrent control and do not control for bias. These trials may use an external control, of which there are two types: historical and concurrent. Historical external controls consist of an external

control group that was treated or assessed before the trial, whereas concurrent external controls consist of an external control group that was assessed at the same time as the trial.

52. According to ICH guidelines, "[i]nability to control bias is the major and well-recognized limitation of externally controlled trials" and, as such, use of this trial design is typically restricted to situations in which the treatment effect is dramatic, the disease course is predictable, and the endpoints are objective.

53. Moreover, because bias cannot be controlled within a trial with this design, persuasiveness of the resulting data "depends on obtaining much more extreme levels of statistical significance and much larger estimated differences" than concurrently controlled trials require and trials that use the design "tend to overestimate efficacy of test therapies." There also is a directional bias associated with this trial design—externally controlled trials "tend to overestimate efficacy" and differences "often favor[] treatment" —and this bias usually runs in the sponsor's favor.

54. Broadly speaking, clinical trials subject to FDA regulation are categorized into three phases known as Phase I, Phase II, and Phase III. Phase I trials typically concern the first administration of the biological product in healthy human volunteers and assess safety, tolerability, and, in some cases, identify an appropriate dose for a subsequent clinical trial. Phase II trials typically enroll patients affected by the relevant disease and are designed to further evaluate safety, refine dosing, and obtain preliminary evidence of proof of concept and efficacy. Phase III or "pivotal" trials are typically performed after the sponsor has obtained preliminary evidence suggesting effectiveness, including via a Phase II trial. Taken together, these trial phases often are intended to provide an adequate basis for FDA approval.

55. Phase I, Phase I/II, or Phase II trials typically are considered "exploratory" trials whereas Phase III trials typically are considered "confirmatory" trials. "For early-phase clinical

trials, especially first-in-human trials, the primary objective" is typically "an evaluation of safety," and "exploratory" "[a]ssessments of activity or efficacy" as "secondary objectives." FDA guidance explains that "[s]ponsors should conduct early- and mid-phase (e.g., phase 2 clinical investigations . . .) to guide selection of dose . . . and can rely on . . . intermediate clinical effects, which may be seen earlier than more definitive endpoints." Moreover, "[l]ate-phase clinical investigations are designed to provide clear determinations of efficacy and further evaluation of safety."

56. However, the type of trial turns not on its phase but on its design, including its controls, endpoints, prospective specification, and its use of randomization, among other trial design elements. Accordingly, if a Phase II trial is a placebo controlled, randomized, and double-blind study with prespecified endpoints and analyses, the resulting data may be considered "confirmatory."

57. Critically, under ICH guidance, "[o]nly results from analyses envisaged in the protocol (including amendments) can be regarded as confirmatory" and thus evidence of safety or efficacy. That is because when an analysis approach is chosen or modified or a decision is made about including or excluding data, including with respect to the comparator patients in an external control, after the data are seen (i.e., post hoc), multiple analyses can be run and external controls created such that the analysis that yields the most favorable result can be adopted.

58. Post hoc decisions or analyses, i.e., analyses that are defined by decisions about what to analyze and how to analyze it (including in whom, against what comparator, or at which timepoint or threshold), that were or could have been informed by knowledge of the data, inflate the false-positive rate and effectively make the hypothesis tested data-dependent and exploratory, not confirmatory. For instance, choices that are made while the data can be seen are vulnerable to being shaped toward the desired conclusion.

59. Likewise, analytical choices made with knowledge of the data typically lead to inflation in false positives such that a post hoc p-value—which is the metric used to determine whether a given result is statistically significant—does not carry the meaning that a prespecified p-value does. As a result, ICH guides that such data exploration are a feature of exploratory trials, which "cannot be the basis of the formal proof of efficacy." Prespecification removes any discretion that could be exercised—consciously or unconsciously—based on knowledge of the data and thereby maintains the integrity of the results.

60. Additionally, "[a]n interim analysis is any analysis intended to compare treatment arms with respect to efficacy or safety at any time prior to formal completion of a trial. Because the number, methods, and consequences of these comparisons affect the interpretation of the trial, all interim analyses should be carefully planned in advance and described in the protocol." "Special circumstances may dictate the need for an interim analysis that was not defined at the start of a trial. In these cases, a protocol amendment describing the interim analysis should be completed prior to unblinded access to treatment comparison data."

**3. The FDA Approval Process for Gene Therapies**

61. Licensure of biologic products by the FDA requires the product's sponsor to demonstrate that the product is safe, pure, and sufficiently potent, with potency referring to effectiveness. The FDA requires "substantial evidence of effectiveness." This is "evidence consisting of adequate and well-controlled" clinical trials (as defined in 21 CFR § 314.126(b)) based on which experts can "fairly and responsibly [] conclude[] . . . that the drug will have the effect it purports or is represented to have." To be adequate and well-controlled, a clinical trial typically includes at least the following characteristics: (i) "a clear statement of the objectives of the investigation and a summary of the proposed or actual methods of analysis in the protocol for the study"; (ii) "a design that permits a valid comparison with a control," i.e., a "[p]lacebo

concurrent control" or a "[h]istorical control," "to provide a quantitative assessment of drug effect"; and (iii) use of "[a]dequate measures . . . to minimize bias on the part of the subjects, observers, and analysts of the data" described in study protocol. While "FDA regulations recognize historical controls as a possible control group," the "inability to control for certain biases could limit the ability of externally controlled trials to demonstrate substantial evidence of effectiveness."

62. "The purpose of conducting clinical [trials]" "is to distinguish the effect of a drug" or therapy "from other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation." Historically, the FDA has interpreted the substantial evidence of effectiveness as requiring more than one pivotal trial. "The usual requirement . . . reflects the need for independent substantiation of experimental results." As such, "[a] single clinical experimental finding of efficacy, unsupported by other independent evidence, has not usually been considered adequate scientific support for a conclusion of effectiveness." Indeed, "[a]ny clinical trial may be subject to unanticipated, undetected, systematic biases" which "may operate despite the best intentions of sponsors and investigators, and may lead to flawed conclusions." And while "there are statistical, methodologic, and other safeguards to address" biases "they are often inadequate to address these problems in a single trial."

63. "FDA regulations provide flexibility in applying regulatory standards" and the agency "'exercises its scientific judgment' in determining the kind and quantity of data a sponsor is required to provide" for approval of individual products. "This flexibility extends from the early stages of development to the design of adequate and well-controlled studies required to demonstrate effectiveness to support marketing approval and to establish safety data needed for the intended use." Recently, the FDA has been willing to approve biological products based on one

adequate and well-controlled trial that "has been appropriately designed" and that "the possibility of bias due to baseline imbalance, unblinding, post-hoc changes in analysis, or other factors is judged to be minimal" and "the results reflect a clear prior hypothesis documented in the [trial] protocol."

64. In a February 18, 2026 article in the New England Journal of Medicine titled, "One Pivotal Trial, the New Default Option for FDA Approval – Ending the Two-Trial Dogma," Makary and Prasad explained that this shift did not "relax[]" the FDA's standards but instead reflected the fact that, for instance, "erroneous conclusions may be reached even with two, three, or four studies" "[i]f the control arm is substandard, the end points dubious, the statistical plan generated post hoc, the power inadequate, or all of the above." Accordingly, Makary and Prasad concluded, "[t]he FDA will carefully examine all aspects of study design with particular focus on controls, end points, effect size, and statistical protocols" and "if a trial has some underlying limitation or deficiency, additional adequate and well-controlled studies may be required."

65. Before a sponsor may test its biological product on humans, it must submit an IND application to the FDA. The IND application typically compiles preclinical data (i.e., laboratory or animal studies), manufacturing information, and the proposed clinical study protocol. Once the FDA approves the IND, the sponsor may test the product in humans unless the FDA places the IND on a clinical hold.

66. If the clinical development program generates, among other things, "substantial evidence of effectiveness," the product's sponsor can submit a BLA to the FDA. The BLA includes a complete record of the clinical, non-clinical, and chemistry, manufacturing, and controls ("CMC") data for the product. After the product's sponsor submits a complete BLA, the FDA

reviews it initially to determine whether it can be filed. Once the BLA is filed, the FDA reviews it to determine whether it will approve the product.

67. Since the 1990s, there have been two approval pathways open to product sponsors – full or traditional approval and accelerated approval. With full or traditional approval, the FDA determines that the sponsor has submitted "substantial evidence" of safety and effectiveness from "adequate and well-controlled" trials which typically means that the product to be granted full approval has demonstrated a clinical benefit (i.e., a positive effect on how an individual feels, functions, or survives) on an endpoint that itself measures a clinical benefit.

68. Accelerated approval is a "[r]egulatory mechanism by which new drugs" or therapies "meant to treat serious, life-threatening diseases and that provide meaningful therapeutic benefit to patients over existing treatments can be approved" based on "adequate and well-controlled clinical trials establishing that [(i)] the drug" or therapy "has an effect on a reasonably likely surrogate endpoint" i.e., a biomarker that "is used in clinical trials as a substitute for a direct measure of how a patient feels, functions, or survives"; "or [(ii)] on the basis of an effect on a clinical endpoint other than survival or irreversible morbidity" which is known as an intermediate clinical endpoint, i.e., an endpoint that measures a clinical outcome earlier than "an effect on irreversible morbidity or mortality (IMM)" and "is considered reasonably likely to predict the medical product's effect on IMM or other clinical benefit."

69. If the accelerated approval regulatory pathway is available, a product's sponsor must conduct post-confirmatory trial(s) to verify the clinical benefit predicted by the data supporting accelerated approval and, if the required confirmatory trial fails to demonstrate the clinical benefit, the FDA may withdraw its approval of the product. Since early 2025, the FDA's

default rule has been that confirmatory trials must be underway before granting accelerated approval.

70. Throughout the development process, the product's sponsor engages with the FDA. Various statutes have created designations for certain diseases or potential therapies that allow the product's sponsor to meet more regularly or frequently with the FDA. As discussed herein, uniQure achieved the Fast Track designation in April 2019, the RMAT designation in June 2024, and the Breakthrough Therapy designation in April 2025.

71. Formal meetings with the FDA fall into one of six categories, including Type A, Type B, Type B (end of phase ("EOP")), Type C, Type D, and Initial Targeted Engagement for Regulatory Advice on the Center for Drug Evaluation and Research ("CDER") and CBER ProducTs ("INTERACT"). Type A meetings "are those that are necessary for an otherwise stalled product development program to proceed or to address an important safety issue." Type B meetings include pre-IND meetings, pre-BLA meetings, and "[m]eetings held to discuss the overall development program for products granted breakthrough therapy or regenerative medicine advanced therapy designation status." Type B (EOP) meetings concern certain end-of-Phase I meetings (i.e., for products to be considered for marketing approval) and end-of-Phase II (i.e., pre-Phase III) meetings. Type C meetings are any other meetings that are not Type A, B, or D, and include early consultations on the use of a biomarker as a new surrogate endpoint not previously used as a primary basis for product approval. Type D meetings are "focused on a narrow set of issues that are used to discuss issues at key decision points to provide timely feedback critical to move the program forward." Because Type D meetings are limited to no more than two focused topics, a sponsor like uniQure would request this meeting for specific questions about presenting data to the FDA following a Type B pre-BLA meeting. Distinct from the other meeting types,

INTERACT meetings concern IND submissions, as they are intended for novel products and development programs that present unique challenges in early development (i.e., before filing an IND or before a pre-IND meeting).

72. Following any formal meeting, the FDA issues "the official, finalized minutes . . . within 30 calendar days after the meeting." The minutes are "official records of meetings" and include "the FDA's documentation of meeting outcomes, agreements, disagreements, and action items." Notably, "[t]he minutes are not intended to represent a transcript of the meeting" and "[t]he FDA may communicate additional information in the final minutes that was not explicitly communicated during the meeting . . . or that provides further explanation of discussion topics."

73. Decisions, agreements, or alignments reached during these meetings are non-binding. Responses to questions from the sponsor are typically based on the best judgment of the FDA relative to current industry practices and knowledge at the time of the meeting and any feedback provided by the FDA in a meeting is considered non-binding such that the FDA can change its opinion of what should be done should circumstances change.

74. Defendants understood the non-binding nature of discussions with the FDA at such meetings before the Class Period. For instance, during a December 2021 call, Defendant Kapusta confirmed that while uniQure had "had interactions with the [FDA] periodically with respect to the [AMT-130] IND" and a "number of discussions with respect" to the design of uniQure's clinical development program for AMT-130," there were "no promises" from the agency regarding any approval pathways for AMT-130.

**4. uniQure Submits AMT-130 IND and Begins Exploratory U.S. and E.U. Phase I/II Trials**

75. uniQure submitted an IND application to the FDA for AMT-130 in late 2018. On January 22, 2019, uniQure announced that the FDA had completed its review and the AMT-130

IND was now effective, allowing uniQure to "initiate its planned dose-escalating, randomized and controlled Phase I/II clinical trial to assess the safety, tolerability and efficacy of a one-time treatment of AMT-130 in patients with Huntington's Disease," the U.S. Phase I/II Trial. Following the initiation of the U.S. Phase I/II Trial, uniQure also launched the open-label E.U. Phase I/II Trial.

76. The U.S. Phase I/II Trial was a first-in-human study of AMT-130 at two doses. The initial trial design called for 26 participants, 10 at the low dose and 16 at the high dose. Of the 26 participants, 4 at the low dose and 6 at the high dose underwent an imitation or sham surgical procedure rather than receiving AMT-130. These patients were followed for 12 months after their sham surgical procedure, at which point they were unblinded and given the option to receive AMT-130. uniQure subsequently added cohorts to the U.S. Phase I/II Trial. Like the U.S. study participants, the E.U. Phase I/II Trial enrolled patients with early manifest HD. The E.U. Phase I/II Trial was an open label trial comprised of 13 participants, 6 of whom received the low dose and 7 of whom received the high dose.

77. Consistent with an exploratory trial design, the U.S. Phase I/II Trial included "[k]ey exploratory endpoints" concerning efficacy of AMT-130, including biomarkers (i.e., HTT protein and NfL levels found in CSF and volumetric MRI) and clinical parameters (i.e., assessments of total motor score ("TMS") and total functional capacity ("TFC") and using the cUHDRS. The cUHDRS is a composite clinical measurement that combines the Total Motor Score and the Total Functional Capacity, plus the results of the Stroop Word Test (during which patients are asked to name the color of a word, rather than the word itself) and the Symbol Digit Modalities Test (during which patients are asked to use a key to decode a message composed of symbols).

78. The 12-month data associated with patients receiving AMT-130 was compared against both the internal control cohort—the 10 patients who received the sham surgery—and an external natural history control. Only the data beyond 12 months was compared against the external natural history control.

79. Before the Class Period, Defendants repeatedly confirmed that the Phase I/II Trial was an exploratory study intended to "explore . . . efficacy signals" and AMT-130's "proof-of-concept" and dosage that would then be confirmed via a Phase III trial. In an April 2021 press release announcing that uniQure had successfully enrolled the first cohort of the U.S. Phase I/II Trial, the Company confirmed that "[t]ogether with" the E.U. Phase I/II Trial, the U.S. Phase I/II Trial was "intended to establish safety, proof of concept, and the optimal dose of AMT-130 to take forward into Phase III development or into a confirmatory study should an accelerated registration pathway be feasible."

80. Similarly, during uniQure's June 16, 2021 Annual General Meeting, Defendant Kapusta updated the market on the U.S. Phase I/II Trial stating, "We're in the process right now of conducting a Phase I/II study with a primary objective to assess safety, tolerability and to also assess potential signals of efficacy." He also confirmed that the U.S. Phase I/II Trial's efficacy endpoints were "proof-of-concept" and noted that uniQure had started an "open-label study" in Europe that was "design[ed] to augment [uniQure's] ability to detect a signal in Phase [I/II] and enable us to find a dose to go to Phase [III]." And Defendant Kapusta stated, "we believe overall that the Phase [I/II] studies will demonstrate disease modification to inform us on proceeding with the Phase [III] trial."

81. Moreover, at the outset of a December 2021 call to discuss the initial clinical results of the U.S. Phase I/II Trial, Defendant Kapusta described it as "dose-escalating" to "explore

potential efficacy on two different doses." Defendant Kapusta added that uniQure's "hope" was to "be able to elucidate efficacy signals" and its "expectation" was to "be able to reach a dose decision to []form a registrational strategy." He concluded, "I think ultimately, our expectation would be that in 2023, we'll be able to elucidate and get an understanding about efficacy signals related to both doses. . . . I would expect that if we're confident about efficacy signals that we would select the highest well-tolerated dose to move into a registrational study" like a Phase III confirmatory trial of AMT-130.

82. Defendants and investors considered the U.S. Phase I/II Trial as exploratory because of its design, which included multiple efficacy endpoints, a limited sham-surgery internal control, and the use of a historical external control (which was not prespecified), and minimal, if any, prespecified analysis of trial data, and because of its size.

83. For instance, in response to a question posed by a Jefferies analyst at uniQure's June 2021 R&D Day, uniQure's then-Vice President of Clinical Development, David Cooper, confirmed that the "challenge" of the U.S. Phase I/II Trial is "that we're talking about a very small number of patients." Likewise, during a December 2021 call, uniQure's then-head of research, Dolmetsch stated, "in general, the FDA prefers a placebo cohort. The issue for us is that our trial is comparatively small. And so we don't really know how much our placebo cohort will progress." Moreover, during a February 2024 Guggenheim biotechnology conference, Defendant Kapusta confirmed that the U.S. Phase I/II Trial "was not designed" or "powered" to demonstrate efficacy at a statistically significant level.

84. Additionally, an August 30, 2021 Wells Fargo report reiterated uniQure's assertion that it "expect[ed] the combined results from [the] U.S. and European studies to establish safety,

proof-of-concept, and the optimal dose of AMT-130 to take forward into Phase 3 development, or into a confirmatory study pending the feasibility of an accelerated registration pathway."

85. Defendants also were aware from the outset of the U.S. Phase I/II Trial that the FDA wanted "randomized, blinded, controlled data" and that this data would be important to finding a path towards potential regulatory approval. For example, during a March 2021 CNS Day hosted by Stifel, Defendant Kapusta stated that the U.S. Phase I/II Trial "was done in conjunction with regulatory feedback from the FDA, where they had strongly recommended that we conduct a study in this manner," i.e., as a "randomized, double-blinded, controlled study" with an "imitation surgical procedure," and suggested that this design "could lead to a faster pathway to the market."

86. Additionally, during the Jefferies-hosted Gene Therapy Editing Summit in October 2021, Defendant Kapusta stated that while it was "a little unusual to adopt a blinded and controlled study for a first-in-man [trial]," "it was very clear that the FDA was strongly recommending that we move forward with this and indicated that" having randomized, blinded, and controlled data "actually could expedite drug development."

87. Similarly, at the Stifel Health Conference in November 2021, Defendant Kapusta explained that "a randomized, controlled study" "was strongly recommended by the FDA." He stated that the FDA was "fairly explicit that in their view they felt that based on whatever the data could read, that it actually could expedite the development timeline." As such, "it was very clear from [the FDA's] perspective that randomized controlled data was going to be important" and that is why the U.S. Phase I/II Trial included patients that were "randomized to a sham procedure."

88. Moreover, when uniQure announced the initial results from the U.S. Phase I/II Trial in December 2021, Dolmetsch commented on the Company's decision to hold back "efficacy data including volumetric MRI data" until after "the first half of 2023" because "[t]he disclosure of

such data has the potential to introduce bias in this ongoing blinded, placebo-controlled study, which could impact our ability to interpret the data and use it for regulatory submissions."

89. In response to an analyst question, "why not disclose all the volumetric MRI data right now," Dolmetsch confirmed that "in discussions with our Steering Committee and the DSMB [Data and Safety Monitoring Board], it was felt that volumetric MRI is very closely related to efficacy" and "if we disclosed efficacy now, this would impair our ability to conduct this blinded study and to use it for regulatory purposes." As a result, Dolmetsch stated: "we've made the decision to only reveal that data once the two cohorts have been unblinded. You can imagine that there's this potential for piloting the study if we were to say something about the study that got working or not working."

### 5. uniQure Initially Focused Its Public Statements Regarding the U.S. Phase I/II Trial on Data Related to Surrogate Biomarker Endpoints

90. On June 19, 2020, uniQure announced that the first two patients had been treated in the U.S. Phase I/II Trial, with one patient receiving AMT-130 and the other receiving the imitation surgery. uniQure announced that it had completed enrollment of the first cohort (the low dose patients) on April 5, 2021. On February 7, 2022, uniQure announced the dosing of the first two patients in the E.U. Phase I/II Trial. On March 21, 2022, uniQure announced that it had completed enrollment for the second cohort in the U.S. Phase I/II Trial.

91. uniQure's executives initially focused their public statements on the data from the U.S. Phase I/II Trial related to the pre-specified surrogate biomarker endpoints, including the reduction of mHTT protein and NfL in CSF and the volumetric MRI data, noting that positive data from these biomarkers would be strong indicators for whether AMT-130 was effective in slowing the progression of Huntington's disease.

92. For instance, Dolmetsch stated at a Credit Suisse conference in November 2020 that uniQure "expect[ed] to see" and "measur[e] over the next two years" "some changes in biomarkers" including a "reduction of huntingtin [protein] in the CSF," "a reduction in neurofilament light chain which is, of course, released from dying neurons," and a "reduction in the degeneration of the deep brain structures" via imaging.

93. In response to a question about what uniQure "would consider to be a home run" in the U.S. Phase I/II Trial, Defendant Kapusta confirmed at the March 2021 Global Life Sciences Conference hosted by H.C. Wainwright that uniQure was "focused on biomarkers," including two it was "really keen to see": NfL, which "increases with progression of disease" and "anatomical or volumetric imaging of the brain."

94. Several months later, at the October 2021 Gene Therapy Editing Summit hosted by Jefferies, Defendant Kapusta likewise confirmed that "one of the most relevant biomarkers for us to be exploring is volumetric imaging of the brain." He further explained:

> This is telling you what is going on inside the brain, which is really what is driving the progression of the disease. And we know from the natural history data that the volumetric imaging is highly correlated with progression of disease. . . . I think to the extent that we can preserve brain volume and mitigate a reduced atrophy, I think we'll be a really strong biomarker that should potentially give us signals of efficacy down the road.

95. At a February 2022 conference hosted by Leerink, Defendant Kapusta went further, stating that it is "our view that if there is an accelerated approval pathway, that volumetric MRI [data] would have to play a pretty significant role." Similarly, one month later at a conference by Stifel, Defendant Kapusta stated that volumetric MRI was "one of the most highly correlated biomarkers" and "to the extent we're able to demonstrate an attenuation of progression of atrophy, I think there's potential to be able to have a discussion with the agency about an accelerated approval pathway."

96. As a result, when the market learned in December 2021 that uniQure would not release interim volumetric MRI data until mid-2023, analysts lowered their price targets and/or downgraded uniQure stock.

**6. June 2023 and December 2023 Interim Data Updates from Phase I/II Trials Disappoint uniQure Investors**

97. On June 21, 2023, uniQure provided investors with an update on the U.S. Phase I/II Trial, disclosing what it described as "promising interim data" from all 26 patients enrolled in the trial, including 26 patients treated with AMT-130 at a low dose (6 patients) and a high dose (10 patients) and 10 patients treated with an imitation surgery, after 24 months (low dose) or 12 months (high dose) of follow-up.

98. With respect to efficacy, uniQure reported "[e]xploratory" data comparing biomarker data (e.g., NfL, mHTT, and volumetric MRI) and functional data (e.g., assessments using the cUHDRS) for the 16 treated patients as compared to the 10 control patients (up to 12 months) and "a natural history cohort [] developed by uniQure in collaboration with the Cure Huntington's Disease Initiative (CHDI) using the TRACK-HD natural history study of patients with early Huntington's disease."

99. The natural history cohort included 31 patients who "met the uniQure clinical trial inclusion criteria." According to uniQure, "[c]ompared to baseline measurements, clinical function was generally preserved at 24 months for patients in the low-dose cohort and at 12 months for patients in the high-dose cohort." Likewise, "[c]ompared to natural history, patients in both dose cohorts demonstrated benefits in each of Total Motor Score, Total Functional Capacity and the composite Unified Huntington's Disease Rating Scale."

100. During a related conference call, uniQure's then-head of research, Dolmetsch, confirmed that "[t]he control patients changed very little over the course of 12 months, except for

the Total Motor Score in which they declined in line with the natural history." In other words, while the comparison of the patients receiving AMT-130 and the natural history control at 12 months showed some benefit, those benefits did not emerge when comparing the patients receiving AMT-130 to the control group receiving the sham surgery.

101. uniQure also reported on three biomarkers, NfL, mHTT, and total brain volume using MRI imaging data. With respect to volumetric MRI data, uniQure reported during the related conference call that "mean total brain volume for the control, low-dose and high-dose cohorts" "were not significantly different from each other or from the natural history" cohort.

102. Commenting on the results, Dolmetsch asserted that both doses showed preliminary evidence of clinical and functional benefits, including favorable trends in cUHDRS. Defendant Tabrizi described the results announced in June 2023 as "encouraging," asserting that they "show[ed] early signs of a potential clinical benefit of AMT-130."

103. Despite Defendants' attempts to spin these results as positive, uniQure's common stock price plummeted by $7.82 per share, or 40%, following these disclosures, falling from a closing price of $19.44 on June 20, 2023, to close at $11.62 on June 21, 2023.

104. A June 21, 2023 report from Chardan explained why: "In the data update, we had been looking for promising early clinical biomarker data reported last year to translate into real-world efficacy, but instead found the data to lack conviction. As such, we have adjusted our model to account for a longer development path forward for AMT-130 where longer, larger studies are likely required to verify clinical benefit."

105. A June 22, 2023 Guggenheim report similarly explained:

> Heading into the AMT-130 update, we were conditioned to think in terms of mHTT reduction (complemented by NfL) validation of which would confirm the underlying MOA [mechanism of action] and pave a path towards accelerated approval. Post-data, we are having to recalibrate our expectations away from

> mHTT, for which there was no dose response, to NfL and disease stabilization, both of which appear to modestly deviate from natural history. While these data are potentially suggestive of a clinical signal—the negative surprise on mHTT, and the variability between NfL and functional outcomes—drove the stock lower by 40%. With AMT-130 now a show-me story, positive evolution on the clinical signal from the follow-up data in 4Q23 could be the redemption.

106. Goldman Sachs added that "the inconsistent mHTT data raises questions, including on the effectiveness of the assay (given the high interpatient variability and AMT-130's targeting to the striatum vs. total mHTT), and the regulatory path forward (discussions by 1Q24), notably regarding the potential for accelerated approval and the powering/endpoints of a pivotal study."

107. Wells Fargo also reported that "CSF mHTT lowering, previously used as a biomarker for target engagement, did not show the expected changes. This surprising finding may or may not be addressable, depending on the cause . . . ." Wells Fargo explained that "the lack of guidance from a target engagement biomarker going forward would increase the risk of conducting a large, prolonged pivotal HD study and the significant investment associated with it." Wells Fargo had additional concerns as to whether the NfL data at "15 mo+ in the low dose group provides evidence for treatment benefit, given how the control arm behaved up to 12 mo and the lack of control beyond 12 mo." As a result, Wells Fargo lowered its price target to $14.

108. Nearly three months later, Defendant Kapusta conceded at a September 2023 Cantor global healthcare conference that the U.S. Phase I/II Trial "data was mixed," noting that "we have a full appreciation for that." Yet Defendant Kapusta was hopeful: "I think if the data continues to support the potential for efficacy, and we get positive feedback from the regulatory authorities, we expect to potentially be in a position to meet with the FDA in the first quarter of next year to talk about possible design of a registrational study and the potential registrational path forward."

109. Following the release of the 12- and 24-month follow-up results for the U.S. Phase I/II Trial, uniQure hired Defendant Abi-Saab as its Chief Medical Officer, with Dolmetsch

transitioning to the role of President and Chief Science Officer. Later, on October 5, 2023, uniQure announced a strategic reorganization, reducing its workforce by 28%. This reduction included the departure of Dolmetsch.

110. On December 19, 2023, uniQure announced interim data for both the U.S. and E.U. Phase I/II Trials that reflected updated "[e]xploratory" efficacy data regarding functional measurements and biomarkers. According to the press release, the 30-month data for the low dose patients and the 18-month data for the high-dose patients "show[ed] evidence of potential dose-dependent clinical benefit relative to the non-concurrent criteria-matched natural history" control. Additionally, for high dose patients, "neurological function as measured by cUHDRS and each of its individual components was preserved or improved at 18 months compared to pre-treatment baseline measurements" for those patients. Moreover, according to uniQure when the 30-month low dose data and the 18-month high dose data were "compared to the expected rate of decline from the natural history cohort, AMT-130 showed favorable trends in cUHDRS, TFC and TMS."

111. With respect to biomarkers, uniQure stated that the NfL protein data "suggest[ed] a reduction in neurodegeneration when compared to an expected increase from baseline in CSF NfL based on natural history data," "[m]ean changes in mHTT [protein] levels measured in CSF samples compared to baseline continue to be variable and impacted by baseline levels near or below the lower limit of quantification," and "[t]he volumetric changes do not appear to be clinically meaningful or associated with protracted increases in neurodegeneration as measured by NfL." As Defendant Kapusta explained during a related conference call, while "treated patients continue to show favorable trends in [NfL] across both dose cohorts," "changes in volumetric imaging and [mHTT] protein were inconclusive and appeared not to be clinically meaningful."

112. Commenting on the results, Defendant Abi-Saab stated: "Overall, we believe that these data are very encouraging as they appear to indicate a stabilization of symptoms after treatments, which is our therapeutic objective with AMT-130. I'm further encouraged as we are starting to see early evidence of a potential dose dependence, suggesting biological activity of AMT-130."

113. Yet uniQure's common stock price again declined, this time by $1.39 per share, or 17%, following these disclosures, falling from an opening price of $8.03 on December 19, 2023, to close at $6.64.

114. On December 19, 2023, Mizuho published an analyst report acknowledging that "based on the stock's reaction (-16.8% vs +2.2% XBI), it doesn't look like investors were persuaded by management's explanations" regarding the disappointing biomarker data. Mizuho continued: "While we are encouraged by some functional data (particularly TMS), we remain cautious about the program. We remain Neutral, as we do not see meaningful near-term catalysts to drive the stock price significantly higher next year, but it is also hard to see QURE trading much lower from current level."

115. Wells Fargo also stated on December 19, 2023:

> We are maintaining our EW rating on QURE following HD update. We note functional data are still difficult to interpret due to small N; more importantly, NfL data with longer follow-up did not show further improvement compared with prior time points. With QURE down 15% today and trading at 35% below its net cash position, we think the key concern is uncertainty in AMT-130 regulatory path, ph3 expense, & outcome. We continue to think it is difficult to contemplate NfL as a surrogate endpoint due to lack of evidence supporting correlation with clinical benefit in HD specifically. We await clarity at regulatory update in 2024 (on endpoint, size/duration, NH as control), but would note discontinuation may lead to modest upside tethered to cash.

116. Raymond James also acknowledged that "most of the improvements observed [in functional endpoints] were derived from natural history comparisons" and added that "when

comparing to the trial's own control cohort (only available out to 12-mos), an efficacy advantage of AMT-130 is no longer evident, which inhibits our ability to definitively assess AMT-130's benefit."

117. A January 3, 2024 Wells Fargo report explained that "recently reported data from the Ph1/2 U.S. and EU studies remained highly variable" explaining that "the changes in CSF NfL, CSF mHTT, and total brain volume continue to be mixed." A January 9, 2024 Mizuho report concluded that "the December 2023 clinical update . . . was not well received by investors." A February 23, 2024 TD Cowen report stated that "there have been difficulties in assaying for HTT protein in the CSF which has caused investor questions around the clinical impact and durability of the therapy." Likewise, an April 2, 2024 UBS report stated, "QURE shares are down over 70% in the last 12 months, we think largely due to biomarker data from its Huntington's Disease (HD) program (AMT-130) that investors viewed as difficult to interpret (our take)."

118. Coming out of the Company's December 19, 2023 update, analysts understood the importance of uniQure's ongoing discussions with the FDA to AMT-130's success. For instance, a Guggenheim report from February 28, 2024 stated, "the bar for an accelerated approval without clear target engagement" as shown via mHTT protein levels in CSF was "very high, which is unlikely to be met within the scope of the current study." While Guggenheim maintained its "BUY" rating for uniQure's common stock, it lowered its price target from $32 per share to $28 per share "to reflect the uncertainty in the AMT-130 development path."

119. Likewise, a same day William Blair report stated that FDA interactions would clarify AMT-130's future. One month later, in a March 27, 2024 report, William Blair added that while the upcoming three-year follow up data scheduled for release in mid-2025 "could be a catalyst for the stock if greater separation from the natural history or sham controls is observed, we believe investor focus is shifting to uniQure's ongoing discussions with regulators, which will provide clarity on

whether there is a viable path to accelerated approval using a retrospective and/or prospective, external, comparator arm."

120. A December 19, 2023 Goldman Sachs report stated, "QURE plans to hold a Type C meeting with FDA in 1Q24 to discuss data from the US and EU studies and the pathway for further advancing the clinical development of AMT-130. Management noted that they see the potential for an accelerated approval pathway given the totality of data and unmet need in Huntington's disease." However, in subsequent reports in May and June 2024, Goldman Sachs reminded investors that the December 2023 interim data "was difficult to interpret" and "the AMT-130 study [wa]s not powered to show a statistically significant separation in cUHDRS."

121. Meanwhile, however, uniQure was reeling from the market's response to the June 2023 and December 2023 data releases. At a February 2024 Guggenheim biotechnology conference, in response to an analyst inquiry which referenced the fact that uniQure's "stock has underperformed miserably over the last couple of years" and asked, "what can you do or what are you doing to turn this around," Defendant Kapusta stated:

> I can't tell you how pissed off I am and we all are extremely disappointed with the stock price performance. Obviously, a lot of the underperformance has happened in the last six months post the latest HD data update, and we can talk more about that. But I think the – that really gets to really what our focus is for 2024, which is really three things that I had kind of alluded to in my opening remarks.
>
> One is really getting regulatory clarity in terms of our HD program so we can understand our path forward. Number two is clinical and operational execution excellence, so really working hard on site activation and trying to expedite patient enrollment because in the end that's what enables us to generate data. And then the third is really making sure we prioritize our spending, focus our investments on things that can drive value, and make sure that we preserve as much cash runway as possible. That's what we're focused on to try to turn things around.

**7. Shift Towards Regulatory Flexibility and Accelerated Approval for Gene Therapy Begins in Earnest in 2023 with Marks as Champion**

122. During his tenure as Director, Marks "played a pivotal role in ushering in the modern era of cell and gene therapies," including the approval of the first gene therapy in the U.S.

With Marks at the helm of CBER, the FDA "recognize[d] that for many rare diseases, there is [] a sense of urgency to find effective treatment" with "gene therapy [being] the most promising path to effective therapies" for these diseases. To that end, the FDA implemented several strategies, including the use of accelerated approval based on surrogate biomarkers or intermediate clinical endpoints and accepting reduced or less traditionally derived data from smaller, single-arm trials using external or natural history controls. According to a summary of a speech Marks gave at an industry conference appearing in BioSpace, "[r]are diseases, by their nature, don't fit the mold—so neither should the trials for therapies designed to treat them nor the regulatory process to approve them."

123. In March 2023, Marks gave the keynote address at the annual muscular dystrophy conference during which he discussed the use of the FDA's accelerated approval pathway for cell and gene therapies for rare diseases. In the months that followed, he attended multiple events at which he "spoke out about the promise of the Accelerated Approval pathway for gene therapy products."

124. According to a February 2024 TD Cowen analyst report, "[c]onsistent messaging by Dr. Marks in 2023 at different forums suggested to us that new leadership at the OTP (Office of Therapeutics) may be far more amenable to accelerated approvals . . . ." The report also stated, "[d]uring his keynote address at the March 2023 annual medical meeting of the MDA (Dallas), Dr. Marks underscored the significant unmet medical need in rare diseases, small and undefined patient populations, long disease progression, to the lack of appropriate animal models." The report also noted: "In its commitment to advance the timely development and availability of novel gene therapies for such indications, Dr. Marks noted the FDA was working on defining the development and approval pathways (such as the accelerated approval pathway) . . . ."

125. A December 28, 2023 H.C. Wainwright report quoted Marks as saying, "'We'll use our accelerated approval provisions to lean in and try to get things across the finish line.'" The same report also stated, "He also noted the use of single-arm trials for potential accelerated approval and pointed out that randomized controlled trials, which are typically considered the gold standard in clinical development may simply not be feasible for rare diseases."

126. According to a February 16, 2024 RBC Capital Markets report, a fireside chat with Dr. Peter Stein ("Stein"), Director of the Office of New Drugs at CDER, and Marks, "offered interesting insights into the different ways [] two primary FDA divisions interpret clinical outcomes, surrogate endpoints, and natural history comparisons in assessing drugs for rare diseases in general." For example, while RBC Capital Markets reported that Marks "continue[d] to view gene therapies as well aligned with the accelerated approval process," Stein urged caution. And while RBC Capital Markets asserted that Marks advocated for "much more flexibility around efficacy" "once [safety] is well established," CDER still "require[d] a drug to show what they view as substantial evidence of effectiveness, which they define as two adequate, well-controlled studies, or one adequate well-controlled study plus confirmatory evidence."

127. With respect to natural history controls (similar to the one used in the U.S. Phase I/II Trial), the RBC Capital Markets report noted that "Drs. Marks and Stein both agreed natural history studies . . . can be useful, at least if there is reasonable consistency." However, while "Dr. Marks believes natural history studies can help discern whether the drug is stabilizing a degenerative disease even if a population is heterogenous," "Dr. Stein views natural history studies as additive to evidence but only to help corroborate observations from adequate, well-controlled studies." According to RBC Capital Markets, Stein also "cautioned that imperfect data collection

often makes matching natural history to clinical study participants less useful, especially when the drug's effect is subtle and the external control may be noisy."

128. CBER's shift towards flexibility in approving gene therapies to treat rare diseases was uniquely tied to Marks while he was at the FDA. For instance, when Marks learned that the FDA review teams were leaning toward rejecting Elevidys outright—likely in part based on the FDA statisticians contending that Elevidys' sponsor, Sarepta, had not provided the FDA with "unambiguous evidence" that Elevidys helps patients—he intervened and sought an advisory-committee meeting. In fact, while Marks agreed with the review team assigned to Elevidys on the issues of product quality and safety, Marks wrote in a June 2023 Center Director Decisional Memo that he "disagree[d] with certain interpretations of the efficacy data" and came "to a different conclusion" regarding children aged 4 to 5, which led him to conclude that the data provided "substantial evidence of effectiveness of ELEVIDYS by demonstrating an effect on the surrogate endpoint." According to the memo, Marks' reasoning was based, in considerable part, on "unmet medical need" and "the serious nature of the underlying disease," which, in his view, made it "reasonable to accept less certainty about effectiveness than in other circumstances."

129. uniQure executives were aware of Marks' regulatory flexibility mantra and use of accelerated approval to push gene therapies for rare diseases over the goal line. For instance, during a September 2023 Wells Fargo healthcare conference, Kapusta stated: "I think that for those that have been following the gene and cell therapy space, it's very clear that leadership at the FDA is really trying to find a way to get potentially transformative therapies, onetime administered therapies to patients more rapidly for indications that are very high unmet needs," including through "accelerated approvals in indications like Alzheimer's and . . . recently in ALS."

130. Additionally, during a February 2024 Guggenheim conference, in response to an analyst asserting that "CBER has been very flexible with neuromuscular disease but we haven't seen that translate into neurodegenerative disease. What gives there? Is it that natural history that the FDA is not buying into?" Kapusta remarked that he thought "the FDA is probably more focused on . . . severe unmet needs, areas that are rare in nature where there's no disease-modifying treatments that are available" but that there was "not one factor" that suggests that the FDA will be more or less flexible. He added that the FDA "look[s] at a number of things, including the clinical data itself."

131. During a March 2024 Leerink conference, Kapusta stated:

> I do think that Peter and the FDA understand this uniqueness of gene therapy, the rarity of these diseases, the fact that they're monogenic in nature and the likelihood that they can work. And so this potential for us to generate long-term follow-up data from our Phase 1/2 study that is not necessarily based on biomarkers but based on actual clinical outcomes is, I think, a unique one. And I do think – my hope is that that will resonate with the FDA. But, of course, we'll see.

132. At the same conference, in response to a query about Kapusta's "view of regulatory clarity with a clear and timely approval pathway" for AMT-130, Kapusta stated, in relevant part:

> [W]e want to know how the FDA is thinking about registration. Is the FDA going to require a placebo control? Are they going to require a Phase 3? Did they look with interest on long-term clinical outcomes of the Phase 1/2? So I think all those questions are going to be really important. I mean, if the FDA basically says, look, we can't make heads or tails of your data because we don't look at natural history comparators, that will mean one thing, right? And it will be one thing not only for UniQure, but really for the entire therapeutic field in Huntington's disease.

**8. uniQure Reports Positive July 2024 Interim Results Focused on Intermediate Clinical Endpoints for the Phase I/II Trials**

133. By 1Q24, uniQure had yet to share any data with the FDA. Accordingly, as Kapusta noted during a February 2024 analyst conference, "our first order of business" with respect to engaging with the FDA in FY2024 was "to share the data [collected to date] with the FDA," including "our interpretation of the data, particularly as it relates to . . . [AMT-130's] efficacy

profile, and understand how the FDA views the data and [whether] they [are] aligned in their interpretation of the data."

134. Defendant Kapusta also explained that uniQure wanted to "have an understanding of [the FDA's] views on natural history, both in terms of how to utilize natural history to interpret the data" from the AMT-130 clinical trials "but also how [uniQure] might be able to utilize natural history in terms of late-stage development and possibly registration." Defendant Kapusta further identified as an "area that we're going to want to be focused on is how the FDA is thinking about our Phase 1/2 data and the ability to leverage the long-term follow-up from the Phase 1/2 data as part of a registration package."

135. On June 3, 2024, uniQure announced that it had received the FDA's RMAT designation for AMT-130 "based on [its] potential . . .to address the major unmet medical need among patients with Huntington's disease." Notably, the RMAT designation "follow[ed] the FDA's review of" the December 2023 U.S. Phase I/II Trial data "and [wa]s based on an analysis comparing these 24-month clinical data to a non-concurrent criteria-matched natural history cohort." In response, uniQure's stock price increased nearly 8%.

136. On July 9, 2024, uniQure issued a press release announcing up to 24 months of follow-up data for 29 treated patients across the U.S. and E.U. Phase I/II Trials. Under a header titled "Exploratory Efficacy and Safety Data," uniQure reported that it had conducted for the first time "a statistical analysis of clinical outcomes for the 21 treated patients at 24 months compared to an expanded, propensity-weighted external control (n=154) . . . using data from TRACK-HD, TRACK-ON, and PREDICT-HD natural history studies." The external control group included "patients that met the Phase I/II clinical trial eligibility criteria, and whose data contributions were

statistically weighted using propensity scoring to closely match the baseline characteristics of patients treated with AMT-130."

137. According to the press release, "[a] statistically significant, dose-dependent, slowing in disease progression measured by cUHDRS was observed through 24 months in patients receiving the high dose of AMT-130" and "[a] statistically significant reduction of NfL in cerebrospinal fluid (CSF) . . . in patients treated with AMT-130."

138. uniQure did not affirmatively provide an interim update on data concerning mHTT proteins or total brain volume (via volumetric MRI). When asked on the related conference call about this data, Defendant Abi-Saab stated that because they were batching results to limit variability in the assay used to assess mHTT protein in CSF, uniQure did "not have enough data at two years to warrant showing the data." With respect to total brain volume, Defendant Abi-Saab confirmed that like the 2023 data updates, this volumetric MRI data "were not clinically meaningful."

139. In the slides presented during a related conference call to discuss the interim results disclosed on July 9, 2024, uniQure noted that the natural history control was "[n]ew" and "expanded" from the control used to evaluate the data released in June and December 2023. According to the slide, uniQure "expanded" the natural history control "to better evaluate efficacy."

140. During the call, Defendant Abi-Saab stated, "We have made significant progress since our last update. . . . [W]e now have patients followed up to three years, the longest interventional study in Huntington's disease to date. More importantly perhaps, now that the majority of our patients have reached the two-year mark, we were able to conduct post-hoc analysis demonstrating a statistically significant dose-dependent slowing of disease progression in patients

treated with AMT-130, as well as exploratory biomarker evidence demonstrating a reduction in neurodegeneration."

141. Defendant Abi-Saab stated, "Since our update in December 2023, we have expanded our natural history cohort beyond the initial TRACK-HD, TRACK-HD/ON study to include the PREDICT-HD study as well." Abi-Saab continued, "We have selected these studies because, first, they prospectively collect data longitudinally, they employ consistent and regular rater training similar to clinical trial settings, and both include clinical as well as imaging endpoints, which are key inclusion criteria in our studies." Defendant Abi-Saab also stated in response to an analyst query regarding the difference in the number of patients compared, i.e., 154 in the natural history cohort and 21 patients receiving AMT-130: "the best way to describe it, is synthetic group of 21 patients made to contribute from these 154 with these people contributing differently to how close they match our subjects."

142. Defendant Abi-Saab stated:

> I think it's clearly now the case that we're going to be relying more and more . . . on [] comparing to an external natural history cohort. So, our objective is to build this natural history to make it more robust by including additional databases that we could have access to by working collaboratively with CHDI, among others. But more importantly, when we meet with the FDA, we want to incorporate also their input on how to best construct these external natural history cohorts to be able to robustly compare to our therapy.

143. Defendant Abi-Saab stated:

> So, in terms of a priori choosing this at the beginning, look, this was a Phase I trial at the beginning when we started the primary endpoint. And I think I mentioned this in my presentation, it's always going to be safety and tolerability. That's the first thing we think about. But of course, this is a gene therapy, one-and-done therapy where we continue to follow patients for years after therapy. We measure important endpoints, clinical endpoints, which these components are key. cUHDRS is the main one with its subcomponents as well as the biomarker data, NfL and others. And those were the decisions that we made at the beginning.

144. In response to the press release and related conference call, TD Cowen issued a same day report stating, "[w]e expect the future of the program (and the associated stock reaction) will depend largely on the outcome of upcoming regulatory interactions and the ability to use the matched NH [natural history] dataset for approval." Wells Fargo also issued a report on July 9 stating, "[w]e think the incremental update is encouraging . . . though not fundamentally different from prior updates. Key focus now is whether FDA allows expedited path based on Ph1/2 data, which we think is uncertain."

145. Additionally, Mizuho issued a report stating, "Overall, we are encouraged by the CSF NfL and cUHDRS clinical data, but we would like to see these results replicated in a larger trial and would like better clarity on the regulatory path forward for AMT-130, which the company hopes to gain in 2H24 through FDA interactions under RMAT designation. Maintain Neutral." A July 11, 2024 UBS report confirmed, "Regulatory path forward a key investor focus."

146. Other analysts expressed concern about the data. For example, while an August 1, 2024 Mizuho report noted that some key opinion leaders ("KOLs") the publication had spoken to were "encouraged by the small baseline change in cUHDRS for the AMT-130 treated patients and the CSF NfL percentage change from baseline," the KOLs "were lukewarm about the Phase 1/2b 2 year follow-up data for AMT-130, citing the small sample size, external control (vs placebo) and the absence of mHTT biomarker data." A subsequent November 5, 2024 RBC Capital Markets report noted that while it "like[d]" the 24 month results announced in July 2024, "[o]verall, the data [from the Phase I/II trial] has multiple limitations including single-arm (benefit is compared to propensity score-weighted external controls), the analysis is post-hoc (all p-values are nominal) and n is small (n=29)."

147. After that, Guggenheim described its conversation with Defendant Tabrizi about "the recent AMT-130 Month 24 data" in an August 2024 report. According to Guggenheim's report, Defendant Tabrizi cited the following in support of her assertion that "the current data [w]as clinically meaningful": (i) "TFC and cUHDRS are the endpoints the FDA and EMA [European Medicines Agency] are focused on for HD, respectively"; (ii) "deeper reduction relative to baseline" in NfL data "at Month 36 would help solidify the case for efficacy"; and (iii) "an inflection in brain volume decrease may not be needed." The Guggenheim report also stated, "Tabrizi sees the FDA as amenable to an accelerated approval pathway using propensity matching and holds that the FDA's RMAT designation for AMT-130 was, in part, facilitated by the matched data include brain volume metrics." The Guggenheim report added that "[i]nteractions with the FDA broadly on HD suggest the agency is sympathetic to the HD population . . . and are open to potential pathways for accelerated approval."

148. On August 1, 2024, uniQure announced restructuring plans, which included a 65% reduction in its workforce. The news came around the time uniQure shuttered a large manufacturing site in Lexington, Massachusetts. The staff cuts were designed to help uniQure devote resources to HD gene therapies. uniQure projected the layoffs to reduce cash burn by 40%, or $75 million, per year.

### 9. uniQure's Late November 2024 Type B Meeting Leads to Purported Agreements with the FDA on a Regulatory Pathway for AMT-130

149. Following its receipt of the RMAT designation for AMT-130, uniQure scheduled a Type B "multidisciplinary" meeting with the FDA in late November 2024 at which the Company planned to present the Phase I/II trial data and "initiate discussions regarding the potential for an expedited development pathway for AMT-130" and "a future communication plan that is expected to include additional sub-disciplinary meetings to take place in the first half of 2025." During a

November 12, 2024 Guggenheim healthcare conference, Defendant Kapusta explained that the Type B meeting was "meant to kick off the set of interactions" with the FDA, with "representatives from all the different sub-disciplines." He added that "there's going to need to be a foundational education about the [AMT-130] program" at the Type B meeting, explaining that "one of the things that we want to lay out for them is our thoughts around clinical development" and "how we feel we can demonstrate therapeutic benefit for the purposes of submitting a BLA."

150. Kapusta added that "we want to gather from this meeting [] an understanding of the feedback from the FDA," like "Do they have any sensitivities? Do they have any concerns?" As part of that effort, uniQure submitted "a very extensive briefing book . . . that include[d] substantial clinical data and preclinical data as well as a series of questions" for the FDA, along with uniQure's "position statements" in response to those questions. Defendant Abi-Saab later confirmed that "the uniQure team prepared a comprehensive briefing book with both substantial non-clinical, CMC, and clinical data, as well as specific questions for an initial multidisciplinary Type B meeting with the FDA." The clinical data included in the briefing book was the July 2024 data plus "[a]dditional data from three high-dose patients having crossed the 24 months duration. So, in total, 24 subjects with two-year data, 12 on the high dose and 12 on the low dose, were submitted in the briefing book."

151. Defendant Kapusta provided a hypothetical example of one of the questions uniQure posed to the FDA in the briefing book at the November 19, 2024 Stifel Healthcare Conference: "we want to know, we want to pose a question to the FDA, do you believe that a propensity-weighted external comparator could be acceptable and being able to demonstrate a therapeutic benefit." He also stated, "I want to be able to leverage long-term outcomes from" the trials "looking at potentially functional-oriented endpoints and compare that to a robust natural

history comparator . . . to demonstrate therapeutic benefit. . . . [M]y questions are going to be oriented around those topics." He also identified additional questions in response to an analyst query: "Specifically, what is the endpoint? Specifically, what's the follow-up period . . . . The ability to pool data, things like that."

152. A November 5, 2024 Mizuho report explained that this was uniQure's "first formal meeting with the FDA since the IND filing for AMT-130" and, as such, "uniQure doesn't expect to have clarity on the path forward from the first meeting and expects to have additional sub-disciplinary meetings (i.e., CMC, statistical analysis plan ('SAP'), etc.) in 1H25 where the company looks to gain meaningful FDA alignments to define the registrational pathway for AMT-130." The Mizuho report further explained that, with respect to the planned 2025 meetings, "the most important alignment to reach is likely the SAP, as uniQure wishes to use a propensity-score weighted natural history comparator." In a same-day report, Goldman Sachs expressed similar sentiments, stating that uniQure "does not expect to have clarity on the path forward from this first meeting. Instead, we expect an announcement from QURE after meaningful FDA alignment is reached" following "additional meetings in 1H25."

153. William Blair also issued a report on November 5, 2024 noting that it "continue[d] to believe that feedback from regulators on a potential regulatory path for AMT-130 will be a meaningful catalyst for uniQure." William Blair further explained, "Despite the regulatory uncertainty, we remain cautiously optimistic given the commentary from Peter Marks . . . the director of CBER" who "ha[d] indicated that the division will look to increasingly use accelerated approval pathways and more flexible pivotal trial designs for gene therapies."

154. TD Cowen similarly reported that "FDA leadership has continued to signal increased use of [accelerated approval] for [gene therapies] in diseases with high unmet need, and

the AMT-130 program would appear to [] fit the bill." TD Cowen also reported that it "expect[ed] that the majority of focus will continue to be on whether AMT-130 has a path to expedited approval" with "regulatory flexibility on allowing a propensity-weighted external control" as "key to an accelerated pathway." Raymond James likewise stated in a November 7, 2024 report that "[t]he next key catalyst for QURE will be an update on next steps and regulatory requirements for [] AMT-130" and "we remain optimistic that QURE also stands to benefit from the FDA's recent flexible stance regarding the regulatory requirements for emerging therapies that address orphan diseases with a high unmet need."

155. Then, on December 10, 2024, uniQure issued a press release and held a conference call to announce that it had "reached agreement with the U.S. Food and Drug Administration (FDA) on key elements of an Accelerated Approval pathway for AMT-130" at a late November 2024 Type B meeting. The hybrid multi-disciplinary meeting with over thirty people attending in person and remotely, including "senior CBER officials," lasted approximately one hour and "was based on a mid-2024 data cut."

156. The December 10 press release confirmed that, according to uniQure, the FDA had "agreed that data from the ongoing Phase I/II studies, compared to a natural history external control, may serve as the primary basis for a BLA submission under the Accelerated Approval pathway, avoiding the need for an additional pre-submission study." According to Defendant Abi-Saab, this agreement "mean[t] that an additional registrational trial for accelerated approval will not be required." Defendant Kapusta added that the agreed-to "accelerated approval pathway avoids the need for an additional, lengthy, and costly pre-submission study, thereby reducing our time to potential licensure by approximately five years."

157. Moreover, with respect to the use of a natural history control, Defendant Kapusta stated:

> I think the most important point is that the FDA understands the difficulty in administering a properly, internally controlled, blinded study and has accepted that the natural history, given how much is available in Huntington's disease, can potentially provide accelerated approval or support of an accelerated approval.

158. Additionally, the December 10 press release stated that, according to uniQure, the FDA had "agreed that cUHDRS may be used as an intermediate clinical endpoint." As explained in a subsequent January 6, 2025 Wells Fargo report, "[a]ccelerated approval supported by an intermediate clinical endpoint is a lesser-known path compared with accelerated approval supported by a surrogate biomarker endpoint." Moreover, as Defendant Abi-Saab confirmed, uniQure had to "ma[k]e a case" to the FDA "that cUHDRS [wa]s a likely endpoint to be able to predict potential for benefit and as such could serve as an intermediate clinical endpoint." In light of the FDA's purported agreement on the use of cUHDRS, Defendant Abi-Saab stated, "I think the agency is feeling comfortable with it to serve as an intermediate clinical endpoint, which is reasonably likely to predict the future potential benefit."

159. For his part, Defendant Kapusta explained that the FDA "has recognized cUHDRS as an intermediate clinical endpoint," even though it was a composite of several clinical assessments. Defendant Kapusta further stated:

> This is not just in Huntington's disease, but I think the agency often takes a skeptical approach of composites because composites are a mixture of different variables. But there's been a tremendous amount of independent data that has shown that the composite UHDRS is actually highly correlated with progression of disease and if anything, more sensitive than some of its individual components.

160. Defendant Kapusta added that "[t]he FDA does seem to be focused on total functional capacity," a singular clinical assessment that is included in cUHDRS "which is a strong measure of the quality of life and the impact of the disease on patients," before speculating, "[s]o,

that's something that the agency perhaps may be looking at and thinking about full approval. But it's not clear." In other words, the Marks-led CBER had purportedly agreed to the use of a composite clinical measure, cUHDRS, but might be more willing to consider full approval based on a singular clinical measure, total functional capacity.

161. According to uniQure's December 10 press release, the FDA also purportedly agreed "that reductions in neurofilament light chain (NfL) measured in cerebrospinal fluid (CSF) may serve as supportive evidence of therapeutic benefit in the application for accelerated approval." As explained in a subsequent Wells Fargo report, "[o]n the question of whether the FDA required NfL [biomarker] as supportive evidence, QURE noted that it was the company that asked whether NfL can be used as such and [the] FDA was not against it."

162. Finally, as Defendant Abi-Saab explained in a subsequent earnings conference call, at the late November 2024 meeting, "we [] discussed . . . with the FDA and agreed that the data cutoff of end of June . . . 2025" and that "we will use the totality of the data to support a BLA submission." Defendant Abi-Saab explained, as of June 2025, "we will have . . . 27 patients with two years of follow-up, 24 patients with three-years of follow up, eight patients with four years and actually one patient with five years." Further, while "[t]he primary analysis will be done on the three-year data because that's where the majority of the patients," Defendant Abi-Saab told investors that "the totality of the data will be received" by the FDA.

163. Commenting on the agreements purportedly reached with the FDA at the late November 2024 meeting, Defendant Kapusta stated:

> We're really pleasantly surprised by our ability to align in the initial RMAT meeting. But honestly, we think this is a testament to the strength of our data and the long-term outcomes that we have and the FDA, in my mind, leaning in to really try to work with sponsors to find expedited pathways of bringing these transformational therapies to patients.

164. The Company's executives also touted uniQure's next steps which included "engag[ing] with the FDA in the first half of 2025 on the statistical analysis plan" and "aggressively moving forward" with "BLA readiness activities," to, as Defendant Kapusta explained, "put us in a position to submit a BLA as quickly as possible."

165. During the December 10 conference call and subsequent discussions with analysts, Defendants Kapusta and Abi-Saab also clarified what they did not discuss with the FDA as part of the late November 2024 meeting. These topics included: (i) the content of a BLA submission or package; (ii) the timing, design, and scope of any confirmatory trial; (iii) whether there was a path to full approval based on the data from the U.S. and E.U. Phase I/II Trials; (iv) the number of patients and length of follow-up for the submitted data; (v) the power, p-value, effect size, or what would be considered "clinically meaningful" by the FDA; and (vi) biases in the U.S. and E.U. Phase I/II Trials data.

166. While uniQure believed that the content of a BLA package would be discussed at a pre-BLA meeting prior to its submission, the topics typically discussed at this meeting underscore the limited nature of the purported agreements reached with the FDA at the late November 2024 meeting. For instance, the "primary purpose" of a pre-BLA meeting "is to uncover any major unresolved problems; identify those studies that the sponsor is relying on as adequate and well-controlled to establish the product's effectiveness;" and "acquaint FDA reviewers with the general information to be submitted in the marketing application" including "topline study results."

167. With respect to the timing, design, and scope of a confirmatory trial, a February 21, 2025 TD Cowen report stated:

> In recent years, the FDA has been more unwilling to grant accelerated approval if a confirmatory study is not enrolling or the sponsor has not given clear commitment. This was a major concern for uniQure going into the November RMAT meeting, since the assumption would be that a confirmatory trial would

> have to be underway or at least agreed on [before a decision on accelerated approval].

168. As a result, Defendant Kapusta explained at a March 3, 2025 analyst-hosted conference that while “[w]e raised” the issue “in our November meeting” and, as part of the briefing book “proposed an outline for a confirmatory study” “the FDA was not at that moment ready to talk about it.” Defendant Abi-Saab similarly stated that “we actually . . . had a proposal in place” for a confirmatory study but “[t]he FDA said we’re not prepared to discuss what would the confirmatory study [] look like until we have a chance to review the data that you submit to us as part of the BLA submission. So, at this point, the agency is not ready to discuss this.” Analyst reports issued after the November 2024 meeting confirmed as much, with Raymond James stating in a December 10, 2024 report that “uniQure still needs to obtain alignment on [the confirmatory trial requirements] with the agency.”

169. Despite the FDA’s unwillingness to discuss the confirmatory study until after it received the next dataset from the U.S. and E.U. Phase I/II Trials, uniQure’s executives speculated as to that future confirmatory study. For example, Defendant Kapusta explained that “we interpreted” the FDA’s request to discuss the confirmatory study “later” to mean “all options are on the table,” including “a new study” that Defendant Kapusta believed would be “open label,” not “blinded or internally controlled.” To that end, Defendant Kapusta stated:

> So, our view is based on the conversation and the written feedback that we think all options are on the table. And that could be it could require a new study. We think it would be very high likelihood to be an open label study that would be conducted post-approval to look at maybe a primary endpoint like total functional capacity or it could be the existing patients in the Phase I/II trial could suffice to produce confirmatory evidence, but looking at longer term follow-up, so we can run the gamut of those alternatives.

170. Defendant Abi-Saab had a similar interpretation of the FDA’s refusal to discuss the confirmatory study at the late November 2024 meeting, stating:

> Our interpretation is that it can be as optimistic as maybe more longer-term data from this study, maybe looking at total functional capacity data from our study at a longer time point, maybe adding another cohort to our study, or a completely new independent study. But it would not be placebo controlled in our opinion. But again, to some degree, this is speculation on our part because the agency did not want to discuss that.

171. Defendant Abi-Saab explained that "it's not expected based on what the agency have told us so far to have" the confirmatory study "completed and done and about to start or halfway conducted before we can file for BLA for accelerated approval." As a result, and even though the FDA did not want to discuss the confirmatory trial until after it received the next dataset from the U.S. and E.U. Phase I/II Trials, Defendant Abi-Saab stated, "we don't think [the confirmatory trial] is going to slow us down at all."

172. With respect to the availability of the full approval pathway for AMT-130, Defendant Kapusta stated that the "options" coming out of the late November 2024 meeting included "a scenario where long-term outcomes from the existing study may be adequate to support full approval." As he explained during the December 10 conference call, "the requirements for a full approval are still on the table and even for what would constitute confirmatory evidence are still on the table and whether or not the study would even be required."

173. With respect to the number of patients and length of follow-up for the submitted data and the power, p-value, effect size, or what would be considered "clinically meaningful" by the FDA, Defendant Kapusta explained during the December 10 conference call that "there is no specific guidance that we've received in terms of a particular number of patients that have to reach a specific amount of follow-up." With respect to the NfL biomarker, Defendant Kapusta confirmed that "there was no conversation about specific requirements of what number it had to be at or what the flexibility was."

174. Defendant Abi-Saab similarly confirmed that "[t]he question of clinically meaningful difference" in cUHDRS "did not come up at all in our discussions" at the late November 2024 meeting. However, Defendant Abi-Saab claimed not to be concerned about this omission:

> And to me, I'm not necessarily worried about it. I think the agency has seen the initial data as supportive for a potential accelerated approval and engaged with us in a very constructive discussion to help us achieve their goal, which is also their goal . . . to bring medicines to patients as quickly as possible in a safe way.

175. Defendant Kapusta likewise was unfazed, stating at a February 2025 analyst conference that:

> [T]he key thing that we reviewed with the FDA is, here's what data we expect to have in the second half of the year. We expect to have 45 patients treated with AMT-130. We expect to have 33 patients with two years of follow-up, 24 patients with three years of follow-up, and the longest follow-up being five years. And we had asked the FDA, do you think this is adequate to demonstrate therapeutic benefit if we see something consistent with what we're seeing in the data we submitted to you? And their answer was yes.

176. With respect to biases in the data from the U.S. and E.U. Phase I/II Trials, Defendant Kapusta explained at a March 2025 analyst healthcare conference that "a specific list of potential biases and how we're mitigating those risks of biases," as well as "our rationale" regarding the issue of bias, was not discussed "in our November meeting." He further explained:

> Keep in mind that . . . when you are thinking about accelerated approval, the biggest thing here is that you're utilizing an open label study and in an external control. So, the key things that the FDA wants to understand is how do you control for biases, right? And those are things that we've thought through. We did not go through our rationale and go through a specific list of potential biases and how we're mitigating those risks of biases. We didn't go through that in our November meeting, but that's precisely what we want to go through with the FDA, make sure that they're comfortable with it, make sure they understand our hierarchy of endpoints, how alpha is going to be spent over those endpoints. So those are things that we want to go through in detail with them, and we expect to do that in the second quarter [as it relates to the statistical analysis plan].

177. However, FDA guidelines explain that "[r]educing the potential for bias in externally controlled trials is best addressed in the design phase," and, as such, "[s]ponsors should finalize a study protocol before initiating the externally controlled trial." This includes "selection of the external control arm and analytic approach" in the design phase as opposed to "after the completion of a single-arm trial" and "prespecify[ing] in the protocol [] before conducting" the trial "well-defined and clinically meaningful endpoints, cogent analytic plans, and approaches to minimize missing data and sources of bias." Moreover, because "lack of blinding, and other sources of bias cannot be eliminated in externally controlled trials," like the U.S. and E.U. Phase I/II Trials, "an assessment of the extent of . . . bias, along with analytic methods to reduce the impact of such bias, are critically important in the conduct of such trials." Accordingly, it was significant that several years into the trial, uniQure had yet to discuss the potential biases or mitigations with the FDA.

178. Defendant Kapusta added that "the FDA understands that this is an open label study, but they do want the statistical analysis to be prospectively defined. And so . . . we should not be, continually doing comparisons against our proposed natural history to the actual data."

179. During the Q&A with analysts following Defendants' prepared remarks on the December 10 conference call, Defendant Kapusta and Cantor Fitzgerald analyst, Kristen Kluska, engaged in the following colloquy:

> KRISTEN KLUSKA: So, originally you had guided to the Street that it may take a few discussions to get some concrete feedback on the path forward, but it appears with today's update that one meeting alone gave you a really good sense. I was hoping you can maybe speak on anything from a macro perspective that may have changed this. I know the FDA has been heavily involved in this. I recently attended an event hosted by HDSA. So, curious it's that or just anything from a macro perspective gave them the ability to give you more concrete feedback on this first meeting versus a series of them?
>
> DEFENDANT KAPUSTA: No, I mean, I think I know what you mean when you talk about macro and did that create some kind of urgency, the political

> landscape. Honestly, we just don't buy that. We don't see that. We think that this is not – the FDA is not acting as a political animal. The FDA is focused on data and focused on executing their mission. And if anything, our view is that the speed of which that we've been able to align with them is really more of a testament to the substantial amount of data and follow-up, including clinical outcomes that we've been able to demonstrate and not something unrelated, macro or political in nature.

180. Following the December 10 press release and conference call, analysts issued reports reiterating and amplifying uniQure executives' statements.

181. Raymond James issued a December 10, 2024 report confirming its "expectation" based on uniQure's executives' statements that "no additional patient follow-up/data is needed to pursue the BLA submission." Raymond James further concluded that "[b]ased on today's update, we expect a BLA filing of AMT-130 in 2025, and are confident that the existing cUHDRS data (along with CSF NfL reductions) will support accelerated approval," upgrading uniQure's common stock to a "Strong Buy" and "increasing [its] PT [price target] to $52."

182. In a December 10, 2024 report, William Blair confirmed its understanding that uniQure's purported agreement with the FDA "circumvents the need to conduct an additional clinical trial, specifically a placebo-controlled trial, and will significantly speed up the time to BLA submission." William Blair added that "the alignment demonstrates the FDA's increased flexibility, particularly for gene therapies being developed for diseases with no available therapeutic options."

183. In a same-day report, TD Cowen similarly noted that before the agreements announced by uniQure, "it wasn't clear on how flexible the FDA would be on the requirement for an extensive Ph[ase] III program for registration, or if an external control would be sufficient as a comparator arm to evaluate efficacy." TD Cowen also stated, "Our regulatory consultants have indicated that the AMT-130 program would be the type of program CBER would be looking for as an accelerated approval given the unmet need, and the early efficacy seen." And with respect to

uniQure executives' statements "in [its] catch up with mgmt.," TD Cowen stated, "they appeared confident that they can assemble an approvable [BLA] package."

184. In a December 10, 2024 report titled, "FDA Leniency Material De-risks HD, Shortens Timelines And Likely Facilities BD Discussion," RBC Capital Markets confirmed its understanding that "data from the ongoing Phase I/II (compared to natural history) may be sufficient for accelerated approval without the need for additional studies" and increased its price target to $20/share.

185. Likewise, UBS Research stated in its December 10, 2024 report its understanding that uniQure "would not need to run additional studies pre-BLA," explaining that "[p]rior to this update, investor questions had been whether a full Ph[ase] 3 looking at clinical endpoints such as cUHDRS would have been required for approval & what the appropriate potential surrogates could be in particularly for QURE." UBS Research also stated, "We think the FDA feedback that QURE may file for AA [accelerated approval] using cUHDRS as an intermediate clinical endpoint based on the Ph[ase] 1/2 is an important derisking & validation for the program" that "suggests potential flexibility from the FDA around filing strategies in HD broadly." UBS Research further stated, "we think that after reviewing QURE's data that the FDA views this data as supportive of a filing and potential approval."

186. Goldman Sachs' December 11, 2024 report also touted the purported FDA agreements announced on December 10 by uniQure as "increas[ing] the probability of success . . . given it provides clarity on the regulatory path, without the requirement for an additional trial."

187. Following uniQure's late November 2024 Type B meeting with the Marks-led CBER, significant questions about the regulatory pathway for AMT-130 remained top of mind for the Company and for investors. Some of these questions and potential areas of dispute would be

addressed in a Type B meeting focused on the SAP, set for the first half of 2025. However, other questions, including alignment on a BLA package, would not be addressed until after uniQure released the next dataset from the U.S. and E.U. Phase I/II Trials and the Company participated in a pre-BLA meeting with the FDA.

188. As explained in a January 4, 2025 William Blair report, "While the [upcoming 3Q25 data release] could be a catalyst for the stock if greater separation from the natural history or sham controls is observed, we believe investor focus has shifted to uniQure's ongoing discussions with regulators." Similarly, Leerink Partners stated in a February 27, 2025 report that "We expect investors to continue to be laser-focused on QURE's interactions with the FDA for AMT-130 in Huntington's disease (HD)."

189. On January 14-15, 2025, uniQure's management, including Defendants Kapusta and Abi-Saab, met with analysts to discuss the Company's interactions with the FDA, the level of confidence uniQure had in these interactions, and the upcoming catalysts for the AMT-130 clinical development program and regulatory pathway. Reporting on their meeting with uniQure's management, Wells Fargo stated in a January 15, 2025 report "that positive takeaways from the discussion further increase[d] our confidence in a successful regulatory outcome for the program."

190. H.C. Wainwright similarly stated in a January 27, 2025 report that they "came away from the[ir] meeting bullish on AMT-130," leading H.C. Wainwright to increase its price target by $50, from $25 per share to $75 per share, and name uniQure a "top pick" for 2025. In that report, H.C. Wainwright analysts also provided "[s]elected [q]uestions for [m]anagement," "recommend[ing]" investors conduct "diligence starting with the[se] questions" as they "evaluate the next steps for AMT-130." These questions included: (i) "[w]ill any additional data . . . be required before [BLA] submission?"; (ii) "[w]hat will the FDA require for confirmatory trials post-

accelerated approval"; (iii) "is there a possibility the FDA may request additional follow-up or a new study for full approval"; (iv) "[w]hat effect size and statistical thresholds will the FDA consider sufficient to demonstrate meaningful benefit?"; and (v) "[w]hat does the FDA consider a clinically meaningful difference on cUHDRS for Huntington's patients?" Critically, these questions remained unresolved before the first day of the Class Period.

### 10. Changes at FDA and CBER Lead to Concern for Gene Therapies Like AMT-130

191. On November 5, 2024, Donald J. Trump was elected for a second term as U.S. president. Shortly after he was elected, President Trump nominated Robert F. Kennedy, Jr. to lead the HHS, which includes under its umbrella the FDA, and Dr. Marty Makary as FDA Commissioner. Kennedy was subsequently sworn in as the head of HHS in February 2025.

192. Beginning in mid-February 2025, the Trump administration began terminating employees at the FDA, subsequently rescinding some but not all of these terminations, leading to chaos within the FDA, which was then still without a confirmed Commissioner.

193. But following "an investor breakfast and fireside" with uniQure at a conference, a March 6, 2025 TD Cowen report stated that "[m]anagement appeared very confident that an approvable BLA plan will materialize following meetings w/FDA in H1." TD Cowen also wrote that, "[r]egardless, on the specifics, the company remains confident given what has been seen in the literature and the AMT-130 efficacy signal." TD Cowen further relayed that "[m]anagement appeared optimistic that the 3yr data will continue to show benefit . . . . QURE expects that patients will continue to be stable on clinical measures, while the propensity weighted external natural history control will continue to decline."

194. Likewise, during a March 10, 2025 conference, in response to a question from Leerink Partners analyst, Joseph Patrick Schwartz, as to how he felt "about the FDA nowadays in the grand scheme of things," Kapusta responded:

> Obviously, you can't go a day without reading in the press about what's going on in Washington, DC. I think that in any organization and for those even in biotechnology, where you have tumult, there's going to be a different frame of mind. What I can tell you is that there's no doubt that, that staff at the FDA . . . [are] going through a lot, there's a lot of uncertainty. ***But as I think about specifically related to our programs, I really don't see any fundamental risk associated with our programs in that regard.***
>
> The interactions that we've had have not been delayed. Again, we are under RMAT designation, which I think, the expectation is that we would go to the top of people's inboxes. But the meeting requests that we've put in have been responded to. The senior officials that we've been dealing with at the FDA, continue to be at the FDA, and, we believe that our accelerated approval path forward, particularly given that we proposed a clinical measure as a primary endpoint, we don't really view that as being terribly controversial. So, I think we're excited to continue to engage with the FDA. And ***we don't really view the circus that's going around in the background as being something that's going to particularly impact our discussions going forward.***

195. In a report that same day, Leerink Partners wrote, "Top of mind for some investors is the environment at the FDA. It is no surprise that many investors are wondering about how the uncertainty and tumult at the FDA and within the government in general may affect companies like QURE." The Leerink Partners report also highlighted Kapusta's reassuring statements at the conference.

196. Makary was confirmed as FDA Commissioner on March 25, 2025. Two days later, HHS announced a restructuring that would cost 20,000 of the 82,000-strong workforce their jobs, including 3,500 FDA employees. The next day, Makary was sworn in as the new FDA Commissioner and was briefed on a plan to push out Marks as head of CBER. Marks was then given the option to resign or be fired; he chose resignation. Marks' forced removal, which

happened that same day, was Makary's first major act at the FDA. Marks was replaced by Scott Steele, who served as interim CBER director beginning on April 2, 2025.

197. After his resignation, analysts issued reports reflecting on the impact of Marks' impeding departure on uniQure's AMT-130 clinical development program. For instance, Chardan issued an April 1, 2025 report stating that "uniQure is cognizant of the potential [e]ffects on regulatory pathways for gene therapies that may come from the recent resignation of Dr. Peter Marks at [CBER] but the company's management has emphasized that it does not expect AMT-130's regulatory pathway to be adversely affected." As a result, Chardan concluded, "[w]hile we acknowledge that these developments at CBER create some uncertainty in the space, we . . . do not expect major regulatory changes in development of gene therapies for life-threatening conditions with high unmet medical need."

198. Wells Fargo also saw only "limited impact from recent personnel change at FDA on the regulatory front on gene therapy programs, including . . . QURE Huntington's program." In its April 3 report, Wells Fargo cited comments that Makary made at a hearing to discuss his nomination to FDA Commissioner about the accelerated approval pathway for rare disease and a speech that Makary gave to FDA staff, and concluded that "we think FDA has a positive view on GT [gene therapies] and could also continue to support AA [accelerated approval] path for applicable diseases." Wells Fargo's report also cited uniQure's assertions "that, to the best of the company's knowledge, its review team at FDA remains intact."

199. For its part, Mizuho stated in an April 1 report that it was "on the sidelines" because of "questions about the potential AMT-130 uptake given the complex and invasive administration, challenging gene therapy reimbursement landscape, and competitive HD development landscape." And in an April 21, 2025 report, H.C. Wainwright stated, in relevant part, "we do not expect Dr.

Marks' exit to translate into meaningful delays or changes to the clinical development of AMT-130" and "we do not believe the current FDA administration, led by Dr. Martin Makary, is looking to slow down or negatively scrutinize gene therapies for rare, fatal diseases with critical unmet needs."

### 11. uniQure Receives Breakthrough Therapy Designation for AMT-130, Soothing Investor Concerns about the Impact of CBER Turmoil

200. On April 17, 2025, uniQure issued a press release announcing that it had received from the FDA the BTD for AMT-130. uniQure sought the designation following the late November 2024 Type B meeting using the U.S. and E.U. Phase I/II Trials data announced in July 2024. To receive the BTD, "the preliminary clinical evidence should show a clear advantage over available therapy."

201. The April 17 press release quoted Abi-Saab as stating that the receipt of the BTD "underscores both the urgent need for effective treatment for Huntington's disease and the encouraging interim data demonstrating that AMT-130 has the potential to slow disease progression." For his part, Kapusta described uniQure's receipt of the BTD as "a significant milestone" that "underscores the FDA's continued engagement with AMT-130" and "the strength of our clinical data." In a subsequent earnings conference call, Abi-Saab added that the BTD "underscore[d] the potential promise of [the AMT-130] program."

202. Analysts touted this development as a net positive for uniQure, especially given that the higher bar for achieving BTD and the tumultuous environment at the FDA. For instance, in an April 17, 2025 report, Leerink Partners stated, "This Breakthrough designation is particularly positive in this environment, when the FDA is in turmoil post-departure of Peter Marks and amid cuts to staff, demonstrating the agency's continued support for advancing therapies for rare diseases with significant unmet needs." Guggenheim also issued an April 17 report, stating therein

that uniQure's receipt of the designation "could be a good harbinger for the already calendared meeting on SAP during 2Q25."

203. Wells Fargo stated in an April 17 report that "BTD for AMT-130 by post-Peter Marks FDA strengthens our belief that the favorable AA [accelerated approval] path granted to QURE was the initiative of front-line reviewers, and thus we continue to expect future positive regulatory actions despite leadership changes at FDA." Wells Fargo also reported that uniQure had "noted their FDA counterparts have not been significantly affected by recent personal changes" at the FDA. For its part, UBS called "BTD a key positive" for uniQure "esp amidst FDA departures" in its April 17 report, noting that it saw "the potential for meaningful upside for shares from here . . . if QURE is able to submit a BLA for AA [accelerated approval] in the near term on the basis of available data." UBS continued, "We think despite uncertainty at the FDA mgmt continues to sound confident and signs so far, including BTD, are encouraging."

204. TD Cowen likewise confirmed in an April 17 report that receipt of the BTD "in our view underscores the FDA's commitment to therapy and that the Agency believes that the data generated thus far are meaningful" although "some FDA uncertainty likely remains until approval is in hand" "given the unprecedented changes at the Agency over recent months." Yet TD Cowen stated that uniQure's receipt of the designation "should be viewed favorably given this helps alleviate a major risk regarding uncertainty around post the departure of Peter Marks, a major champion for accelerated approval and gene therapy."

205. Similarly, in a section of an April 21, 2025 report titled, "Increased confidence in upcoming regulatory interactions support accelerated pathway to potential approval in our view," H.C. Wainwright wrote: "The Breakthrough Therapy designation supports our high level of confidence in a positive outcome from the regulatory interactions expected in 2Q25, and the

upcoming data readouts from the AMT-130 Phase 1/2 trials in 3Q25." H.C. Wainwright continued, "The announcement is particularly relevant ahead of a potential" BLA submission "and supports an accelerated pathway to approval, implying a potential commercial launch in 2026E" in part because it "was granted in a post-Peter Marks FDA."

#### 12. Prasad's Appointment as CBER Director Creates Additional Uncertainty for AMT-130 Given His Views on RCTs and Use of Accelerated Approval

206. On May 6, 2025, the FDA named Dr. Vinay Prasad, a hematologist oncologist, to lead CBER. Prasad, a Professor at the University of California San Francisco, was a known outspoken critic of the FDA's use of accelerated approval pathways, and his appointment prompted immediate concern in the biotechnology sphere. The day his appointment was announced, STAT News reported that Prasad had been a critic of the FDA's decisions on "oncology drugs, gene therapies, and other medications using novel mechanisms," and stated that Prasad was "skeptical of the use of surrogate endpoints and accelerated approvals." In Prasad's own words, "the FDA for a long time has been lowering the bar that leaves more toxic costly products on the U.S. market. We don't know if patients live longer or live better."

207. It was widely predicted that Prasad's appointment would lead to tougher standards for companies seeking approval of their products, especially those seeking accelerated approval. Pink Sheet wrote on May 7, 2025 that Prasad was a supporter of "randomized controlled studies with hard clinical outcomes," and drew an explicit comparison to Marks, who "embraced more flexible approaches, particularly for rare diseases." In a comment to Pink Sheet, the CEO of a biotechnology company described Prasad as "anti-FDA, anti-innovation, fairly anti-accelerated anything."

208. According to BiopharmaDive, the appointment of Prasad "upended" expectations that Marks' successor would continue to endorse accelerated approval pathways for gene therapies

for rare diseases. Prasad's own writings before his appointment gave significant support to this prediction. Prasad had previously described the FDA as a "failure" because it "rubber stamps too many useless products," and called for the firing of Marks due to his "reckless attitude to drug regulation" and accused Marks of "trying to lower the bar for gene therapy." Following Marks' resignation, Prasad posted on X that Marks had been a "bobblehead doll that just stamps approval."

209. Prasad's reaction to Marks' intervention in the accelerated approval of Sarepta's Elevidys was instructive to market commentators on what to expect from Prasad's CBER. In June 2024, when Marks overruled FDA staff to grant Elevidys full approval for all DMD patients, despite three review teams being against the broadened approval, Prasad railed against the decision and questioned whether the drug was "clinically beneficial." When Marks again overruled FDA staff's concerns with Elevidys in the spring of 2025, even though staff believed the drug did not meet the requirements for accelerated approval, Prasad wrote that Marks was "actively trying to lower the bar for gene therapy." He continued to criticize Marks throughout March 2025, including by accusing Marks of intervening to directly benefit the pharmaceutical industry and specifically Sarepta.

210. Prasad's stance towards accelerated approval pathways, specifically for gene therapies without solid clinical data, was so well known that analysts had an immediate negative reaction to the news of his appointment. A William Blair analyst described the announcement as a "surprise," considering Prasad seemed to be in "stark contrast to the themes and initiatives laid out" in Makary's early tenure, including support of flexible approval pathways for rare disease therapies. A Jefferies analyst wrote that it was not necessarily antithetical to have Prasad run CBER, but companies would need to "produce more supporting clinical evidence," and take "less 'shortcuts.'" Similarly, a Baird analyst commented that it would be more difficult for companies

to "avoid accountability," and that "[c]ell and gene therapies now face a new challenge regarding the bar for full approval and the use of bioplausibility in granting accelerated approval." The prediction that companies would need to provide more solid evidence for approval was supported by what a McGill University article described as Prasad's "ruthless insistence on randomized controlled trials." On the day of Prasad's appointment, Sarepta's stock dropped by 26%.

211. The news had a similar impact on uniQure's stock price, as analysts connected Prasad's strident views to uniQure's plans for AMT-130. As noted in a May 8, 2025 H.C. Wainwright report, "[i]nvestors' reaction to Dr. Prasad's appointment was negative with . . . QURE shares down 25% since the announcement of the appointment" as well as mixed results from another Phase II trial for a Huntington's disease treatment. H.C. Wainwright explained: "We believe investors are concerning that both announcements will weigh on the FDA's decision to grant accelerated pathway to approval for AMT-130."

212. Yet H.C. Wainwright was optimistic, calling "the selloff [] overdone" and noting that "we continue to expect a positive outcome from regulatory interactions with the FDA in 2Q25" and "we do not believe the current FDA administration, led by Dr. Martin Makary, with Dr. Vinay Prasad as head of CBER . . . is looking to slow down or negatively scrutinize gene therapies for rare, fatal diseases." H.C. Wainwright also stated, "We do not anticipate Dr. Prasad's appointment to translate into meaningful delays to the clinical development of AMT-130," explaining that "given AMT-130's strong data reported to-date, the nothing-but-positive feedback from [KOLs] on uniQure's program, combined with the positive regulatory momentum on AMT-130, we continue to expect a positive outcome from the regulatory interactions with the FDA in 2Q25, and the upcoming data readouts from the AMT-130 Phase 1/2 trials in 3Q25."

213. On May 9, 2025, uniQure issued a press release announcing its 1Q25 financial results and held its first ever earnings conference call with analysts. The May 9 press release quoted Kapusta as saying that "We continued to have constructive interactions with the [FDA] . . . enabling us to further advance AMT-130 towards a planned [BLA] submission." Kapusta added that receiving the BTD "underscores the FDA's continued engagement with AMT-130."

214. During the related conference call, Kapusta stated, "In recent weeks, we've had multiple productive interactions with the FDA focused on preparing for our planned BLA submission" and "we've had very constructive interactions with the FDA. We've previously gotten very clear feedback" before concluding: "We look forward to continue productive engagement with the FDA on AMT-130" and "providing the regulatory update," and "we feel very encouraged about our path forward."

215. However, during the May 9 call, analysts queried uniQure executives regarding the appointment of Prasad as CBER head. Luca Issi, an analyst from RBC Capital Markets, remarked that "Ultragenyx, which is a company with a long history in rare disease, is on record saying that Dr. Prasad may not be the right guy for the job" and asked "would you agree with Ultragenyx" and "how confident are you that all the productive conversations that you have had so far with CBER on Huntington's will not be flipped upside down by the new leadership?" Kapusta responded, "The reality is that no matter who is the director of CBER, we believe strongly in our data, and we believe in the end that this is going to carry the day." Kapusta also tried to differentiate AMT-130's clinical development program from other programs that relied on surrogate biomarkers, stating, "We're going to be seeking accelerated approval based on three-plus years of clinical outcomes [] utilizing a clinical measure as a primary endpoint. . . . I believe that this is a key differentiator for AMT-130 and I remain really encouraged about our path forward."

216. Similarly, Uy Ear, an analyst with Mizuho, asked if "[b]etween the CMC meeting [in March 2025] and your recent meeting with the FDA [in late April 2025], were there any changes to key personnel?" In response, Kapusta stated, "We've had no material impact on anybody that is part of the review team that we've obviously conceived. There's some public record of people that have resigned. There's been at least 30 people that have been involved in our various interactions and there's been no material changes that we're aware of."

217. Following uniQure's first earnings conference call, analysts issued reports reiterating and amplifying Kapusta's and Abi-Saab's statements. Leerink Partners reported that uniQure "continues to reiterate that they have an established accelerated approval pathway" for AMT-130 and explained, "We have seen some volatility for QURE shares over the past few months on regulatory developments (including a negative move on the appointment of Dr. Vinay Prasad as CBER Director) . . . so we expect the stock could continue to be volatile in this environment."

218. Leerink Partners stated:

> On the call, QURE said they are very much looking forward to working with Dr. Prasad and are thankful for his public service. No matter who the director is, QURE believes strongly in their data and will ultimately matter most. AMT-130 is not reliant on a surrogate biomarker as QURE will be seeking accelerated approval for AMT-130 based on 3+ years of clinical outcomes and using the composite Unified Huntington's Disease Rating Scale (cUHDRS) as an intermediate clinical endpoint. QURE sees this as a key differentiator, and they remain encouraged about their path forward. We do note that Dr. Prasad has been lauded for his statistical analyses in oncology and acknowledge there is some uncertainty about whether he might get involved in the review of AMT-130, especially since QURE's Type B meeting on stats likely occurred prior to his appointment. On the other hand, we do note that the propensity-matched analyses are the gold standard and FDA statisticians advocate for their use.

219. William Blair also flagged as a positive that "recent commentary from Dr. Prasad and Marty Makary, M.D., the new FDA Commissioner, indicated that the FDA will engage in flexible approval pathways for rare-disease therapeutics."

220. Similarly, in a May 9, 2025 report, TD Cowen stated, "The announcement of Dr. Prasad as the head of CBER put pressure on the stock due to his outspoken views on AA [accelerated approval] and gene therapy, which then was alleviated slightly when his address to FDA staff took a more measured tone." TD Cowen continued, "While not without risk, we continue to believe that AMT-130 is the type of therapy that the 'old' and 'new' FDA would support," citing the following: (i) Huntington' disease "is a rare disease with high unmet need"; (ii) "a placebo controlled Ph. I/II program was conducted"; (iii) "AMT-130 received BTD in April [] based on improvement vs. NH [natural history]"; (iv) uniQure's prior assertions "that key elements of the AA [accelerated approval] pathway were discussed and aligned upon with the FDA"; and (v) "the timing of FDA feedback and the Agency's support of the activity shown." Based on these points, TD Cowen concluded that "there has been no fundamental shift in regulatory thinking," the "probability of success for AMT-130 has not fundamentally changed," and "[w]e remain optimistic for an AA pathway for AMT-130."

221. H.C. Wainwright issued a report stating that the "concerns surrounding the appointment of Dr. Vinay Prasad as the new head of CBER are overstated and that the leadership change is unlikely to impact the regulatory trajectory for AMT-130," citing December 2024 draft guidance on accelerated approval that allowed sponsors to rely both on surrogate biomarkers and intermediate clinical endpoints, like cUHDRS, "uniQure's recent interactions with FDA staff," and the lack of "indication that the new CBER leadership intends to alter previously endorsed regulatory pathways." However, most of these points occurred before Prasad's appointment and, as of May 9, Prasad only had been CBER head for three days.

222. Wells Fargo likewise issued a May 9, 2025 report reflecting uniQure's response to the appointment of Prasad: "In response to a question on changes in CBER leadership, the

company highlighted that they believe strongly in their data," noting that the Company believed that its use of an intermediate endpoint (cUHDRS) instead of a surrogate biomarker was "a key differentiator for them."

223. Finally, UBS Research issued a report on May 13, 2025 noting that it had "spoke[n] to mgmt" about uniQure's interactions with the FDA. According to UBS, "recent FDA changes including at CBER have raised investor questions but we think rare, fatal diseases like HD could be more insulated" particularly given "commentary from both Makary & Prasad" indicating "support for rare disease accelerated approvals when there is high unmet need (e.g., Prasad's recent comment that 'randomized controlled trials are not always necessary')." Per UBS, the Company's management "reiterated that the meeting [with the FDA] was very productive and there have been no major surprises" and "sound[ed] confident in the accelerated approval pathway."

224. In addition to questions about Prasad's appointment, analysts inquired about uniQure executives' confidence in the three-year data, scheduled to be released in 3Q25, during the May 9 conference. For instance, Debjit Chattopadhyay of Guggenheim asked Abi-Saab "how confident are you on the three-year follow-up data on the cUHDRS?" He responded, "we've been monitoring these patients for a long time" and "[w]e have no indication at all that we lose any of the efficacy over time. As a result, we believe that the dose-dependent reduction in cUHDRS that we observed at the two-year data will be maintained when we evaluate the three-year data."

225. Following the May 9 conference call, TD Cowen stated that its "expectation is to continue seeing benefit on the cUHDRS . . . based on the expected decline of NH and the benefit seen thus far with AMT-130." Guggenheim also issued a report on May 9 stating that it did "not anticipate any . . . material deterioration in cUHDRS trends from yr-2 to yr-3." Similarly, Wells Fargo wrote on May 9 that it "expect[ed] the AA [accelerated approval] path update (2Q) to

confirm a filing profile that's relatively low risk (i.e., 3-year data, NH [natural history] control), and . . . the 3-year data (3Q) to largely resemble 2-year data."

### 13. uniQure Executives Rely on Late April 2025 Type B Meeting to Quell Investor Concern about Changes at FDA and CBER

226. On June 2, 2025, uniQure issued a press release and held a conference call to discuss two Type B meetings with the FDA, one on the manufacturing for AMT-130 in March 2025 and one on the SAP for analysis of data from the U.S. and E.U. Phase I/II Trials in late April 2025. According to Kapusta, "both meetings were very well attended" and included "[s]enior officials from CBER and the Office of Therapeutic Products," then led by Verdun and her deputy, Anatol, with "no material changes to the participation from meeting to meeting to meeting." He reaffirmed in response to an analyst question during a subsequent earnings call that despite "some public record of people that have resigned," "[w]e've had no material impact on anybody that is part of the review team."

227. With respect to the SAP Type B meeting, the press release reported that uniQure "ha[d] reached alignment with the FDA on several key components of the" SAP. With respect to the Company's prior purported agreements with the FDA in late November 2024, uniQure reported only that "[t]he FDA continued to support its prior agreement that the" cUHDRS "may serve as an acceptable registrational, intermediate clinical endpoint for accelerated approval."

228. The June 2 press release also reported two additional purported agreements. First, according to uniQure, "[t]he FDA agreed that the primary efficacy analysis for the BLA will evaluate the 3-year change in cUHDRS in high-dose AMT-130 patients compared to a propensity score-adjusted external control arm." Per Kapusta, "We believe this approach to accelerated approval based on multiple years of clinical outcomes data represents a differentiated and robust strategy that positions AMT-130 for success. Second, according to uniQure, "[t]he FDA [] agreed

that ENROLL-HD . . . may be acceptable as the external control dataset for the primary analysis of the trial data." Related to this agreement, Abi-Saab stated, "Based on feedback from the agency, we will also be using additional sensitivity analysis using a propensity score matching methodology and supplemental analysis to further assess the robustness of the conclusions."

229. The June 2 press release also confirmed that "[b]ased on these recent Type B meetings with the FDA, the Company continues to prepare for a BLA submission for AMT-130 in the treatment of Huntington's disease." Additionally, now that uniQure was "aligned with the [FDA] on key components of the statistical analysis plan and CMC requirements," Kapusta reported that uniQure planned to submit a BLA application in 1Q26.

230. Commenting on these agreements during the June 2 conference call, Abi-Saab stated, "we are very pleased with the guidance provided by the FDA and are grateful for the agency's continued productive engagement." Kapusta likewise confirmed that "[w]e now have a clear regulatory path . . . ." Per Kapusta, this "alignment represents a critical step forward in the development of AMT-130," "adds to the growing momentum behind the program," and "strengthens our confidence in the accelerated regulatory path ahead."

231. During the June 2 conference call and subsequent discussions with analysts, Defendants Kapusta and Abi-Saab also clarified what they did not discuss with the FDA as part of the late April 2025 meeting. These topics included: (i) the purported alignment in late November 2024 as to the accelerated approval pathway and the use of NfL biomarker as supportive evidence for a BLA submission; (ii) the content of a BLA submission or package; (iii) the timing, design, and scope of any confirmatory trial; (iv) whether there was a path to full approval based on the data from the U.S. and E.U. Phase I/II Trials; (v) the number of patients and length of follow-up

for the submitted data; and (vi) the power, p-value, effect size, or what would be considered "clinically meaningful" by the FDA.

232. With respect to prior purported agreements with the FDA, Abi-Saab stated, "We have previously discussed with the FDA the fact that changes from baseline in CSF NfL levels may be supportive of evidence of therapeutic benefit. In this statistical analysis plan, there was no additional discussions on this. So in our opinion, whatever was agreed with the FDA still holds[.]" He also confirmed that "[t]here's been no other discussion on any other endpoints not requested by the FDA to evaluate those to support our submission."

233. With respect to the contents of a BLA submission or package, Abi-Saab explained that this would be addressed at the pre-BLA meeting, then set for 4Q25. According to Abi-Saab, "pre-BLA meetings are usually very helpful" and are intended "for us to align with the agency about what we propose to submit, just what they want, do they think that we need more data like this or like that or we need to address a particular question." In other words, the purpose of a pre-BLA meeting was "to look at the data that . . . we're going to be submitting and then align with [the FDA] as to whether this would be . . . meeting their requirements so that they can accept the BLA submission."

234. With respect to a confirmatory trial or a path to full approval, Abi-Saab explained that while "the FDA said they would be open to evaluating the data from this current study, whether based on the cutoff that we will be submitting of June 30 or after longer periods of observation to evaluate whether this could serve as a basis for potential full approval," "any discussions for what it would take to have a full approval and what evidence will be needed to be generated will take place only after they have a chance to review those data. . . . So our anticipation is that, that discussion will happen at the pre-BLA meeting" set for 4Q25.

235. With respect to the number of patients, length of follow-up, the Trials' power, p-values, effect size, and what would be considered "clinically meaningful" by the FDA, Abi-Saab confirmed that "magnitude of effect and p-value . . . were not specifically discussed or request[ed] by the agency" and thus he does not "know to what degree a specific p-value needs to be met . . . Those were not things that were discussed specifically and would be a matter for review in my opinion." He continued, "[t]here's no particular level of clinical meaningfulness that we proposed in our SAP, nor was it raised by the agency," later stating that "there was no predefined degree of clinical meaningfulness that we were requested to meet or any discussion on that topic that were raised by the FDA." He reaffirmed in response to an analyst inquiry that the assessment of the 3-year data was "not p-value-driven."

236. Yet Abi-Saab felt "very confident with our mechanism of action with data progression overall and with the robustness of the plan that we have, and I expect that the three years, this will continue to remain steady and actually become even more salient when we compare to natural history." He also gave his "personal interpretation" as to why this was not requested by the FDA:

> My personal interpretation is that the magnitude of effect that they have seen and the consistency of the data that they've seen so far lends itself to a level of comfort if those are maintained into three years. And then that is why I believe this was not specifically requested[.]

237. Following the Company's press release and conference call describing its Type B meetings with the FDA in March and late April 2025, analysts issued reports reflecting the Executive Defendants' reassurances. For instance, TD Cowen reported on June 2, 2025 that uniQure management's "meetings with the FDA have continued to be productive with no material changes in personnel or engagement between the initial meeting in November last year vs the SAP/CMC meetings this year." To that end, TD Cowen wrote, "we are encouraged that QURE

continues to make steady progress towards the BLA submission and that timelines are within expectations given the uncertainty around changes at the FDA in recent months." The same day, Leerink Partners issued a report stating, that they were "encouraged by the fact that the alignment with the FDA is consistent with what we heard from QURE last year" and "what we have continued to hear from management so far this year . . . , despite some nervousness due to the appointment of Dr. Vinay Prasad as CBER Director."

238. Analysts also were "comfort[ed]" by the fact that uniQure and the FDA had not discussed or aligned around a "pre-defined p-value or clinically meaningful threshold that QURE will have to meet" with the three-year data to be announced in 3Q25, believing that the FDA would "look at the totality of the data" based on statements made during the June 2 conference call. Nevertheless, several analysts recognized that there was "no consensus" among KOLs as to how much the disease progression must slow down to be clinically meaningful. A June 2 William Blair report stated that a "threshold of clinical meaningfulness is not defined in the pivotal trial design" and "the lack of a predefined p-value or magnitude of effect does leave room for uncertainty."

#### 14. Further Turmoil at CBER and Adverse Regulatory Decisions for Other Gene Therapies Lead to Uncertainty for uniQure's AMT-130

239. On June 18, 2025, Verdun, director of the FDA's Office of Therapeutic Products (OTP) — the CBER office responsible for reviewing cell and gene therapy applications — and her deputy, Anatol, were placed on administrative leave and escorted out of the building. Verdun had been with the FDA since 2012 and was appointed inaugural director of the Office of Therapeutic Products when it was established in 2023 to handle the large amount of cell and gene therapy products that required FDA time. That same day, the FDA announced that Prasad had been appointed chief medical and scientific officer, two roles typically held by separate individuals.

240. In a June 20, 2025 article titled, "Industry deeply disappointed as FDA reportedly puts cell and gene therapy chief on leave," Fierce Biotech wrote that "[p]ushing Verdun out of the FDA would intensify questions, which date back to at least the exit of Peter Marks . . . about the agency's ability to provide a predictable service to cell and gene therapy developers" like uniQure.

241. The article explained that, "[i]n recent months, multiple biotechs have responded to analyst questions about changes at the FDA by praising Verdun and highlighting the continuity she provided. For example, the article quoted Taysha Gene Therapies CEO Sean Nolan as stating during a May 2025 earnings call, "Verdun has certainly been at the official meetings. We've had ... consistent senior leadership review. Peter was never in any of the meetings, that's not his role. He leaves that up to Nicole and the teams beneath her. That part has been very consistent. There really has been no departure, no deviation from the conversations that we had going back to [] April of last year." The same article also quoted Rocket Pharmaceuticals CEO Gaurav Shah as stating during a November 12, 2024 presentation with respect to "Marks and Verdun's impacts," "'We have seen significant progress in flexibility around trial design, relying more on natural history, more openness to single-arm trials, and really being thoughtful about endpoints that don't take years but maybe take one to two years.'"

242. A June 20, 2025 BioSpace article titled, "Nicole Verdun Exits as CBER Director Vinay Prasad 'Consolidates Power'" similarly reported, "The well-respected director of the FDA's cell and gene therapy office [Verdun] was seen as a stabilizing and trustworthy voice inside the quickly reshaping FDA, especially since the late-March exit of CBER Director Peter Marks." The article explained, "[a]fter Marks was pushed out [of CBER] in late March," "'everyone exhaled and had a sigh of relief because Verdun remained . . .' Courtney Rice, a principal at the rare disease and gene therapy consultancy Acadia Strategy Partners, told *BioSpace*." An October 2025

retrospective BioSpace article titled, "FDA's Lost Leaders: Where are they now?," stated that following Verdun and Anatol's ouster "rumors spread" that the decision to place them on administrative leave "had something to do with dermaiocel, a cell therapy being developed by Capricor Therapeutics," namely, that "two leaders were allegedly put on administrative leave because of an argument" over whether to send a CRL like Prasad wanted.

243. Because Verdun and Anatol advocated for accelerated approvals for gene therapies like AMT-130, their removal without explanation the same day that Prasad took over as chief medical and scientific officer led analysts and industry leaders alike to flag the uncertainty these unexpected removals created. A June 20, 2025 William Blair report described these departures "as another sentiment hit and source of volatility for the cell and gene therapy spaces," explaining that "[d]uring the FDA's recent round table on cell and gene therapies, several panelists acknowledged Dr. Verdun has been fair and balanced in her questions and interactions as well as integral in the field's advancement."

244. On June 20, 2025, following two deaths and one life threatening case for patients using Sarepta's Elevidys gene therapy, the FDA issued a safety communication explaining that it was investigating the deaths. After the third death, which Sarepta reported to the FDA on July 3, 2025, the FDA announced on July 18, 2025 that it had placed Sarepta's investigation LGMD gene therapy trials on a clinical hold, revoked Sarepta's AAVrh74 Platform Technology Designation, and in a meeting with Sarepta, requested that the company voluntarily halt all U.S. shipments of Elevidys. The FDA also notified Sarepta that Elevidys' indication should be narrowed to ambulatory patients.

245. Initially, Sarepta refused the FDA's request to pause shipments and fought back in a same-day press release. However, Sarepta subsequently reversed course and halted U.S. shipments of Elevidys as of July 22, 2025.

246. In addition to the FDA's actions on or related to Elevidys, on July 11, 2025, the Prasad-led CBER issued a pair of CRLs to Ultragenyx Pharmaceuticals for its BLA for UX111 (ABO-102), an AAV gene therapy for Sanfilippo syndrome type A (MPS IIIA), a rare and fatal pediatric lysosomal storage disorder and Capricor Therapeutics for its BLA for deramiocel (CAP-1002), a cardiosphere-derived allogeneic cell therapy for DMD-associated cardiomyopathy.

247. While the CRL issued to Ultragenyx was based on manufacturing concerns, the FDA issued the CRL to Capricor in part because the data from the Phase 2 HOPE-2 trial, an open label extension trial that relied on natural history comparisons, on which the company relied for its BLA did not meet the substantial evidence of effectiveness statutory requirement. The issuance of the CRL surprised Capricor's executives, with the CEO stating, "We are surprised by this decision by the FDA. We have followed their guidance throughout the process. Prior to the CRL, the review had advanced without major issues, including a successful pre-licensure inspection and completion of the mid-cycle review."

248. Nearly two weeks later, CBER issued another CRL, this time related to the Replimune Group Inc.'s ("Replimune") BLA for RP1 (vusolimogene oderparepvec) plus nivolumab for treating advanced melanoma concerning the sufficiency of the efficacy data from Replimune's Phase I/II IGNYTE trial. In a July 22, 2025 press release, Replimune stated that it was "surprised by this FDA decision," including because "[t]he issues highlighted in the CRL were not raised by the agency" previously and "we had also aligned on the design of the confirmatory study."

249. The press release also quoted Replimune's CEO: "'It is deeply disappointing that the FDA has not exercised regulatory flexibility to meet patients' needs given the data supporting strong efficacy and the favorable safety profile. . . . The country's foremost melanoma specialists stood behind the RP1 data. Patients and caregivers pleaded for urgency. All of it was met with inconsistent communication and a fragmented and slow-moving regulatory process[.]'"

250. Critically, it was not until its receipt of the CRL that Replimune "learned that a different review team was appointed," replacing "the prior team who had interacted with the company." The press release also asserted that in the CRL, CBER "appear[ed] to have contradicted positions expressed at the September 2025 Type A meeting," as well as historical alignments, including March 2021 Type B meeting minutes which reflected the FDA's willingness to accept "a single arm trial" for accelerated approval "if the data was sufficiently compelling" even though the FDA's preference was for an RCT.

251. On July 29, 2025, uniQure issued a press release announcing its financial results for 2Q25 and held its second-ever earnings conference call. The July 29 press release quoted Kapusta as touting the FDA alignment from late November 2024: "'With alignment from the FDA on a biological license application (BLA) pathway and pivotal topline data expected in September, AMT-130 is well-positioned to potentially become the first disease-modifying therapy for people living with Huntington's disease.'"

252. During the related call, Kapusta stated during his prepared remarks, "In Q2, we continue to have productive interactions with the FDA" and "achieved alignment with the FDA on both our statistical analysis plan and CMC requirements for planned BLA submission in the first quarter of 2026" in June 2025. During the same call, Abi-Saab confirmed during his prepared

remarks that "our recent FDA interactions have been highly productive following two Type B meetings in the first and second quarter."

253. As part of the call, analysts asked questions about the recent events at CBER. Debjit Chattopadhyay, a Guggenheim analyst, asked whether "the FDA expect[s] a minimum threshold for clinical benefit versus the ENROLL-HD" external natural history control "on cUHDRS?" to which Abi-Saab responded, "In discussion with the FDA, a minimum clinical effect has not been requested nor has it been included in the SAP plan" but "we expect that [the three-year data] will show substantial level of evidence that would support accelerated approval after the FDA review," leading Chattopadhyay to follow up with, "So how certain are you that the FDA senior leadership won't renege on what's already been communicated to the company?" Kapusta responded:

> [O]bviously we're watching what's going on in the space. We know what's publicly available in those situations. Each of these situations are very nuanced. All of our interactions with the FDA have been very encouraging and very supportive. And as we've said in the past numerous times, we have very clear and unambiguous feedback with the FDA.
>
> So in terms of our situation, it is different meaningfully in so much that we're moving forward with clinical outcomes data and long-term clinical outcomes data as opposed to relying on a surrogate biomarker. So we believe this is a robust approach. We're focused on controlling and executing on what we can control. And we're feeling very optimistic about our path forward.

254. But that reassurance was not sufficient. Luca Issi, an analyst with RBC Capital Markets, subsequently asked, "have you actually met or maybe had some informal conversations with Vinay Prasad?" Issi continued, "I think many investors argue that the final decision to approve this drug will ultimately come down to the very [s]enior [l]eadership at CBER similar to Sarepta with Peter Marks. So I was just curious if you already had interactions with him and if you have any insights that you can share there?"

255. In response, Kapusta confirmed that "our last interaction with the FDA occurred in late April," which contrary to Kapusta's statements on the call occurred before Prasad's

appointment. However, Kapusta claimed that he had "had a chance to meet with [Prasad]" at the CEO listening tour where, according to Kapusta, Prasad "made very clear" that he was "very interested and willing to evaluate additional data sets other than randomized controlled studies." Kapusta pointed to these remarks plus Prasad's training as an epidemiologist and understanding of external controls and synthetic cohorts to examine therapeutic benefit and told analysts, "I'm confident . . . that he's open and supportive of faster accelerated pathways for cell and gene therapies that are addressing severe unmet needs like Huntington's disease."

256. Following uniQure's 2Q25 financial results press release and conference call, analysts issued reports largely adopting the uniQure executives' statements. For instance, Leerink Partners issued a July 29, 2025 report confirming that "[r]egulatory risk is a key focus for investors, especially with tumultuous news flow from CBER," and stating, "Everyone is closely watching other regulatory interactions . . . . We have gotten the sense that investors are more worried about the regulatory path in light of several CRLs from CBER in quick succession," referring to the Ultragenyx and Capricor CRLs on July 11 and the Replimune CRL on July 22, discussed above. Leerink Partners, however was sanguine as to the impact on AMT-130, noting that "QURE management think[s] their approach with an intermediate clinical endpoint is less risky than a surrogate biomarker" and reiterating Kapusta's description of his interaction with Prasad at the CEO listening tour.

257. TD Cowen likewise issued a July 29 report confirming that uniQure "[r]emains [o]ptimistic [f]or AMT-130 [s]uccess, [d]espite [r]ecent [e]vents [c]oncerning [o]ther GTxs [gene therapies]." Per the report, "Several gene therapy programs regulated by CBER have recently received clinical holds (e.g., Sarepta in LGMD due to Elevidys) or CRLs (e.g., Replimune's RP1) which placed some pressure on QURE shares." However, TD Cowen reflected uniQure's view that

"there are fundamental differences between these programs" including that the primary efficacy measure is not a surrogate biomarker, AMT-130's delivery is "localized," "safety has continued to be clean" and uniQure has had "continued productive interactions and progress with FDA (e.g. BTD/RMAT, SAP/CMC Type B meetings)." TD Cowen also reiterated Kapusta's optimism that Prasad's epidemiology training would be helpful to uniQure.

258. Similarly, H.C. Wainwright reported that uniQure's "[r]egulatory strategy . . . remains differentiated and intact" "[d]espite sector concerns around recent regulatory setbacks for other gene therapy sponsors" citing (i) "uniQure's alignment with the FDA on AMT-130"; (ii) reliance on an intermediate clinical endpoint; (iii) the robustness of the U.S. and E.U. Phase I/II Trials data; and (iv) uniQure's receipt of the BTD, which "further reinforc[es] the FDA's view that the program may offer substantial improvement over existing therapies, and its potential for accelerated approval."

259. Notably, however, Capricor and Replimune had repeated interactions and alignments with the FDA, including with respect to the use of Phase I/II trial data to support a BLA submission (and Replimune had the Breakthrough Therapy designation) and that did not prevent CBER from reversing course under Prasad in the CRLs. Likewise, Prasad's training did not prevent him from taking drastic steps in response to the Elevidys deaths earlier in the month.

260. Moreover, in a July 29, 2025 report, Goldman Sachs noted that the "bar for success" for AMT-130 was "unclear" because:

> (1) the FDA has not set a pre-specified p-value requirement or clinical bar for filing; and (2) the inability to draw a direct comparison to the prior update, which demonstrated an ~80% mean slowing of progression per the composite unified Huntington's Disease Rating Scale compared to a propensity score-weighted external control arm (which differs from the propensity score-matched methodology that will be presented and was requested by the FDA). . . .Overall, while we acknowledge the opportunity for AMT-130 (GSe peak sales of $1.6bn),

> we continue to see clinical and regulatory risk, given the aforementioned factors and changes at the FDA.

### 15. Prasad Resigns and Is Reinstated; Analysts Look to uniQure's 3Q25 Update on Phase I/II Trials Data

261. After the market closed on July 29, 2025, various media outlets reported that Prasad had left his role at CBER and the FDA. In a July 30, 2025 report, William Blair suggested that the resignation was tied in part to "the contentious regulation of Elevidys." However, the William Blair report explained, that "[b]ased on [Prasad's] prior criticisms regarding the use of accelerated approvals based on surrogate endpoints," his "departure may alleviate some of the overhang on the cell and gene therapy spaces, where accelerated approval pathways are often used."

262. However, less than two weeks later, on August 9, 2025, Prasad returned to his role as CBER Director. Commenting on Prasad's return, FDA Commissioner Makary stated that Prasad had not been pushed out at the end of July, but had instead resigned, leading Makary to push for his return.

263. Two days later, UBS Research issued a report stating, "[w]e continue to think regulatory de-risking is a key [uniQure] investor focus, and any more information we get here will be the most important stock-moving events." One week later, Leerink Partners issued a report stating:

> One of the largest unknowns in this setup for most investors is how the regulatory path will play out here. Everyone is acutely aware of the situation at the FDA, and every headline drives volatility for QURE shares. The majority of investors have clearly put QURE solidly in the bucket of companies who are reliant on 'regulatory flexibility,' though we think QURE's management team is playing chess and have set themselves up with a strong argument for AMT-130 approval, which many of these other companies do not have. Further, if the September data are stat-sig and definitive, we think this is an even smaller risk, which should help investors get more comfortable with the setup.

264. With respect to whether uniQure's BTD for AMT-130 "really matter[s]," Leerink Partners wrote that this designation was "particularly notable" because it is the hardest designation

to obtain and "particularly positive" for uniQure because it was issued when "the regulatory environment was incredibly uncertain" and "the FDA was in turmoil post-departure of Peter Marks amid staff cuts, further demonstrating the agency's continued support for advancing therapies for rare diseases with significant unmet needs." Leerink Partners also cited the fact that the "extra guidance and expedited timelines that come with" designations like Breakthrough Therapy meant "that the FDA has seen the data multiple times, giving QURE multiple changes to address anything that could become a review issue later on."

265. Critically, however, Replimune, which received an efficacy related CRL in July 2025, had both the BTD and alignment with the FDA that data from its Phase I/II trial could support a BLA submission. Additionally, Replimune did not receive feedback from the FDA on its submissions despite requesting it. Leerink Partners seemingly addressed that in its report stating,

> In the past, we have been fairly comfortable speculating on how the FDA may view specific NDAs/BLAs based on logic, precedent, and FDA guidance, though we all know the FDA has ultimate authority and sometimes acts in ways that may be surprising or even overturn review decisions (like in the case of SRPT's approval for Elevidys, for example). However, the last few months have come with several high-profile cases that have left companies, investors, and us sometimes scratching our heads. Of note, there were 3 successive CRLs that came out of CBER (for CAPR [Not Rated], RARE [OP], and REPL [MP, Chang]) and the unprecedented back-and-forth between the FDA and SRPT that led to Vinay Prasad's abrupt departure from CBER, though he has already returned.
>
> Ultimately, we have very little visibility and predictive power into what is going on with leadership at the FDA and even less about what is happening at the reviewer level, which leaves some investors more unwilling to take on this kind of regulatory risk.

266. However, with AMT-130, Leerink Partners was willing to be optimistic, in part because of a misconception that the late April Type B meeting concerning the SAP occurred after Prasad was appointed – it occurred before his May 6 appointment, and due to Kapusta's description of his interaction with Prasad at the CEO listening tour generally about regulatory flexibility (not AMT-130) and Prasad's epidemiology training.

267. The Leerink Partners report summarized its position as follows:

> [W]e think QURE has been levered to the idea of "regulatory flexibility" in a time of FDA turmoil and tons of uncertainty in the [CBER] that has left the stock volatile, yet somewhat range-bound at ~$15 . . . since they reached initial alignment with the FDA on accelerated approval in December 2024. However, we think the upcoming data readout could provide definitive support for accelerated approval and ease investors' worries that QURE will need to rely on "regulatory flexibility[.]"

**B. Defendants Misleadingly Reaffirm Agreement with FDA and Tout U.S. and E.U. Phase I/II Trials as "Pivotal" and the Related Data as "Clear Cut"**

268. Before the markets opened on September 24, 2025, uniQure filed a current report with the SEC on Form 8-K disclosing additional results from the U.S. and E.U. Phase I/II Trials (the "September 24 Form 8-K"). The September 24 Form 8-K attached a copy of a same day press release titled, "uniQure Announces Positive Topline Results from Pivotal Phase I/II Study of AMT-130 in Patients with Huntington's Disease" (the "September 24 Press Release"). Additionally, the Individual Defendants participated in a conference call to discuss the results from these Trials (the "September 24 Conference Call"). In connection with that call, Defendants used a set of slides (the "September 24 Slides").

269. The September 24 Press Release announced that the U.S. and E.U. Phase I/II Trials "met its prespecified primary endpoint, with high-dose AMT-130 demonstrating a statistically significant slowing of disease progression as measured by the [cUHDRS] at 36 months compared to a propensity score-matched external control," "met a key secondary endpoint by achieving statistically significant slowing of disease progression as measured by [TFC] at 36 months compared to a propensity score-matched external control," and showed "[f]avorable trends in other secondary endpoint measures of motor and cognitive function." Throughout the September 24 Form 8-K, Press Release, Conference Call, and Slides, Defendants described the U.S. and E.U. Phase I/II Trials as "***pivotal***."

270. The September 24 Form 8-K, Press Release, Conference Call, and Slides also described the cUHDRS endpoint as a "***primary endpoint of the stud[ies]*** and stated that "[a] statistically significant 75% slowing of disease progression as measured by cUHDRS (p=0.003), which met ***the primary endpoint of the study***."

271. With respect to the data from the U.S. and E.U. Phase I/II Trials, Defendants described it as "clear" and "compelling and clinically meaningful evidence." For instance, during his prepared remarks, Defendant Kapusta stated, "we believe ***these findings*** provide ***compelling and clinically meaningful evidence*** of AMT-130 disease modifying potential." Likewise, Defendant Tabrizi stated, "I believe ***these data*** are the first to ***provide clear evidence*** of an investigational therapy inducing Huntington's disease modification."

272. Later, in response to an analyst query seeking to identify any "shortcomings to these data . . . that would give [her] a pause," Tabrizi stated, "***No, I don't think there's any shortcomings . . . . the data was so clear to me that this drug was working, the effective size was huge . . . . I don't see shortcomings***." Similarly, in response to an inquiry from a H.C. Wainwright analyst regarding "[h]ow confident" she was "that the data will be sufficient for accelerated approval," Tabrizi stated, "***these clinical results are very clear cut***."

273. The September 24 Form 8-K and Press Release likewise reaffirmed the continuing existence—and terms—of an agreement that uniQure purportedly reached with the FDA regarding AMT-130. In particular, the September 24 Form 8-K stated:

> Based on [uniQure's] interactions with the U.S. Food and Drug Administration ('FDA'), ***it was agreed*** that data from cohorts 1 and 2 in the Phase I/II studies could be compared to a propensity score-matched external control derived from the Enroll-HD natural history data set, under a prespecified statistical analysis plan, ***which may serve as the primary basis for a Biologic License Application ('BLA') submission***.

274. In response to a question from Yanan Zhu of Wells Fargo Securities LLC, Abi-Saab represented that—based on the purported agreement reached with the FDA—even if "accelerated approval is the path" for AMT-130, the requirement that uniQure conduct a post-approval confirmatory trial be conducted would not delay the approval of AMT-130:

> In terms of the confirmatory trial with the FDA, we've tried to have the discussions with them a couple of times, but the agency was very clear that they would like to see data from this trial before they can decide whether they're going to take action via traditional pathway as in full approval or accelerated pathway, which will then require confirmatory trial. But it was very clear to us that even if they go down the path of accelerated approval, because it is – we're following what they're doing, it's not going to require that we start that trial, have it 50% recruited or whatever to delay approval of the accelerated pathway.

275. Finally, in the September 24 Conference Call Defendant Kapusta referred to uniQure's "planned BLA submission."

276. That same day, Kapusta gave an interview to Adam Feuerstein, a reporter writing for STAT News. After Feuerstein noted that "[t]he FDA ha[d] undergone considerable changes in the months since uniQure reached its agreement on the terms of AMT-130's submission package" and "Vinay Prasad, a physician with a reputation for taking a more conservative view of gene therapies now oversees the division that will review and decide on the approval of AMT-130," and reported that Kapusta stated, "'***We're confident in our data.'. . . . 'We've had a great relationship with the FDA so far. We've had very constructive interactions with unambiguous feedback.***'"

277. Approximately six weeks later, on October 30, 2025, Defendants Abi-Saab and Tabrizi participated in a webinar titled, "What the AMT-130 News Means for the HD Community" from 2:00 pm to 4:00 pm ET (the "October 30 Webinar"). The October 30 Webinar was presented by the Huntington's Disease Society of America ("HDSA") and moderated by Arik Johnson, Chief Mission Officer of HDSA.

278. During the October 30 Webinar, Abi-Saab stated that the Company would be "***hav[ing] a meeting with the FDA in the fourth quarter [of 2025], where we're going to be discussing plans to submit a BLA***." Abi-Saab also referred to the Company's prior meetings with the FDA, stating "***all of these next steps have been aligned with and agreed to with the FDA***." In response to a question from the moderator about the timeline for additional trials and making AMT-130 available to patients, Abi-Saab stated that "***we're doing everything we can to make sure that***" uniQure makes AMT-130 available to patients, including "***mov[ing] forward with our interactions with the FDA.***"

279. For her part, and with respect to the U.S. and E.U. Phase I/II Trials, Tabrizi asserted that "***the FDA gave this word for it, a 'pivotal' study in that it was agreed in advance with the FDA and the primary and secondary and exploratory endpoints were all pre-agreed and the study met all of those endpoints***." She further described the data as "***convincing evidence*** that the course of Huntington's disease can be modulated."

**C. The Market Reacted Positively to Defendants' Statements about the U.S. and E.U. Phase I/II Trials Data and Prior Purported Agreements with the FDA**

280. During trading hours on September 24, 2025, investors drove the Company's share price up by ***nearly 250%*** in response to Defendants' disclosures regarding AMT-130. Specifically, uniQure's share price skyrocketed from $13.66 per share at the close of trading on September 23, 2025 to $47.50 per share at the close of trading on September 24, 2025. uniQure's share price continued to rise over the ensuing days and months, reaching $59.40 at the close of trading on September 29, 2025 and a Class Period high of $70.59 per share at the close of trading on October 29, 2025.

281. Analysts likewise celebrated Defendants' September 24 statements and understood them to indicate that there was minimal regulatory risk associated with AMT-130 going forward.

For example, in a September 24, 2025 report titled "HD Data Mature Like a Fine Wine, We See Very Limited Regulatory Risk From Here," Leerink Partners stated that uniQure disclosed "pretty definitive" data that "limits the regulatory risk for this program going forward." Leerink Partners then stated that the data "can support an approval with minimal need for regulatory flexibility from the FDA (and therefore with limited regulatory risk), which has been a concern for investors, and we would not be surprised to see the stock trade up 100% or more on today's news." Later that same day, Leerink Partners issued a second report increasing its price target from $48 to $68 per share. This report quoted extensively from Defendant Tabrizi's comments during the September 24 Conference Call and noted that uniQure "will submit the BLA with a request for priority review" in 1Q26.

282. TD Cowen added that uniQure planned for a BLA submission in 1Q2026 and further suggested that "hitting on cUHDRS and TFC substantially de-risks the approval decision next year, and it's possible in our view the FDA could consider a full vs. accelerated approval which would be upside from initial expectations." TD Cowen noted that uniQure's intent to seek priority review "would lead to a potential late 2026 approval."

283. Guggenheim Partners more than tripled its price target for uniQure from $28 to $95 per share and concluded that the Phase I/II trial results disclosed by the Company, along with its disclosure that it "plans to submit a BLA in the first quarter of 2026," "position[] AMT-130 for accelerated if not full approval during 2026, in our view."

284. Mizuho Securities analysts stated that Defendants' disclosures indicated that "AMT-130 has a clear pathway towards BLA submission in 1Q26 and potential accelerated approval in 2H26." Mizuho issued another report later in the day doubling its price target from $30 to $60 and noting that the data will "Serve as Basis for Potential FDA Approval." The report

then stated that "[m]anagement confirmed the FDA has agreed the 3-year data presented today (12 high-dose patients completed) will serve as the basis for BLA submission and potential approval," and further noted that the data "should be sufficient to gain FDA approval."

285. H.C. Wainwright issued a report stating that the data "support a 1Q26 Biologics License Application (BLA) filing and potential accelerated approval in 2026, assuming priority review by the FDA," and "assigning a probability of success to AMT-130 of 75% in 2026E."

286. UBS Research issued a report on September 24, 2025 increasing its price target $27 per share, calling the Company's disclosures a "best case scenario," repeating uniQure's plans to submit a BLA in 1Q26 "with an anticipated launch if approved later that year," and stating that "while some uncertainty remains on the regulatory front in this FDA climate any regulatory de-risking color from here will support upside for shares."

287. RBC Capital Markets issued a report on September 24, 2025 more than doubling its price target from $24 to $55 per share, stating:

> **QURE Remains Confident On Regulatory Pathway –**
>
> On regulatory path forward, QURE will bring the data (n=29, with 5 patients not at 36-month at data cutoff) to the FDA at pre-BLA meeting expected later this year, with the goal of submitting a BLA in the first quarter of 2026. QURE plans to request priority review and the company indicated preparedness for either full approval or accelerated approval with requirement of a confirmatory trial. While an Adcom is not out of the question given the pivotal is using an external control arm and not placebo, QURE emphasizes package convincingly shows stabilization of disease given 3-year data corroborates efficacy seen at 2 year. We also like that FDA aligned on primary analysis and the prespecified statistical plan, and that curves are continuing to separate for both cUHDRS and TFC from 24 to 36 months, suggesting that treatment may be disease modifying. On CMC, QURE suggests that the progression of the performance process qualification campaign is on track to meet the BLA submission timeline.

288. William Blair analysts stated that uniQure's disclosure "Meets Our Bull-Case Scenario" and noted that while "[q]uestions remain on whether the FDA will grant full approval based on the current dataset or pursue the accelerated approval pathway, which would require a

confirmatory trial," management "plans to submit a BLA in the first quarter of 2026, suggesting it could be commercially available in late 2026." The report also highlighted Defendant Tabrizi's comments during the September 24 Conference Call regarding the "unprecedented clinical and biomarker signals" and her reference to the results as "game-changing" and "the first clear evidence of disease modification in HD."

289. Goldman Sachs' analyst report issued on September 24, 2025 increased its price target from $13 to $56 and stated that uniQure's AMT-130 data "supports a regulatory filing in 1Q26," noting that "the data bodes well for AMT-130's approval and the commercial outlook" and will "serve as the primary efficacy analysis for the BLA filing (in 1Q26) under an accelerated approval pathway." It then noted:

> Recall, QURE previously announced that following Type B meetings with the FDA, it reached alignment on the key components of the statistical analysis plan (SAP) and Chemistry, Manufacturing and Controls (CMC). The FDA agreed that the primary efficacy analysis for the BLA will evaluate the 3-year change in cUHDRS in high-dose AMT-130 patients (n=12) compared to a propensity score-matched external control arm, leveraging the ENROLL-HD natural history dataset. Per QURE, ENROLL-HD is a large, prospective, longitudinal, natural history study of over 33,000 patients with Huntington's disease which offers a substantially larger sample size, lower attrition rates, and longer average patient follow-up compared to previously the natural history studies, including TRACK-HD and PREDICT-HD, used in the prior update.

290. Finally, Chardan issued a report increasing its price target from $35 to $76 per share, calling the data "a major win for uniQure" that "will support a BLA submission in 1Q26 and "close to the best-case scenario." Chardan stated that the data "have AMT-130 well positioned to obtain regulatory approval next year." Chardan went on to state:

> uniQure is expected to hold a pre-BLA meeting with the FDA in 4Q25, and plans to submit a BLA for AMT-130 in 1Q26, consistent with previous guidance. If approved, uniQure plans to launch the therapy in late 2026. We believe a more likely path will include an accelerated approval, which would require post-approval confirmatory data, although the company is not ruling out full approval, which would not require any additional data. If confirmatory data are required, we believe it is unlikely that the FDA would require uniQure to perform an entirely new study.

> Rather, the company would likely be able to leverage additional data from its ongoing studies, potentially including 4-year data from the cohorts described above and/or data from an additional cohort. We expect some clarity on these details following the pre-BLA meeting in 4Q25.

**D. Defendants Immediately Profit from uniQure's September 24 Disclosures**

291. Immediately following Defendants' September 24, 2025 statements regarding AMT-130, Defendant Kapusta pocketed ***nearly $8 million*** from the sale of uniQure common stock. In particular, on September 24, Kapusta exercised options to purchase 226,316 shares of uniQure common stock at an average price of $6.52 per share. That same day, Kapusta sold those 226,316 shares of uniQure stock in the open market at an average price of $41.46 per share, generating an immediate profit of $7.91 million.

292. Like Kapusta, uniQure itself immediately profited from its September 24 public disclosures. Shortly after the markets closed on September 24, 2025, uniQure issued a press release announcing that, pursuant to its January 7, 2025 shelf registration statement filed with the SEC on Form S-3, it intended to raise $200 million through the public offering of common stock and pre-funded warrants to purchase common stock (the "Offering"). The press release indicated that Leerink Partners, Stifel, Van Lanschot Kempen, and Guggenheim Securities would act as bookrunning managers for the Offering. Later that evening, uniQure filed with the SEC a preliminary prospectus supplement on Form 424B5 in connection with the Offering (the "Preliminary Prospectus Supplement").

293. The next day, uniQure issued another press release announcing that it had increased the size of the Offering by 50% overnight to $300 million, including 5,789,473 common shares offered at a price of $47.50 per common share—the closing price for uniQure common stock on September 24, 2025 and a 250% premium over its closing price on September 23—and pre-funded warrants to purchase an additional 526,316 common shares offered at a price of $47.4999 per

warrant. The press release identified Leerink Partners, Stifel, Guggenheim Securities and Van Lanschot Kempen as Bookrunning Managers and H.C. Wainwright & Co. as the Lead Manager (collectively, the "Underwriters"), and it noted that uniQure had provided the Underwriters with an option to purchase an additional 947,368 common shares through the Offering.

294. On September 29, 2025, uniQure filed its final prospectus supplement for the Offering with the SEC on Form 424B5 (the "Final Prospectus Supplement"). According to the Final Prospectus Supplement, which was dated September 25, 2025, uniQure expected to net $281 million in proceeds from the Offering (or $323 million if the Underwriters exercised their option) after deducting Underwriters discounts and commissions. The Final Prospectus Supplement stated that the Company "will retain broad discretion over the use of the net proceeds from the" Offering. It added that it "currently intend[ed] to use the net proceeds . . . to fund our commercialization readiness activities, the potential commercial launch of AMT-130 and related commercialization activities, the development of our other clinical product candidates, business development initiatives and research projects and for general corporate purposes." uniQure explained that it "may also use a portion of the net proceeds to acquire or invest in businesses that are complementary to our own."

295. Later that day, uniQure published a press release announcing that the Company had closed the Offering and that the Underwriters had fully exercised their option. As a result, through the Offering, uniQure sold 6,736,841 common shares and pre-funded warrants to purchase 526,316 common shares for gross proceeds of approximately $345 million.

### E. Defendants' September 24 and October 30 Statements Were Materially False and Misleading

296. Defendants' use of regulatory terms of art, i.e., "pivotal," "primary endpoint," and "evidence" of benefit, to describe the U.S. and E.U. Phase I/II Trials and the resulting data in

conjunction with statements reaffirming the purported agreements with the FDA and referring to uniQure's "planned BLA submission" created the misleading impression that the U.S. and E.U. Phase I/II Trial were adequate and well-controlled studies, and the resulting data demonstrated "substantial evidence of effectiveness," which was necessary to achieve FDA approval, and was sufficient to be the primary support of a BLA submission seeking accelerated approval premised on the cUHDRS intermediate clinical endpoint. Defendants' September 24 and October 30 statements likewise created the misleading impression and that the changes in leadership at the FDA, and, in particular, the appointment of Prasad and ouster of Marks and Verdun, as well as the adverse regulatory decisions for other gene therapies before September 2025, including with respect to Sarepta and the three CRLs, would not impact uniQure's plan to submit a BLA the FDA based on the cUHDRS data.

#### 1. The U.S. and E.U. Phase I/II Trials Were Not "Pivotal" and cUHDRS Was Not a "Primary" Endpoint

297. Defendants' repeated descriptions of the U.S. and E.U. Phase I/II Trials as "pivotal" and cUHDRS as a "primary endpoint of the stud[ies]" during the Class Period deceived investors into believing that the data from these studies was sufficient to be the primary support for a BLA submission under a Prasad-led CBER. In reality, as designed and administered, both trials were "exploratory" and, as such, could not by definition be "pivotal," and the cUHDRS endpoint was, at best, secondary to the studies' safety endpoints.

298. As explained above, *see* Sections IV.A.4-6, the U.S. and E.U Phase I/II Trials were not originally designed to be confirmatory studies that would support a BLA submission. Instead, Defendants acknowledged that these studies were designed to be "exploratory" and "intended to establish safety, proof of concept, and the optimal dose of AMT-130 to take forward into Phase III development or into a confirmatory study."

299. Additionally, cUHDRS was not the "primary endpoint" for either study. The summary of the U.S. Phase I/II Trial titled, "A Phase 1/2, Randomized, Double-Blind, Sham Control and Open-Label Study to Explore Safety, Tolerability, and Efficacy Signals of Multiple Doses of Striatally-Administered rAAV5-miHTT Total Huntingtin Gene (HTT) Lowering Therapy (AMT-130) in Early Manifest Huntington's Disease," confirmed that it was "designed to establish safety and proof-of-concept," and not efficacy via cUHDRS as a "primary endpoint." In the section titled, "What is the study measuring," the U.S. Phase I/II Trial's webpage noted that the "Primary Outcome Measure," or "the planned outcome measure that is the most important for evaluating the effect of an intervention/treatment" was the "Number and type of Adverse Events (AE)." This measure assessed "[s]afety," not efficacy. The "Secondary Outcome Measure," or "a planned outcome measure that is not as important as the primary outcome measure for evaluating the effect of an intervention but is still of interest," was "Duration of persistence of AMT-130 in the brain"—also not an efficacy measure. In fact, all the efficacy measures were listed under the primary and secondary measures as "Other Outcome Measures." Among those measures, the cUHDRS was listed third behind two biomarkers (mHTT and NfL in CSF).

300. Similarly, the summary of the E.U. Phase I/II Trial titled, "A Phase Ib/II Randomized, Double-Blind Study to Explore Safety, Tolerability, and Efficacy Signals of Multiple Doses of Striatally-Administered rAAV5-miHTT Total Huntingtin Gene (HTT) Lowering Therapy (AMT 130) in Early Manifest Huntington's Disease" confirmed that the E.U. Phase I/II Trial's "aim" was "to build upon the safety demonstrated in the first human dose (FHD) randomized, double blind, sham-controlled sequential dose escalation study . . . being conducted in the US." The "Primary Outcome Measure" of the E.U. Phase I/II Trial included 19 measures to "[e]valuate the safety and tolerability" of AMT-130 by patients receiving treatment, and the same

"Secondary" and "Other" measures identified for the U.S. study. As such, like the U.S. Phase I/II Trial, the E.U. Phase I/II Trial was designed to assess safety through each of its "primary" outcomes.

301. The Company's purported agreements with the FDA during the late November 2024 and late April 2025 also did not transform the "exploratory" U.S. and E.U. Phase I/II Trials to "pivotal" studies or upgrade one of many exploratory efficacy endpoints or "other" outcome measures to that of the "primary" endpoint or outcome measure. As described by the Executive Defendants, these agreements were limited.

302. Even if these purported agreements provided Defendants some basis to describe the U.S. and E.U. Phase I/II Trials as pivotal and cUHDRS as a primary endpoint, as explained below, there was a material and undisclosed risk obscured by Defendants' use of these terms: that the Prasad-led CBER would be unwilling to look beyond the Trials' original designs and allow uniQure to submit a BLA based on this data.

**2. AMT-130's Phase I/II Data Suffered from Significant Flaws, Biases, and Limitations**

303. Defendants' description of the results from the U.S. and E.U. Phase I/II Trials as "***compelling and clinically meaningful evidence***," or "***provid[ing] clear evidence***" of "***disease modification***" or "***convincing evidence that the course of Huntington's disease can be modulated***," among other statements, were materially false and misleading because the Trials were exploratory, not confirmatory. Indeed, while data from exploratory trials, like these studies, "may contribute to the total body of relevant evidence" of efficacy under FDA guidelines, "[a]s a rule, confirmatory trials are necessary to provide firm evidence of efficacy."

304. They also were not "adequately powered" and did not have pre-specified p-values and levels of effect and clinical meaningfulness even after the late-April 2025 meeting with the

FDA about a SAP for the results announced on September 24. By using terms like “compelling and clinically meaningful evidence” or asserting that the data “provide clear evidence” of disease modification, Defendants created a misleading impression that results from just 12 patients at three years could be the primary basis for a BLA submission and accelerated approval based on an intermediate clinical endpoint.

305. The U.S. and E.U. Phase I/II Trials were not designed to reduce bias. For instance, while the U.S. trial included a placebo-control group within the first and second cohorts, by design uniQure only received 12 months of data from this group. The remaining cohorts of the U.S. Phase I/II Trial and the entire E.U. Phase I/II Trial were open label and the data beyond 12 months was compared to an external natural history control. Additionally, the clinical endpoints included subjective assessments, making them more susceptible to the placebo effect and patient and observer biases. cUHDRS also raised concerns given that it was a composite endpoint of other clinical measures.

306. ICH guidance restricts use of external controls “to situations in which the effect of treatment is dramatic and the usual course of the disease highly predictable” and “to cases in which the endpoints are objective and the impact of baseline and treatment variables on the endpoint is well characterized” none of which is present here. The progression of Huntington’s disease is not highly predictable, cUHDRS is not an objective endpoint as it requires subjective assessments, the difference on a composite rating scale like cUHDRS is not a dramatic effect, and the inability to match striatal volume in the ENROLL-HD data (because the database did not contain MRI data) sets up an inability to directly characterize the impact of a baseline variable. Likewise, the use of the open label design for the E.U. Phase I/II Trial meant that uniQure needed to make “every effort

. . . to minimize the various known sources of biases" and use "primary variables" that are "as objective as possible."

307. Additionally, because the U.S. and E.U. Phase I/II Trials did not prespecify hypotheses, endpoints, analyses, or the external natural history control, all the analyses were post hoc and would not typically be sufficient to be the primary support of a BLA submission.

308. Moreover, because the U.S. and E.U. Phase I/II Trials did not prespecify hypotheses, endpoints, analyses, or the external natural history control, uniQure saw the results and changed course several times during the Trials. For example, the natural history control for the Phase I/II trial changed over time—from TRACK-HD to PREDICT-HD to ENROLL-HD—as uniQure analyzed more data from the study. Defendants likewise shifted their focus away from certain biomarkers in the midst of the Phase I/II study when preliminary results indicated that these data, including mHTT and volumetric MRI data, did not provide evidence of efficacy for AMT-130. According to ICH guidance, "[r]edefinition of the primary variable after unblinding will almost always be unacceptable, since the biases this introduces are difficult to assess."

309. The purported FDA agreements also did not change the design of the U.S. and E.U. Phase I/II Trials, mitigate actual or potential biases, or the nature of the results that could be gleaned from these "exploratory" studies. While the FDA purportedly agreed that data from these Trials "may serve as the primary basis for a BLA submission," that was not a guarantee. It also did not change the U.S. and E.U. Phase I/II Trials' design or address the biases created by uniQure's decisions during the administration of the trials. Likewise, while the FDA supposedly agreed that cUHDRS "may serve as an acceptable registrational, intermediate clinical endpoint for accelerated approval," that too was not a guarantee and said nothing about the sufficiency of the cUHDRS data from the Trials to support a BLA submission.

310. Furthermore, the purported agreement with the FDA on a SAP to analyze the data available as of June 30, 2025 did not change the biases inherent in the design of the studies or created by uniQure's decisions during the Trials. Indeed, guidance related to SAPs provides that they be agreed to before the data is unblinded. If the data already is unblinded or was never subject to a blind (in the case of an open label trial design), the SAP documents analytical choices—in this case, choices purportedly agreed to with the FDA including what to analyze (i.e., three-year data for 12 high dose patients as of June 30, 2025) and the selection of endpoints and external natural history control. It does not, however, insulate uniQure from the Trials' design or its decisions during the studies.

311. The FDA agreed with these assessments. For instance, during uniQure's October 2025 pre-BLA meeting with the FDA, the agency "raised the point that [the U.S. and E.U. Phase I/II] studies were designed as hypothesis-generating studies and any such analyses after we've collected the data and we looked at them would be considered post-hoc." The February 27, 2026 official minutes of the Company's Type A meeting with the agency on January 30, 2026 stated the FDA "cannot agree that data from the Phase I/II studies compared to an external control are sufficient to provide the primary evidence of effectiveness to support a marketing application" and "highlighted the absence of treatment effects relative to sham subjects in the US Phase I/II study after 12 months." The FDA also "rais[ed] questions around absence of any clinical or biomarker signal in" the sham-controlled portion of the U.S. trial. According to a subsequent conference call transcript, "the FDA . . . reverted back to looking at the 12-month data of our US study, because that's the only study that had the sham control in it. And they raised challenges that they don't see biomarker data in that small sample size over one year."

312. Additional commentary from that meeting suggested that because the FDA was seeking "an adequately powered" Phase III trial and "a maximum reduction of potential bias," the U.S. and E.U. Phase I/II Trials were not adequately powered and were biased.

313. In a February 26, 2026 interview with CNBC, Makary defended decisions made by Prasad's CBER and rejected the idea that Prasad's decisions on rare disease therapies were out of step with the agency's broader position. Makary pointed to the FDA's recent announcement that it would have "more regulatory flexibilities" for manufacturing, including the "plausible mechanism pathway," which would enable earlier green-lighting of therapies that appear safe and effective. Makary discounted rumors that Prasad had been "quietly undermining" the program by rejecting applications through CLRs when companies thought they were following the FDA's advice. As reported in BioSpace, Makary stated during the interview that, "'There's always going to be two sides to a story. There are moneyed interests . . . . I get it, if I were an investor and I put in $100 million into a product and you didn't get the results that you like—it is disappointing.'"

314. Makary stated, "'There was a product where the researchers drilled a burr hole, literally a hole, in people's skulls'" to deliver the therapy and "'[a]t the end of the randomization period, it was found no benefit, and yet this is one of the drugs that we were pressured to approve.'" Although Makary did not name uniQure or AMT-130, the market understood him to be describing the process for administering AMT-130 and the fact that the results at 12-months for the patients that received AMT-130 as compared to the patients that received the imitation or sham surgery showed no benefit. Makary stated that the FDA would not approve treatments, such as AMT-130, where there was "morbidity associated with it, if the clinical trial was stone-cold normal." He clarified that the rejection of such treatments was not an issue of Prasad's specific stance on gene therapies, but a simple and predictable result of the review process: "The process is simple. If your

drug works, it's getting improved." Makary described the conversation around Prasad's decisions as a "smear campaign," and emphasized that "***100% of the accept or reject decisions at the FDA on my watch have been the accept or reject recommendation of the primary career scientists at the agency***." (emphasis added).

315. During a March 3, 2026 call with agencies including Reuters, STAT News, CNN, and FiercePharma, according to STAT News, an anonymous senior FDA official "explain[ed] the agency's decision to block the company from submitting a marketing application," i.e., a BLA for AMT-130, because "[t]he Food and Drug Administration has concluded that an experimental treatment for Huntington's disease developed by uniQure was not providing benefit for patients based on existing clinical data." According to the senior FDA official, which media outlets eventually confirmed was Prasad himself, "[a]gency reviewers 'are not convinced there's any therapeutic benefit of the product. . . . If we felt there was any therapeutic benefit, we, of course, would approve it. But they're not persuaded.'" The STAT News article also reported that "[a] second FDA employee who works in the agency's biologics division and has knowledge of the uniQure review told STAT that the opinions of staff and leadership were 'generally aligned.'"

316. The same article also reported that "[t]he senior FDA official told STAT that a search of prior communications, along with records of calls and meeting minutes with uniQure found no documented agreement" with respect to the use of the U.S. and E.U. Phase I/II Trials data as the primary basis for a BLA submission. The senior FDA official continued, "'I question whether or not such an agreement was made. Was it a verbal agreement or written agreement? . . . . Somebody [at the FDA] might have said something off the record. That might have happened. I don't know.'"

317. Additionally, in response to pushback regarding the lack of regulatory flexibility afforded uniQure's AMT-130, the STAT news article reported the senior FDA official as stating, "'Our message remains totally clear. We will be extremely flexible and make available therapies that may offer benefits even where there's still some uncertainty. But we also have to be very clear, we cannot approve drugs that do not have any evidence of benefit and have serious harms. We can't do that. That hasn't always been the case.'" The senior FDA official also stated, "'We are trying to do our best for the Huntington's disease community and sometimes doing your best means protecting someone from inappropriate marketing and something that can only hurt them.'"

318. In addition to STAT News, Fierce Biotech posted an extensive article on March 5, 2026 titled, "UPDATED: Senior FDA official refutes uniQure's claims amid controversy over Huntington's gene therapy," describing the "briefing" as "blunt," in that the "senior FDA official accused uniQure of pushing 'distorted' data to mask a 'failed; therapy for Huntington's disease." Fierce Biotech reported:

> Speaking on a call with reporters Thursday, the senior FDA official defended the agency's demand that uniQure conduct another sham-controlled trial for its Huntington's gene therapy and disputed the biotech's characterization of the agency's past communication with the company.
>
> "We only ask for randomized data when a condition is heterogeneous, when the will to believe is strong, when the therapy is invasive or potentially harmful, when the effect size is difficult to detect and when the possibility you are fooling yourself is high," the FDA official said, standing firmly behind a longtime agency policy for Huntington's candidates.
>
> "We asked uniQure to take their product and randomize patients to getting the treatment the way they give the treatment, which requires a skin incision, a hole in the skull and an intracranial injection of the product, versus a control arm, where all they do is anesthetize the patient and put one to three nicks in the scalp," the official said. "We did not ask them to compare against a partial sham burr hole."
>
> The procedure requested by the FDA, the official added, would theoretically be done in just 30 minutes under anesthesia.

> But the FDA official said the agency has always wanted an internal control arm, stating that the approach has been the "long-standing policy for at least two decades" for Huntington's treatments.
>
> These include Roche and partner Ionis Pharmaceuticals' antisense drug tominersen, which, like AMT-130, was designed to reduce the production of the huntingtin protein but failed in a phase 3 placebo-controlled trial in 2021.
>
> "Instead of doing the right thing and running the correct clinical study, uniQure is performing a distorted or manipulated comparison in the mind of FDA," the FDA official said.

319. The Fierce Biotech article continued:

> The agency believes a placebo-controlled study is necessary because Huntington's is heterogeneous and patients are susceptible to a placebo effect, especially as the endpoints are very subjective.
>
> Instead of a sham-controlled trial, uniQure relied on data from a phase 1/2 trial showing a 75% slowing of disease progression on the Unified Huntington's Disease Rating Scale after three years when compared with an external control of patients with matching characteristics based on a natural history database.
>
> The problem with comparing to that database is that those people don't get a placebo effect because they weren't under the impression that they received any treatments, the FDA official pointed out.
>
> "We do not dispute the claim that it's 75% better than those people," he said. "What FDA disputes is that those people are a fair comparator. They are not a fair comparator."

320. As for the external natural history control selected by uniQure, ENROLL-HD, the Fierce Biotech article reflected the senior FDA official's views:

> The FDA leader further questioned the validity of the database by flagging a seeming contradiction.
>
> Part of uniQure's proposed dataset also includes sham-controlled data from a small group of U.S. patients 12 months after treatment. In its feedback, the FDA highlighted that AMT-130 lacks a treatment effect relative to sham subjects in that cohort after 12 months, according to uniQure. During an investor call Monday, uniQure's chief medical officer, Walid Abi-Saab, M.D., argued that it is "virtually impossible" for a drug designed to slow progression to demonstrate a treatment effect after just one year because study-controlled patients with early Huntington's did not show clinical worsening after one year.

> However, when compared with external control, AMT-130 demonstrated a benefit after one year, according to the FDA official.
>
> "If both of those statements are true, why do we see a benefit at one year in the external controlled data, but not in the randomized data?" the FDA official asked Thursday.

321. With respect to uniQure's prior "agreements" with the FDA, the senior FDA official stated:

> "Did FDA ever agree to accept this distorted comparison? No, I've asked our people to look for any written or verbally transcribed or minutes of a meeting that document such a promise, and there is no such promise made," the official said. "Moreover, FDA, as a general rule, never makes such assurances. FDA will always say, 'Well, we have to see the data when we get it.'"

322. Another media outlet that participated in the call, CNBC, reported that the same senior FDA official had described AMT-130 as a "failed therapy for Huntington's patients" and stated that uniQure executives "likely acknowledge or understand at some deep level that their trial failed years ago, and instead of doing the right thing and running the correct clinical study, UniQure is performing a distorted or manipulated comparison in the mind of FDA." The CNBC article reported that the senior FDA official added that the FDA "never agreed to accept [uniQure's] distorted comparison" and, in fact, that the FDA "never makes such assurances."

323. Industry experts have also stated that Defendants "jump[ed] the gun" and "overs[old]" the results of the Phase I/II study in making their September 24 disclosures.

324. As reflected in the transcript of a November 4, 2025 interview with Slingshot Insights, a professor of neurology and "director of a large Huntington's disease program," which "participate[s] pretty much in every research trial that's out there for Huntington's disease," was asked to provide his "high-level view on AMT-130 and the data" from uniQure's U.S. and E.U. Phase I/II Trials. According to the transcript, he responded by stating:

> Yeah. My high level of view of it is it's very preliminary data. I've always felt that uniQure was jumping the gun in sending out press releases claiming that they had

> clear efficacy data on their CUHDRS. There's only been 12 patients that have been reported over three years. And yeah, my top level opinion is that it's encouraging, but it's far from ready for approval or even accelerated approval.
>
> And that's really based on a couple things. One is the clinical trial now excludes so many patients due to its requirement for a certain volume of subcortical structures. So the way the current inclusion criteria are written is that you have to have a certain volume of the striatum in order to be eligible. And the challenge in Huntington's is that by the time you have motor symptoms and you have to have some motor symptoms for this trial, the vast majority of patients have atrophy of that region. So it's been really hard to figure out who would be eligible for this therapy.
>
> And secondly, what the clinical interpretation of their data is, given the fact that the people that are getting in may not represent the normal HD patient. So that's the first thing.
>
> And then the next thing is about the [c]UHDRS and the data they've presented. The [c]UHDRS is a score that's made up of motor severity function based on the total functional capacity, which is basically items that address independence and ability to do hygiene and work and things like that. And then there's these cognitive scales, which are very susceptible to practice effects. So the effects that they've shown really make it look like the effect is being driven largely by some of those cognitive effects, namely the symbol digit and Stroop. So because of those two things, it's been really hard for me to interpret which patient of mine would actually qualify for this drug. And then secondly, is there really a difference that's obvious when you take into account that these patients have been given this same set of cognitive tests, I think like every three months for the last three years, and they've just learned how to do the test?
>
> So that's kind of my high level thoughts on uniQure program. Small samples, preliminarily encouraging for patients, but they've been overselling the effects because of the issues that I've raised.

325. When asked specifically for his thoughts on the data Defendants disclosed on September 24, 2025—including the disclosure of a "statistically significant 75% slowing of disease progression as measured by" cUHDRS at 36 months—and whether the "pre-specified plan" and SAP they purportedly agreed to with the FDA supported a BLA filing, the transcript reflects the professor again stating that Defendants "oversold the 75% number" in their statements to the market:

> Yeah. I have a lot of thoughts. The first thought I have is about the word pre-specified. So when this trial started, they had a sham control arm. There were no

plans on using historical control data when they first started this trial, that was something that was introduced later on. We've never been told what the FDA actually agreed to when it came to pre-specified endpoints. We know that they've done propensity scores. When they've reported those propensity scores, a lot of us have been concerned that they overfit the model. For instance, they would match on CAG repeat, age, and CAP score, and CAP score is an equation of CAG repeat and age. So there's a lot of overfitting of that model.

So we're not exactly sure what the FDA actually agreed to when it came to historical controls. It could have been, 'Yeah, we're happy if you show us the historical controls,' but whether or not they actually went through the propensity model that they created and whether or not the FDA agreed to the model they created, a lot of us think that they overfit the model. So that's the first comment I'd make.

I would say the second comment I'd make is this has been a challenging press release for a lot of gene therapy companies because many of the rare diseases use historical controls. And I think it's important to think about where the historical controls are coming from and the data that uniQure is looking at.

So they're looking at a cohort of patients from a natural history study called E[NROLL]-HD, which basically looks at all comers, patients that are at risk or known gene positive, symptomatic, asymptomatic, and then they follow them yearly with the same measures that make up the [c]UHDRS amongst other things.

It's important to realize that that data is not registry quality data. It's kind of like data from a clinic, but the concept that they had is like, well, if you look at thousands of patients, we're at least able to get a signal, even though it's noisy, of how fast these things progress. But when it comes to like 12 patients versus the propensity matched, it's very unevenly weighted.

So for instance, when it comes down to how often a person is exposed to the simple digit part modality tests, and in rural it's once a year. In the uniQure studies, it's way more than that. It might even be up to three or four times a year. So the experimental procedures are a little different and that could influence some of those cognitive outcomes which really drive that quote unquote 75% difference.

So I wasn't sure, they never gave us details of what they agreed to. It was definitely done after the trial study started, at least in year two follow-up. We're not sure exactly how much information they had and what they looked at. We didn't know what they actually agreed to when it came to propensity matching, what variables were important. And then the historical controls are very different experimentally, so it's a little bit dangerous to say we have a 75% difference in treatment versus placebo when that could be driven in part by the experimental procedures, differences in the protocol of uniQure and then the natural history. So encouraging, but not... Certainly, I think they oversold the 75% number.

326. According to the transcript, the professor stated with respect to AMT-130 that "the provider community, the clinician community was very, I would say on the whole, skeptical of how the press release made it sound like they had a home run. They were more like, 'Well, this is a small sample. It's going the right way, but gosh, I think we should be very cautious before we jump to conclusions.'"

327. The professor also noted, according to the transcript, that medical professionals in the Huntington's disease community were not "outrage[d] over the FDA reversal," *see infra* Section IV.E.2, but "most people are like, 'Well, that fits with what we thought when we first looked at the data they presented,' that this may not be a slam dunk."

328. The transcript of another Slingshot Insights expert interview dated November 6, 2025 reflects a "Clinical Professor of Neurology and Neurological Sciences at Stanford" who "direct[s] the Huntington's Disease Center of Excellence" agreeing that the data was preliminary in nature and based on an extremely small sample size:

> I think it's really promising, and this is what I tell my patients also, that it's really promising and exciting, but as a provider and prescriber, I would not prescribe this medication to my patients if it were to become FDA available based on the data alone. It's very exciting and promising, but in my perspective, and I run a lot of clinical trials, there is insufficient data to feel confident that this is truly disease-modifying and safe, et cetera. Again, I would want to see a larger trial that's double-blind in order to feel confident in the scientific rigor of this clinical trial.

329. As reflected in the transcript, the professor then stated that even if AMT-130 obtained "accelerated approval [based] on these data," they "would not be comfortable prescribing this" to their patients:

> At this moment, no. And I was telling my patients actually, when the press release came out not too long ago, patients who were coming into my clinic asking me about this, very excited and the press was quite prominent, so people who are not even in the scientific field or forwarding press releases to me, to remind patients and families that this was really data based on only 12 patients. And one family member said to me, "You have more patients in your waiting room right now than who was actually included in this clinical trial."

> I think while the company did what they could to have a comparison group, it's an observational cohort, and that's great to have as a comparison group, but it doesn't replace a placebo group. Also, the number of patients is so small for us to feel very confident in the data as it stands if it were to be FDA approved at this point. I'm very much in agreement with doing a larger clinical trial.

330. Additionally, two reports from analyst firm, Truist, laid bare the issues with the natural history control selected by uniQure. In a November 3, 2025 report, Truist stated that "[t]hought leaders in HD we have spoken with were a bit surprised by [uniQure's selection] given ENROLL-HD did not conduct MRI assessments that can be used as a matching criteria with AMT-130's Ph1/2 study." The Truist report continued:

> In contrast, PREDICT-H[D] and TRACK-HD do have MRI data that can be used as a comparator This is relevant for AMT-130 as the procedure requires 6 injections into the caudate on each side of the brain (total 12 injections) and QURE may have selected HD patients who may have caudate large enough to carry out 6 injections. Therefore, the KOLs we have spoken with expected that the matched NH comparators would come from PREDICT-HD and TRACK-HD that have MRI data to match with those from AMT-130, although the pool of patients to match from may be smaller. This matters because change in the size of caudate (atrophy) is a sensitive biomarker for HD disease progression . . . . Given the number of injections into the caudate needed for AMT-130, KOLs expressed some concern that the patients may have been screened who may have caudate large enough to inject into, i.e. even though the patient may have been from the same ISS-HD stage, that individuals screen[e]d to receive AMT-130 may have had larger caudate and that there may have been a selection bias.

331. Additionally, in a November 23, 2025 report following a webinar hosted by EHDN at which Defendant Tabrizi presented, Truist stated:

> Ph1/2 inclusion criteria, which included caudate volume of at least 2ccm (6:17). Despite this, caudate volume was not a criteria used to match with external control from NHS • Two of 10 patients from the sham group were disqualified from rolling over into the active arm due to HD progression and because their "striatum volume had become too small to be eligible" (29:37). This, to us, is an implicit admission by Dr. Tabrizi of a correlation between HD disease progression and reductions in striatal (caudate) volume • Studies showing that 1% change in caudate volume correlates with >7.5 yrs of HD disease progression . . . . Taken together, our conclusion is that efficacy of AMT-130 cannot be reliably assessed given caudate/striatal volume was not a criteria used to match study participants with NHS cohort . . . . This, in our view, is important as striatal/caudate volume is increasingly viewed as an important biomarker of HD progression.

332. The foregoing also demonstrates that any assertion that the data reported on September 24, 2025 was "clear" or "clear cut" is materially false and misleading. Moreover, the design of the U.S. and E.U. Phase I/II Trials, as well as the Company's decisions through the course of the studies, created significant regulatory risk, further undermining the September 24 and October 30 statements. This regulatory risk became material with the appointment of Prasad, the administrative leave of Verdun, and the negative regulatory actions that occurred in June and July 2025.

### 3. uniQure and the FDA Had Not Aligned on Numerous Key Aspects of the Company's AMT-130 BLA Submission

333. Defendants' representations regarding the AMT-130 results and the pathway to regulatory approval were likewise misleading given the absence of alignment between uniQure and the FDA on many key issues related to AMT-130's potential approval pathway.

334. *First*, the Company had not reached any agreement with the FDA regarding the contents of uniQure's BLA submission regarding AMT-130. As Kapusta confirmed during uniQure's June 2, 2025 conference call, those issues were not going to be addressed until the pre-BLA meeting, which was scheduled to take place during the fourth quarter of 2025, and thus had not been addressed before Defendants' September 24 misstatements.

335. *Second*, as discussed above, uniQure and the FDA had not aligned on what a confirmatory study for AMT-130 would look like. Before the Class Period, during a February 5, 2025 Guggenheim biotech conference, Kapusta stated that "the FDA felt like [the topic of confirmatory trials] was something that we should discuss at a later point in time." A month later, at a TD Cowen healthcare conference, Kapusta was asked again about what he had heard "from the FDA thus far in terms of the need for a confirmatory study or what that would look like," to which he responded:

> We raised it in our November meeting. We actually proposed an outline of a confirmatory study. And I think the FDA was not at that moment ready to talk about it. We did raise to them our awareness that the FDA has put guidelines out that they want confirmatory trials to be initiated. And they appreciated the fact that we were – we're conscious of that and told us it's okay, we'll raise that, we'll talk about this at another point in time.

336. Abi-Saab added that uniQure "actually . . . had a proposal in place" for a confirmatory study but "[t]he FDA said we're not prepared to discuss what would the confirmatory study [] look like until we have a chance to review the data that you submit to us as part of the BLA submission. So, at this point, the agency is not ready to discuss this."

337. Notwithstanding the FDA's unwillingness to discuss the specifics of a confirmatory study before seeing the Phase I/II data, Defendants repeatedly speculated about the timing and details of that potential study, including in their September 24, 2025 statements to the market where they assured investors that the FDA is "not going to require that we start that [confirmatory] trial, have it 50% recruited or whatever to delay approval of the accelerated pathway."

338. *Third*, the Company had not aligned with the FDA on whether there was a path to full approval for AMT-130. During the Company's June 2, 2025 conference call with investors and analysts, Abi-Saab stated that "the FDA said they would be open to evaluating the data from this current study, whether based on the cutoff that we will be submitting of June 30 or after longer periods of observation to evaluate whether this could serve as a basis for potential full approval," but that "any discussions for what it would take to have a full approval and what evidence will be needed to be generated will take place only after they have a chance to review those data." He stated that this issue too would be discussed with the FDA during the planned 4Q25 pre-BLA meeting, meaning that it had not been discussed before Defendants' September 24 misstatements.

339. *Fourth*, uniQure had not aligned with the FDA on the number of patients and length of follow-up that would be required for the submitted data, nor had there been any meeting of the

minds as to the power, p-value, effect size, or what evidence was necessary to demonstrate that the data was "clinically meaningful." Kapusta explained during the December 10 conference call, for example, that "there is no specific guidance that we've received in terms of a particular number of patients that have to reach a specific amount of follow-up." Likewise, when asked "what is the FDA view as a clinically meaningful difference on cUHDRS, and I guess, should we interpret this as the FDA viewing your data reported as already showing a meaningful difference since they're reaching sort of alignment with you on that endpoint?," Abi-Saab responded: "The question of clinically meaningful difference did not come up at all in our discussions." During the June 2 conference call, Abi-Saab reiterated that "magnitude of effect and p-value . . . were not specifically discussed or request[ed] by the agency" and he did not "know to what degree a specific p-value needs to be met." He added that "a minimum clinical effect has not been requested nor has it been included in the SAP plan," "[t]here's no particular level of clinical meaningfulness that we proposed in our SAP, nor was it raised by the agency," "there was no predefined degree of clinical meaningfulness that we were requested to meet or any discussion on that topic that were raised by the FDA," and the FDA's assessment was "not p-value-driven."

340. *Fifth*, uniQure had not discussed—or reached agreement—with the FDA about how the apparent biases in the data from AMT-130's Phase I/II trials would be accounted for or mitigated as part of the approval process during the late November 2024 meeting. As noted above, Kapusta explained that one of "the key things that the FDA wants to understand" through the approval process "is how do you control for biases," and that uniQure wanted to discuss potential biases with the FDA to "make sure that they're comfortable with it." But he stated that uniQure "did not go through our rationale and go through a specific list of potential biases and how we're mitigating those risks of biases" with the FDA during its November 2024 meeting.

### 4. Personnel Changes at CBER and Adverse Regulatory Decisions Undermined Defendants' Statements Regarding uniQure's Purported Agreement with the FDA

341. Even if the Marks-led CBER may have been willing to overlook the exploratory design of the U.S. and E.U. Phase I/II Trials and the biases in the data described above, there was no indication as of September 24, 2025 that the Prasad-led CBER was willing to do the same. Before Defendants' September 24 statements, the market acknowledged this and expressed substantial concern over whether uniQure's alleged agreement with the FDA would survive the transition from Marks to Prasad. For example, in an August 18, 2025 report, Leerink Partners analysts acknowledged that "[o]ne of the largest unknowns" for uniQure investors "is how the regulatory path will play out here." Leerink then noted that "[e]veryone is acutely aware of the situation at the FDA, and every headline drives volatility for QURE shares."

342. Before the Class Period, the Executive Defendants attempted to quell these concerns by focusing on, among other things, their positive interactions with FDA staff and the fact that AMT-130 was granted a BTD in April 2025. For example, in a press release issued on May 9, 2025—three days after Prasad was appointed to lead CBER— Kapusta noted that "[i]n recent weeks," uniQure had "multiple productive interactions with the FDA focused on preparing for our planned BLA submission" and that those "constructive interactions" left Defendants "feel[ing] very encouraged about our path forward." In that same press release, he described the BTD as a "significant milestone" for the Company that "underscores the FDA's continued engagement with AMT-130" even after Marks' departure. The market agreed, with TD Cowen stating in an April 17 analyst report that the BTD "helps alleviate a major risk regarding uncertainty around post the departure of Peter Marks, a major champion for accelerated approval and gene therapy."

343. The Executive Defendants also attempted to minimize the market's concerns over Prasad's elevation to CBER Director by noting that "there's been no material changes" to the review team assigned to uniQure. In response to a question during the Company's May 9, 2025 conference call about "how confident are you that all the productive conversations that you have had so far with CBER on Huntington will not be flipped upside down by the new leadership," Abi-Saab responded:

> I very much look forward to working with Dr. Prasad and really do appreciate his public service. The reality is that no matter who is the director of CBER, we believe strongly in our data, and we believe in the end that this is going to carry the day. I also want to point out something really important in terms of the reliance on surrogate biomarkers, which has been something that I think has come up over the last couple of days. . . . this is not our approach with AMT-130. We're going to be seeking accelerated approval based on three-plus years of clinical outcomes and utilizing a clinical measure as a primary endpoint. So, honestly, I believe that this is a key differentiator for AMT-130 and I remain really encouraged about our path forward.

344. Yet by the start of the Class Period, Defendants knew that positive interactions with the FDA, continuity in FDA review teams, and BTDs were not indicators that FDA approval was likely or that Prasad would honor any agreement uniQure reached with the Marks-led CBER. While Prasad initially indicated that he was open to continuing Marks' efforts to exercise "regulatory flexibility" in the rare disease space, his actions throughout 2025 indicated the opposite and, in particular, his willingness to undo actions previously taken by Marks. As noted above, upon taking control of CBER, Prasad immediately placed Verdun, the FDA's highly respected Director of the Office of Therapeutic Products who had helped "steer[] efforts to modernize the [FDA's] approach to cell and gene therapy regulation over the past two years," and her deputy on administrative leave. Prasad's removal of individuals who had previously advocated for accelerated approvals for gene therapies increased the regulatory risk for AMT-130 and further undermined uniQure's purported alignment with the FDA.

345. Shortly thereafter, Prasad effectively undid Marks' actions with respect to Sarepta's Elevidys gene therapy (which, as discussed above, Marks had approved over the objection of CBER staff) by compelling Sarepta to institute a shipping hold on the therapy. In doing so, Prasad publicly called out Marks, stating: "It is rare that you can blame a single person for a regulatory failure, but Peter Marks at [the] FDA overruled 3 review teams and pushed [Elevidys] on the market despite a failed trial." Similarly, as discussed above, Prasad's decision to reject Replimune's and Capricor's cellular and gene therapies in July 2025—despite prior alignments between those companies and the FDA and, in the case of Replimune, a BTD—surprised the market and "represent[ed] a clear shift by the FDA towards increased oversight of trial design" that created significant regulatory risk for uniQure.

346. As discussed above, Defendants attempted to differentiate AMT-130 from these failed gene therapies by suggesting that uniQure was "utilizing a clinical measure as a primary endpoint" rather than a surrogate biomarker. But Defendants knew by the start of the Class Period that there was no basis to believe that the use of a clinical endpoint would be better-received by the Prasad-led CBER than a surrogate biomarker endpoint.

347. Prasad himself also had been openly critical of the data surrounding AMT-130 before the Class Period, and its Phase I/II study was flawed in precisely the ways that would create regulatory concerns for Prasad.

348. Each of these facts contradicted Defendants' September 24 statements by undermining any suggestion that the Phase I/II trial design and data would be sufficient under a Prasad-led CBER, or that Prasad would blindly honor a purported agreement reached between uniQure and the Marks-led CBER regarding AMT-130.

349. Thus, by no later than September 24, 2025, Defendants were aware of, among other things, fundamental shortcomings of—and biases built into—the AMT-130 Phase I/II study, substantial gaps in their purported agreement with the Marks-led CBER, and actions taken by the FDA throughout 2025 that created significant regulatory risk related to the approval of AMT-130. Given their awareness of these facts, Defendants lacked a factual basis for their overly-optimistic statements on September 24, 2025 touting the results of study and reaffirming the existence of a purported agreement with the FDA that those results could support the approval of AMT-130.

### F. The Relevant Truth Is Revealed

350. On November 3, 2025, the material facts and risks concealed by Defendants' September 24 and October 30 false and misleading statements and omissions were revealed to the market.

351. On that day, uniQure filed a current report with the SEC on Form 8-K providing an update on the Company's October 29, 2025 Type B pre-BLA meeting with the FDA (the "November 3 Form 8-K"). The November 3 Form 8-K stated:

> Though final meeting minutes have not yet been received, based on the discussions at the meeting, uniQure believes that the FDA currently no longer agrees that data from the Phase I/II studies of AMT-130 in comparison to an external control, as per the prespecified protocols and statistical analysis plans shared with the FDA in advance of the analyses, may be adequate to provide the primary evidence in support of a BLA submission.

352. The November 3 Form 8-K further stated, "Consequently, the timing of the BLA submission for AMT-130 is now unclear."

353. The November 3 Form 8-K attached as an exhibit a press release with the same date titled, "uniQure Provides Regulatory Update on AMT-130 for Huntington's Disease" (the "November 3 Press Release"). The November 3 Press Release reiterated the information in the

November 3 Form 8-K and added that "This is a key shift from prior communications with the FDA in multiple Type B meetings over the past year."

354. The price of uniQure common stock declined significantly in response to this news, falling more than 49% from a close of $67.69 per share on October 31, 2025 to close at $34.29 on November 3, 2025.

355. Market participants were shocked by this news and recognized that it revealed significant regulatory risk that called into question uniQure's AMT-130 timeline. For example, Leerink Partners issued two reports on November 3, 2025. In those reports, Leerink Partners stated that "QURE said that they did not wait for the final minutes from the FDA to release this news as it was so material, and it was better to be transparent" and called the disclosure "unexpected" and "confusing." Leerink Partners also provided more detail about uniQure's interactions with the FDA:

> We were told that there were ~20 FDA staff in the most recent meeting that the clinical lead and biostatistics lead were the same as prior interactions, and there is a new director of the Office of Therapeutic Products (who was previously Nicole Verdun). QURE said that Vinay Prasad was not present in this meeting, but it is hard for us to rule out his involvement given what we have heard from news sources recently. . . and wonder if FDA is just becoming more conservative overall with less willingness to be flexible.

356. Leerink Partners added that it could not "help but draw parallels with what happened with [Replimune] earlier this year, when a senior FDA official was instrumental in giving the company a CRL for their BLA." Mizuho similarly called the November 3 disclosures "surprising" and noted that they "suggest[ed] that an additional clinical study may be required." Wells Fargo similarly stated in a November 3, 2025 report that the "Surprise Shift in FDA Stance" "could have severe consequences on [the BLA] timeline," which "was previously planned for 1Q26" but "now TBD." William Blair downgraded uniQure to Market Perform in response to this disclosure because it "now see[s] the timing of the BLA submission for AMT-130 as unclear."

357. For its part, Chardan reduced its price target by over $20 per share, from $76 to $53, in response to this news, noting that the BLA timeline previously disclosed by the Company was "now unlikely" and that it was "pushing back the potential launch of AMT-130 to 2028." Chardan called the November 3 disclosures "a complete reversal from guidance the Agency has provided in Type B meetings over the past year and more broadly calls into question whether or not FDA alignment under previous leadership is still meaningful under the new administration." Chardan went on to state that "[u]nder its new leadership," including Makary and Prasad, "the FDA has become unpredictable" and the FDA's shifting stance on "non-placebo-controlled studies . . . is particularly important in cases where companies have previously aligned with the FDA (under its former leadership) on the use of such trials to support regulatory applications, and [we] are now left to wonder whether that alignment is still meaningful."

358. Goldman Sachs likewise noted "the regulatory outlook for AMT-130 is [now] unclear" following uniQure's November 3 disclosure. The Goldman Sachs report also stated:

> We spoke with management, who noted the FDA does not consider the Ph1/2 data to adequately provide substantial evidence of AMT-130's effectiveness given the inability to accurately quantify bias per the statistical analysis (which was not specified prior to initiating the trial) and external comparator, noting the studies were initially designed as hypothesis-generating, proof-of-concept studies, and comparisons to an external control are post-hoc and exploratory in nature.

359. In a same-day report, Guggenheim provided more detail, stating that "[t]he clinical and statistical lead have remained the same, but all other senior representatives of the FDA have changed" and "in a 180° turn, the agency now views the Ph1/2 study as exploratory and the statistical analysis as post-hoc." RBC Capital Markets likewise stated, "we just caught up with the team, and . . . . the FDA is arguing that the trial was hypothesis generating, the analysis was not pre-specified since day zero and there were other limitations including no clear dose response." RBC Capital Markets continued, "We also believe that recent FDA leadership changes did

contribute as Nicole Verdun (we think a supporter of accelerated approval)" and "a vocal participant in prior meetings" "was escorted out of the building soon after the Type B meeting where the SAP was discussed/agreed on."

360. H.C. Wainwright stated on November 4, 2025 that the Company's November 3 disclosure was "significant," "Clouds Near Term Visibility," and will likely result in "a significant delay in BLA timing." H.C. Wainwright also stated, "[w]e met with management— including CEO Matt Kapusta, CMO Walid Abi-Saab, and Head of IR Chiara Russo—on November 3" and learned based on that discussion that the FDA's "written feedback focused heavily on methodological and statistical caveats related to open-label designs and post hoc analyses, rather than addressing the extensive propensity-matching and sensitivity analyses uniQure had prespecified and shared with the FDA over the past year." H.C. Wainwright added that after adjusting its valuation model for this disclosure, it "now value[d] AMT-130 at $55 per share (vs. prior $100)," and it reduced its price target for uniQure to $70 from $110.

361. Cantor Fitzgerald commented that the November 3 disclosures presented a "very negative scenario for QURE shares." Cantor Fitzgerald then lowered its 12-month outlook for uniQure's stock price from $80 to $55. Commenting on this, the Cantor Fitzgerald report noted that it was unclear if additional trials would need to be run. After Cantor Fitzgerald analysts met with uniQure's leadership, the analyst firm reported the additional detail that "[t]he pushback was around statistical concerns: that the study was intended to be a hypothesis generating study to investigate safety and tolerability," and "there is something from regulations that says for open label studies with external controls, the FDA strongly recommends defining SAP before starting the study (***whereas in this case it was done after study initiation but prior to database lock***)" (emphasis added).

362. Analysts also linked uniQure's November 3, 2025 disclosure back to Defendants' September 24 representations, acknowledging that it raised questions about the veracity of those prior statements. For example, on November 6, 2025, Baptista Research stated that "[w]hile UniQure insists it had 'clear and unambiguous' feedback from the FDA, it now faces a credibility gap with investors and analysts" because its November 3 disclosure "introduce[s] significant regulatory risk and call[s] into question the company's previous guidance and preparedness for commercialization."

363. News coverage of the announcement emphasized the importance of AMT-130 to uniQure, and connected the FDA's decision to previous, similar decisions taken by the agency under CBER Director Prasad. Reuters issued a November 3, 2025 article titled, "UniQure Shares Plummet as FDA Says Inadequate Clinical Data for Huntington's Therapy" stating that "Analysts on Monday described the development as a major regulatory setback."

364. That same day, Biopharma Dive reported in an article titled, "uniQure dives after FDA's 'very surprising' reversal on Huntington's gene therapy" that the Company's common stock "lost more than 65% of its value Monday morning after" the November 3 disclosures. According to the Biopharma Dive article, the FDA's feedback validated "lingering concerns about the path to approval" that had been prompted when Prasad took over the CBER in May 2025, noting Prasad's known history of criticizing the FDA's use of accelerated pathways to approval. The article also compared the feedback to uniQure to several previous decisions by the FDA in July 2025, and noted that Prasad's control over the division had strengthened since his return to the agency in July. Quoting a Stifel analyst, the article stated that while Prasad was not in the pre-BLA meeting, "it's hard to believe that this [uniQure] about face happened without him knowing

or being involved." The analyst emphasized that under Prasad, the FDA's decisions were "as uncertain as it's been in the past decade or longer."

365. Similarly, the same day, in an article titled, "uniQure's ballyhooed gene therapy for Huntington's hits FDA roadblock," Fierce Biotech reported that "UniQure's stock price plummeted 66% in premarket trading Monday" and explained:

> Based on uniQure's description, AMT-130 may be another casualty of the new FDA's stance toward cell and gene therapies under Center for Biologics Evaluation and Research Director Vinay Prasad, M.D. The FDA in July declined to approve Capricor Therapeutics' cell therapy to treat a serious heart condition associated with Duchenne muscular dystrophy. In making that decision, the agency cited a data package that "does not meet the statutory requirement for substantial evidence of effectiveness," the biotech explained in a press release. At that time, Capricor CEO Linda Marbán, Ph.D., also said the company was surprised by the FDA's decision and that it had followed the FDA's guidance throughout the process. Replimune also got a surprise FDA rejection for its application for an accelerated approval of an oncolytic virus therapy in melanoma. According to the biotech, the agency cited a lack of substantial evidence of effectiveness from the phase 1/2 data the company had provided. Replimune CEO Sushil Patel, Ph.D., said the issues were not raised by the agency during previous communications.

366. Additionally, a November 6, 2025 STAT News article, titled "the FDA is a mess, but that doesn't mean it should be blamed for everything," stated:

> [O]n Monday, Uniqure said its plans to seek approval for what appeared to be a groundbreaking gene therapy for Huntington's disease were thrown into doubt after a recent meeting at which FDA officials said they no longer "agreed" with the company's clinical trial that compared the gene therapy, called AMT-130, against an external control group.
>
> * * *
>
> Why did the FDA reverse course? It's murky. The decision certainly has Prasad's conservative data-stickler fingerprints all over it. But I also find it hard to believe he'd give The Wall Street Journal editorial page another easy opportunity to write a "Prasad: FDA's Grim Reaper" attack piece without a compelling concern about the adequacy of the AMT-130 data. Sarepta Therapeutics and Duchenne muscular dystrophy patient advocates helped push Prasad out of the FDA. Now that he's back, why risk adding Huntington's patients to his enemies list? Approving AMT-130 seems like a no-brainer win for the FDA and the policy initiatives pushed by its leadership.

> You have to consider the possibility that there is a significant issue with the AMT-130 data, the composition of the external control group, or both, that Uniqure hasn't disclosed.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

367. Before the markets opened on September 24, 2025, uniQure filed a current report with the SEC on Form 8-K disclosing additional results from the U.S. and E.U. Phase I/II Trials.

368. Under the heading, "Item 8.01 Other Events," the September Form 8-K stated, "On September 24, 2025, the Company announced positive topline data from the ***pivotal*** Phase I/II study of AMT-130 for the treatment of Huntington's disease."[1] The Form 8-K added that "[b]ased on" uniQure's "interactions" with the FDA, "the ongoing Phase I/II AMT-130 clinical trials are supplemented by two additional protocols . . . . The new protocols . . . provide for the pooling of data across" the U.S. and E.U. Phase I/II Trials and "prespecified the ***pivotal*** comparison of AMT-130 clinical endpoints compared to a propensity score-matched external control from the Enroll-HD natural history data set."

369. The September 24 Form 8-K described the assessment of cUHDRS as the "***primary endpoint***" of the U.S. Phase I/II Trial, including "[a] statistically significant 75% slowing of disease progression as measured by cUHDRS (p=0.003), which met ***the primary endpoint of the study***."

370. The September 24 Form 8-K further stated:

> Based on [uniQure's] interactions with the U.S. Food and Drug Administration ('FDA'), ***it was agreed that data from cohorts 1 and 2 in the Phase I/II studies*** could be compared to a propensity score-matched external control derived from the Enroll-HD natural history data set, under a prespecified statistical analysis plan, ***which may serve as the primary basis for a Biologic License Application ('BLA') submission***.

[1] Unless otherwise noted, the misstatements and omissions alleged herein are bolded and italicized.

371. The September 24, 2025 Form 8-K attached as an exhibit a copy of a press release announcing results from uniQure's analysis of data from the U.S. Phase I/II Trial (the September 24 Press Release) titled, "uniQure Announces Positive Topline Results from ***Pivotal*** Phase I/II Study of AMT-130 in Patients with Huntington's Disease." The September 24 Press Release described the U.S. Phase I/II Trial as "***pivotal***," stating "the ***pivotal*** Phase I/II study of AMT-130 for the treatment of Huntington's disease" and "this ***pivotal*** Phase I/II study." The September 24 Press Release also quoted Defendant Tabrizi as describing the U.S. Phase I/II Trial as "***pivotal***."

372. Additionally, the September 24 Press Release described the assessment of cUHDRS as the "***primary endpoint***" of the U.S. Phase I/II Trial, including "[a] statistically significant 75% slowing of disease progression as measured by cUHDRS (p=0.003), which met ***the primary endpoint of the study***." The September 24 Press Release added that the ***"[p]ivotal study met primary endpoint***" and "***[t]he study met*** its prespecified ***primary endpoint***."

373. Under the heading, "About the Phase I/II Clinical Program of AMT-130," the September 24 Press Release stated:

> Based on interactions with the FDA***, it was agreed that data from cohorts 1 and 2 in the Phase I/II studies*** could be compared to a propensity score-matched external control derived from the Enroll-HD natural history data set, under a prespecified statistical analysis plan, which ***may serve as the primary basis for a BLA submission.***

374. That same day, uniQure held an accompanying investor call. At the outset of the September 24 Conference Call, Chiara Russo, uniQure's Senior Director Investor Relations, described the "data" announced in the September 24 Form 8-K and Press Release as "***pivotal***."

375. During the September 24 Call, each Individual Defendant provided prepared remarks. During his prepared remarks, Defendant Kapusta stated, "As reported in our press release this morning, we achieved the ***primary endpoint*** of our ***pivotal*** Phase I/II study, high dose AMT-130, [our] ***registrational*** dose, demonstrated a statistically significant 75% slowing of disease

progression as measured by the composite Unified Huntington's Disease Rating Scale of 36 months."

376. Kapusta further stated, "we believe ***these findings*** provide ***compelling and clinically meaningful evidence*** of AMT-130 disease-modifying potential."

377. Kapusta concluded his prepared remarks stating, "As we move closer to ***a planned BLA submission***, our focus remains clear, to advance AMT-130 with urgency . . . ."

378. During his prepared remarks, Defendant Abi-Saab stated, "Before I get into the details of the study results, let me take a moment to go over the ***primary*** clinical ***endpoint*** in this ***pivotal*** study." Abi-Saab further stated:

> Earlier this year, we held a Type B meeting with the FDA to discuss the proposed use of external control data and the proactively prospectively defined statistical analysis plan, or SAP, ***in support of a planned BLA submission for AMT-130***. The FDA agreed that the cUHDRS could serve as an acceptable registrational intermediate clinical endpoint for accelerated approval.

379. Additionally, during his prepared remarks, Abi-Saab stated, "In the study's ***primary endpoint*** of cUHDRS, we can see clearly that at 36 months, AMT-130 shows a statistically significant reduction in disease progression as shown on this graph." He also stated, "In summary, following the statistical analysis plan agreed upon by the FDA, at 36 month ***AMT-130 met*** both ***the primary*** and the key secondary ***endpoint***, demonstrating a meaningful slowing of disease progression compared to a robust external control."

380. Following Abi-Saab's prepared remarks, he "turn[ed] the call over to" Tabrizi, who introduced herself as "a lead scientific advisor to the study" and gave prepared remarks. As part of these remarks, Tabrizi stated, "I have over 30 years of experience in Huntington's disease research and clinical care, and I believe ***these data*** are the first to ***provide clear evidence*** of an investigational therapy inducing Huntington's disease modification."

381. During the question-and-answer portion of the call, Debjit Chattopadhyay, an analyst from Guggenheim Securities, asked Tabrizi whether "there [were] any shortcomings to these data . . . that would give [her] a pause." In response, Tabrizi stated:

> ***No, I don't think there's any shortcomings***. I am here because I think the data are really very exciting. A 75% slowing in the composite Uni[fied] Huntington's Rating Scale, which captures all aspects of function, motor score, cognition and a 60% slowing in total functional capacity. We really just haven't had anything like that. And I have run many different clinical trials, I've developed – developing drugs. ***But when the data was so clear to me that this drug was working, the effect size was huge.*** So in all honesty, ***I don't see shortcomings***.

382. Patrick Trucchio, an H.C. Wainwright analyst inquired about Defendants' level of confidence in the data:

> TRUCCHIO: [W]e've met the primary and secondary endpoints here. How confident are you that the data will be sufficient for accelerated approval?
>
> TABRIZI: . . . . Will it get approved by the FDA in the discussions? I'm not a regulator. But I've seen many clinical trial results over my years working in Huntington's disease, and ***these clinical trial results are very clear cut***. The numbers are small in the high dose, of course, it's 12 people have reached 36 months, but that's quite typical for gene therapy trials, and the value and importance of the propensity score matched ENROLL-HD data, which has really been critical. I'm very optimistic that we will try and get this drug to the patients and families as soon as we can.

383. Yanan Zhu, a Wells Fargo analyst asked about the FDA's requirement for a confirmatory trial for accelerated approval:

> ZHU: [A]ssuming accelerated approval is the path and a confirmatory trial is required, how do you think about FDA's requirement for the confirmatory trial to be well underway at the time of approval? Would that be something that can be done with the current forecast?
>
> ABI-SAAB: In terms of the confirmatory trial with the FDA, we've tried to have the discussions with them a couple of times, but the agency was very clear that they would like to see data from this trial before they can decide whether they're going to take action via traditional pathway as in full approval or accelerated pathway, which will then require confirmatory trial. ***But it was very clear to us that even if they go down the path of accelerated approval, because it is – we're following what they're doing, it's not going to require that we start that trial, have it 50% recruited or whatever to delay approval of the accelerated pathway***.

384. At the end of the question-and-answer portion of the September 24 Conference Call, Kapusta stated, "We are all enormously excited about these ***pivotal results*** and look forward to keeping you informed as we move closer to ***our planned BLA submission.***"

385. During the September 24 Conference Call, Defendants referred to a set of slides titled, "***Pivotal*** Phase I/II AMT-130 Huntington's Disease Update." The September 24 Slides for Kapusta's prepared remarks stated that "[h]igh-dose AMT-130 met ***primary . . . endpoint***[] at 36-months."

386. Additionally, in a section titled, "Topline Data from ***Pivotal*** Phase I/II Study" in connection to Abi-Saab's prepared remarks, the September 24 Slides described the U.S. and E.U. Phase I/II Trials as "***[p]ivotal***" and cUHDRS as the "***PRIMARY ENDPOINT***." The September 24 Slides for Abi-Saab's prepared remarks added that the U.S. and E.U. Phase I/II Trials "***met primary endpoint of cUHDRS*** at 36 months." Furthermore, in the concluding slide in that section stated, "High-dose AMT-130 ***met its primary . . . endpoint[]*** at 36 months."

387. In a September 24, 2025 STAT News article titled, "Experimental gene therapy for Huntington's markedly slowed disease progression in key trial," Adam Feuerstein reported on an interview with Kapusta. After Feuerstein noted that "[t]he FDA ha[d] undergone considerable changes in the months since uniQure reached its agreement on the terms of AMT-130's submission package" and "Vinay Prasad, a physician with a reputation for taking a more conservative view of gene therapies now oversees the division that will review and decide on the approval of AMT-130," and reported that Kapusta stated, "'***We're confident in our data.' . . . . 'We've had a great relationship with the FDA so far. We've had very constructive interactions with unambiguous feedback.***'"

388. On the news of AMT-130's purportedly successful results, the price of the Company's ordinary shares substantially jumped from a close of $13.66 per share on September 23, 2025, to close at $47.50 per share on September 24, 2025, a nearly 250% increase.

389. Additionally, analysts issued reports repeating and amplifying Defendants' statements. In a September 24, 2025 report titled, "QURE: WOW1 Increasing PT to $95 (prior $28) for Our Top Pick," Guggenheim wrote that "AMT-130 delivered on all fronts." Similarly, in a report titled, "HD Data Mature Like a Fine Wine, We See Very Limited Regulatory Risk From Here," issued after the press release but before the conference call, Leerink Partners described the U.S. Phase I/II Trial as "pivotal" and noted that the reported results "limits the regulatory risk for this program going forward." Leerink Partners also stated, "we think these data are definitive and can support an approval with minimal need for regulatory flexibility from the FDA (and therefore with limited regulatory risk), which has been a concern for investors, and we would not be surprised to see the stock trade up 100% or more on today's news." In a follow-on same-day report issued after the conference call titled, "Our Post-Call Thoughts: Leading HD KOL Calls AMT-130 a Game-Changer, PT to $68,"in a section titled, "Putting these impressive results into context," Leerink Partners highlighted Tabrizi's statements, confirming that she "noted she didn't see any shortcomings of these data and that it is 'so clear to me that this drug was working.'"

390. H.C. Wainwright likewise issued a September 24 report titled, "HCW Top Pick 2025: AMT-130 Shines in Top-line Pivotal Program; BLA Filing on Track for 1Q26; Reiterate Buy," stating "we believe these top-line pivotal data establish AMT-130 as a leading candidate in HD, and support a 1Q26 Biologics License Application (BLA) filing and potential accelerated approval in 2026, assuming priority review by the FDA." Wells Fargo issued a report stating that "[b]ased on KOL feedback, we believe the level of evidence for clinical efficacy is compelling"

leading Wells Fargo to increase its price target from $30/share to $65/share. William Blair also issued a September 24 report, writing in a section titled, "Leading HD expert highlighted unprecedented clinical and biomarker signals," that Tabrizi "described the results as 'game-changing,' calling them the first clear evidence of disease modification in HD."

391. Moreover, in a September 24 report titled, Positive 3-Year AMT-130 Data Should Support Potential Approval; Increasing PT to $60," Mizuho stated that "[t]he renowned KOL on the call," Tabrizi, "called AMT-130's results 'very clear cut' and 'game-changing.'" Mizuho further reported that "[m]anagement confirmed the FDA has agreed the 3-year data presented today (12 high-dose patients completed) will serve as the basis for BLA submission and potential approval" and described the data as "robust[]" and "sufficient to gain FDA approval." Mizuho also raised its price target from $30 to $60 "[g]iven the highly positive data." Similarly, in a report titled, "uniQure (QURE): Positive Huntington's data supports a regulatory filing in 1Q26," Goldman Sachs wrote, "QURE shares are trading higher post positive data from the pivotal Ph1/2 study of gene therapy AMT-130 in Huntington's disease," noting that "[t]he data from the high-dose cohort (n=12) will serve as the primary efficacy analysis for the BLA filing in 1Q26 under an accelerated approval pathway following FDA alignment."

392. Further in a September 25 report titled, "QURE (Buy, PT to $76): Excellent 3-Yr Data for AMT-130 in HD; BLA in 1Q26," Chardan wrote "The data will support a BLA submission in 1Q26, paving the way for AMT-130 to potentially become the first disease-modifying therapy approved for Huntington's disease" and "we believe these results have AMT-130 well positioned to obtain regulatory approval next year." With respect to uniQure's approval pathway, Chardan stated:

> We believe a more likely path will include an accelerated approval, which would require post-approval confirmatory data, although the company is not ruling out

> full approval, which would not require any additional data. If confirmatory data are required, we believe it is unlikely that the FDA would require uniQure to perform an entirely new study. Rather, the company would likely be able to leverage additional data from its ongoing studies, potentially including 4-year data from the cohorts described above and/or data from an additional cohort.

393. The statements set forth above in ¶¶368-87 were materially false and misleading when made. For instance, Defendants' use of regulatory terms of art, i.e., "pivotal," "primary endpoint," and "evidence" of benefit, to describe the U.S. and E.U. Phase I/II Trials and the resulting data in conjunction with statements reaffirming the purported agreements with the FDA and referring to uniQure's "planned BLA submission" created the misleading impression that the U.S. and E.U. Phase I/II Trial were adequate and well-controlled studies, and the resulting data demonstrated substantial evidence of effectiveness, which was necessary to achieve FDA approval, and was sufficient to be the primary support of a BLA submission seeking accelerated approval premised on the cUHDRS intermediate clinical endpoint. Defendants' September 24 statements likewise created the misleading impression that the changes in leadership at the FDA, and, in particular, the appointment of Prasad and administrative leave of Verdun, as well as the adverse regulatory decisions for other gene therapies before September 2025, including with respect to Sarepta and the three CRLs, did not and would not impact uniQure's plan to submit a BLA to the FDA based on the cUHDRS data.

394. More specifically, Defendants' statements describing the U.S. and E.U. Phase I/II Trials as "***pivotal***" and cUHDRS as a "***primary endpoint***" or a "***primary endpoint of the study***" were materially false and misleading when made because the Trials were not "pivotal" and cUHDRS was not a pre-specified "primary endpoint" of the Trials. The U.S. and E.U. Phase I/II Trials were by design "exploratory" and the primary endpoints agreed-to at the outset of these Trials were safety-related with the efficacy endpoints, including at least three biomarkers and

several clinical assessments (including cUHDRS) were listed in the publicly available clinical trial materials as secondary and "exploratory." *See supra* Sections IV.A.4-6.

395. Further, uniQure's purported "agreements" with the FDA were limited and did not include recasting the "exploratory" U.S. and E.U. Phase I/II Trials as "***pivotal***" and transforming the cUHDRS exploratory efficacy endpoint into a "***primary endpoint***" of those studies. For instance, if the FDA "agreed that data" from these Trials "may serve as the primary basis for a BLA submission" in the late November 2024 meeting with uniQure executives, any such agreement did not change the design or purpose of the Trials. Instead, it reflected the willingness of the Marks-led CBER to overlook the exploratory trial design, including the use of a single arm, external natural history control, and the lack of prespecified hypotheses, endpoints, and analyses, as well as the related biases. That willingness to entertain the data from the U.S. and E.U. Phase I/II Trials as the primary support for a BLA for accelerated approval did not make the Trials or the resulting data "pivotal." Unlike traditional or full FDA approval, accelerated approval does not require the submission of "substantial evidence" of efficacy but "on the basis of an effect on" an intermediate clinical endpoint. If accelerated approval is granted, a sponsor must conduct post-confirmatory trials to *verify* the clinical benefit predicted by the data supporting the original approval. Thus, neither the Trials nor the resulting data were "pivotal."

396. Likewise, if the FDA agreed that cUHDRS "may serve as an acceptable registrational, intermediate clinical endpoint for accelerated approval" in the late November 2024 and late April 2025 meetings, any such agreement did not transform the cUHDRS endpoint from one of many "other" exploratory efficacy endpoint into a "***primary endpoint of the study.***" Instead, this meant that the CBER before Prasad's appointment was willing to consider an accelerated approval *application* using cUHDRS an endpoint that measures a clinical outcome earlier than "an

effect on irreversible morbidity or mortality" that "is considered reasonably likely to predict the medical product's effect on IMM or other clinical benefit" in patients with Huntington's disease. Moreover, while it appears that the SAP prespecified the *analysis* of the cUHDRS data as the primary analysis for the results shared on September 24, that does not transform cUHDRS into the "primary *endpoint*" of the Trials.

397. Additionally, Defendants' statements that the U.S. and E.U. Phase I/II Trials data did not have "***shortcomings***" and was "***compelling and clinically meaningful evidence***," "***clear evidence of an investigational therapy inducing Huntington's disease modification***," "***clear cut***" and made it "***clear***" that AMT-130 was "***working***" with "***a huge effect size***" were materially false and misleading for the same reasons and because the U.S. and E.U. Phase I/II Trials were exploratory, not confirmatory. Indeed, while data from an exploratory trials, like these studies, "may contribute to the total body of relevant evidence" of efficacy, i.e., that a drug was "working," had a "huge effect size" or was "inducing . . . modification" in Huntington's, under FDA guidelines, "[a]s a rule, confirmatory trials are necessary to provide firm evidence of efficacy." By describing data from the exploratory Trials as "evidence" of clinical benefit, Defendants gave investors the misleading impression that it would be sufficient as the primary support for BLA and, ultimately, accelerated approval—even though the Company did not discuss with the FDA the power of the Trials, p-values, effect size, or what would be considered clinically meaningful at either the late November 2024 or late April 2025 meetings. Indeed, with respect to clinical meaningfulness, "there was no predefined degree of clinical meaningfulness that we were requested to meet or any discussion on that topic that were raised by the FDA." Moreover, as explained above in Section IV.E.2, there were also significant "shortcomings" in the data from these Trials that made the data anything but "clear" or "clear cut" and ultimately were the basis

for the FDA's determination that the data from the U.S. and E.U. Phase I/II Trials was not sufficient to be the primary support for a BLA.

398. Defendants' statements also were materially false and misleading when made because they omitted the risk that the Prasad-led CBER and, in particular, Prasad, would not view: (i) the U.S. and E.U. Phase I/II Trials as "***pivotal***"; (ii) cUHDRS as the "***primary endpoint of the study***"; (iii) the data as without "***shortcomings***" or was "***compelling and clinically meaningful evidence***" or "***clear***," "***clear cut***," or "***clear evidence***" ***of an investigational therapy inducing Huntington's disease modification***; (iv) the data that made it "clear that AMT-130 was "working" with "a huge effect size"; or (v) the data was sufficient as the primary support for a BLA submission. For instance, as explained above in Section IV.A.12, before Prasad was appointed head of CBER, he was an outspoken critic of the FDA's use of accelerated approval and a support of "randomized controlled studies with hard clinical outcomes." After his appointment, CBER's actions at his direction, i.e., Verdun's administrative leave, the FDA's actions against Sarepta, and three CRLs for gene therapies, appeared to confirm Prasad's views. And it was these views that ultimately led Defendants to conclude following the October 29 meeting that the data from the U.S. and E.U. Phase I/II Trials would not be sufficient as the primary basis for a BLA for accelerated approval. *See* Sections IV.E.2 and IV.F.

399. Moreover, Defendants' statements that the FDA had "***agreed that data from . . . the Phase I/II studies . . . may serve as the primary basis for a BLA submission***," the Company and the FDA had discussed the use of a SAP "***in support of a planned BLA submission for AMT-130***," and otherwise referring to uniQure's "***planned BLA submission***" were materially false and misleading for the same reasons and because each of these purported agreements was made by CBER when it was led by Marks (who had already overruled staff in favor of approving gene

therapies) or before it was led by Prasad when Verdun was still head of the Office of Therapeutic Products. Moreover, as explained in detail above, *see* Sections IV.A.9 and IV.A.13, there were many pertinent topics about which the Company and the FDA did not engage in any discussion, let alone reach an agreement. In particular, uniQure and the FDA did not discuss or reach agreement on at least the following, all of which undermined the purported agreements reached: (i) the content of a BLA submission or package; (ii) the timing, design, and scope of any confirmatory trial; (iii) whether there was a path to full approval based on the data from the U.S. and E.U. Phase I/II Trials; (iv) the number of patients and length of follow-up for the submitted data; (v) the power, p-value, effect size, or what would be considered "clinically meaningful" by the FDA; and (vi) biases in the U.S. and E.U. Phase I/II Trials data. By virtue of the fact that the Company only reaffirmed the purported agreement with the FDA to use of cUHDRS as an intermediate clinical at the late April 2025 meeting, it does not appear that uniQure and the FDA discussed the purported alignment in late November 2024 as to the accelerated approval pathway and the use of NfL biomarker at that meeting. In any event, Prasad subsequently asserted that he asked CBER staff "to look for any written or verbally transcribed or minutes of a meeting that document such a promise, and there is no such promise made."

400. Finally, Defendant Abi-Saab's statement that the FDA is "***not going to require that we start that [confirmatory] trial***" or "***have it 50% recruited***" before accelerated approval was materially false and misleading when made because the FDA never was willing to discuss any confirmatory trial before Defendants' September 24 statements. For instance, as explained above, even though uniQure included a proposal for a confirmatory study in the materials it submitted for the late November 2024 meeting with the FDA, "the FDA said we're not prepared to discuss what would the confirmatory study [] look like until we have a chance to review the data that you submit

to us as part of the BLA submission." Accordingly, Abi-Saab had no basis for asserting that the FDA, which in recent years "ha[d] been unwilling to grant accelerated approval if a confirmatory study [wa]s not enrolling," would approve AMT-130 on an accelerated basis without requiring uniQure to "start" the trial or have it at least partially recruited.

401. On October 30, 2025, Defendants Abi-Saab and Tabrizi participated in a webinar titled, "What the AMT-130 News Means for the HD Community" from 2:00 pm to 4:00 pm ET. The October 30 Webinar was presented by the HDSA and moderated by Arik Johnson, Chief Mission Officer of HDSA.

402. During the October 30 Webinar, Abi-Saab presented the data from the U.S. and E.U. Phase I/II Trials. During his presentation, he stated: "Before I go and describe the specific details about the study, maybe we should take a moment to talk a little bit about ***the primary endpoint***, which ***is the composite UHDRS***." To that end, he stated that cUHDRS was "***the primary, statistically defined endpoint*** that was reviewed with the FDA and submitted with the FDA before we did the analysis." He likewise stated, ***"[t]he primary endpoint*** in the analysis as I mentioned ***is cUHDRS***."

403. Later, during the question-and-answer portion of the October 30 Webinar, Abi-Saab stated, "We're observing these people over a three-year period and over those three years, we're also looking with ***the primary endpoint being a very important clinical endpoint***, ***the composite score and all of its, you know, components***, but also TFC, which in and by itself is an important, functional endpoint. So that really carries a lot of weight."

404. As to the data from the U.S. and E.U. Phase I/II Trials, Abi-Saab stated that "we really are encouraged by these ***pivotal study results***." Likewise, Defendant Tabrizi stated:

> I've looked at lots of clinical trial data over the years and this was what we call . . . ***the FDA gave this word for it, a "pivotal" study in that it was agreed in advance***

> ***with the FDA and the primary*** and secondary and exploratory ***endpoints were all pre-agreed and the study met all of those endpoints***. And I think it's a really important proof of principle result. We've underst[ood] much more about the disease biology and I think for the first time, I've seen ***convincing evidence that the course of Huntington's disease can be modulated*** in these people and that was something that gave me great hope.

405. After presenting the data from the U.S. and E.U. Phase I/II Trials, Abi-Saab stated that "all the indicators are exciting, encouraging, and that's why we're sharing it with you. ***That's why the health authority is willing to review the data and consider it for approval. But until we've had those further discussions,*** it's always the right thing to do to be cautiously optimistic."

406. With respect to his and uniQure's interactions with the FDA, Abi-Saab stated, "over the past nine months, we've engaged extensively and constructively with the FDA, ***and we've reviewed these data with them—not the data themselves—but we've reviewed the plans for how we want to analyze them***."

407. Abi-Saab also stated uniQure was "looking forward to ***hav[ing] a meeting with the FDA in the fourth quarter [of 2025], where we're going to be discussing plans to submit a BLA***."

408. Abi-Saab further stated:

> ***We have had several meetings with the FDA before, and all of these next steps have been aligned with and agreed to with the FDA and we're moving forward towards meeting with them so that we can maximize the chances that our dossier that we're going to be submitting to them will be successful***. And we expect to submit that BLA in the first quarter of [2026] and we will also request a priority review, which shortens the review time by approximately two months.

409. Then, in response to a question from the moderator about the FDA approval and the BLA submission, Tabrizi stated, "As Walid said, ***we don't know what the FDA will say in their meeting.*** We're hopeful, but it's difficult. ***We don't know what that outcome will be***."

410. Finally, in response to an inquiry from the moderator about "what's in front of you now at uniQure and for AMT-130," Abi-Saab stated, "the most important element that we can do

would be to be laser-sharp focused ***on taking the next step and submitting the BLA for review by the FDA.*** ” He also stated:

> . . . this whole process started when we applied for, and obtained, what they call the RMAT designation, which is back in March of 2024, that gives us a much closer interaction with the FDA, much faster access. That was followed by a series of meetings, November of 2024, and two meetings--one in March of 2025 and one in April [2025]—focus[ed] respectively, the March on the CMC, the product quality and all those elements, to make sure that we're manufacturing it the correct way and the way that the FDA is going to support, and what data we need to provide in the BLA for them to be able to verify that, and the clinical aspect—what are we going to be comparing to, ENROLL-HD, in this case; how are we going to be doing it, the procedure, propensity score methodology with the various sensitivit[ies], ***the primary endpoint***, so on [and] so forth.
>
> Now we lock the database as we were planning, and share the topline results with you because again, these are very material information for the company--a company like us that is relatively small-and these data have an important implication financially for the company because we are publicly traded--we have to share that information.
>
> * * *
>
> ***[W]e're doing everything we can to make sure that we do it as quickly as possible*** and we get the priority review so that we can get ultimately, go through the review process next year and potentially get approval, and have the drug available, potentially to patients by the end of next year . . . So while the study is ongoing and [we're] still collecting data, . . . ***the most important part is to move forward with our interactions with the FDA.***

411. The statements set forth above in ¶¶401-10 were materially false and misleading when made. For instance, Defendants' use of regulatory terms of art, i.e., "***pivotal***," "***primary endpoint***," and "***evidence***" of benefit, to describe the U.S. and E.U. Phase I/II Trials and the resulting data in conjunction with statements reaffirming the purported agreements with the FDA and referring to uniQure's "***planned BLA submission***" created the misleading impression that the U.S. and E.U. Phase I/II Trial were adequate and well-controlled studies, and the resulting data demonstrated substantial evidence of effectiveness, which was necessary to achieve FDA approval, and was sufficient to be the primary support of a BLA submission seeking accelerated

approval premised on the cUHDRS intermediate clinical endpoint. Defendants' October 30 statements likewise created the misleading impression that the appointment of Prasad and administrative leave of Verdun, as well as the adverse regulatory decisions for other gene therapies before September 2025, including with respect to Sarepta and the three CRLs, would not impact uniQure's plan to submit a BLA to the FDA based on the cUHDRS data.

412. More specifically, Defendants made a number of statements that gave investors the misleading impression that the pre-BLA meeting with the FDA had not yet occurred and that discussions during those meetings indicated that the FDA "no longer agrees that data from the Phase I/II studies of AMT-130 . . . may be adequate to provide the primary evidence in support of a BLA submission, including: (i) the FDA "***is willing to review the data and consider it for approval. But until we've had those further discussions*** . . . ."; (ii) "***we've reviewed these data with them—not the data themselves—but we've reviewed the plans for how we want to analyze them***"; (iii) "***hav[ing] a meeting with the FDA in the fourth quarter [of 2025], where we're going to be discussing plans to submit a BLA***"; (iv) "***we're moving forward towards meeting with them so that we can maximize the chances that our dossier that we're going to be submitting to them will be successful***"; (v) "***we don't know what the FDA will say in their meeting.*** We're hopeful, but it's difficult. ***We don't know what that outcome will be***"; (vi) "laser-sharp focused ***on taking the next step and submitting the BLA for review by the FDA***"; and (vii) ***[W]e're doing everything we can to make sure that we do it as quickly as possible*** . . . . ***the most important part is to move forward with our interactions with the FDA***."

413. In fact, on or before October 27, 2025, i.e., two days before uniQure's October 29, 2025 Type B pre-BLA meeting with the FDA, uniQure received written feedback from the FDA that "focused heavily on methodological and statistical caveats related to open-label designs and

post hoc analyses, rather than addressing the extensive propensity-matching and sensitivity analyses uniQure had prespecified and shared with the FDA over the past year." Then, during the October 29 pre-BLA meeting, which occurred the day before Abi-Saab and Tabrizi made the statements set forth above in ¶¶401-10, the FDA told the meeting participants, which included at least Abi-Saab, that the U.S. and E.U. Phase I/II Trials "were designed as hypothesis-generating studies and any such analyses after we've collected the data and we looked at them would be post-hoc." The FDA subsequently raised additional concerns with the data from the Trials, "highlight[ing] the absence of treatment effects relative to sham subjects in the US Phase I/II study after 12 months" and raising "questions around absence of any clinical or biomarker signal in" the sham-controlled portion of the U.S. trial." Additional commentary from subsequent meetings suggested that because the FDA was seeking "an adequately powered" Phase III trial and "a maximum reduction of potential bias," the U.S. and E.U. Phase I/II Trials were not adequately powered and were biased. Additional reactions to the data are set forth in Section IV.E.2.

414. Defendants' statements describing the U.S. and E.U. Phase I/II Trials and the results as "***pivotal***" and cUHDRS as a "***primary endpoint***" or the ***primary, statistically defined, endpoint***" were materially false and misleading when made for the reasons set forth above in ¶¶411-13 and because the Trials were not "pivotal" and cUHDRS was not a pre-specified "primary endpoint" of the Trials. *See supra* ¶¶393-400. And, in any event, to the extent that any of the Company's purported agreements with the FDA included the ability to describe the Trials as "pivotal," discussions with the FDA the day before the October 30 Webinar confirmed that the data from the Trials may not be adequately provide primary evidence in support of a BLA submission.

415. Likewise, Defendants' statement that there was "***convincing evidence that the course of Huntington's disease can be modulated***" was materially false and misleading when made for the reasons set forth above in ¶¶393-400, 411-13 and because the written feedback and discussions with the FDA confirmed that the data from the U.S. and E.U. Phase I/II Trials could not be the primary basis for a BLA submission in part because of the "open label designs and post hoc analyses."

## VI. LOSS CAUSATION

416. Class members were damaged because of Defendants' fraudulent conduct as alleged in this Complaint. During the Class Period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omissions of material facts, trends, events, and uncertainties required to be disclosed, relating to, among other things: (i) the FDA's position on uniQure's comparison of the U.S. and E.U. Phase I/II Trials' data to ENROLL-HD as a basis for BLA submission; and (ii) the timeline for BLA submission and approval.

417. As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, uniQure's common stock traded at artificially inflated prices throughout the Class Period.

418. Unknowingly and in reliance upon Defendants' materially false and/or misleading statements and omissions, Class members purchased uniQure's common stock at artificially inflated prices on the Nasdaq exchange. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased or otherwise acquired uniQure's common stock at the artificially inflated prices at which the common stock traded during the Class Period.

419. Lead Plaintiff and other investors learned the truth about Defendants' fraud on November 3, 2025, when uniQure announced that it had received feedback from the FDA about

AMT-130's path to BLA approval. Critically, uniQure revealed that based on a November 2025 pre-BLA meeting with the FDA, the agency "currently no longer agrees that the data from the Phase I/II studies of AMT-130 in comparison to [the ENROLL-HD] external control, as per the prespecified protocols and statistical analysis plans shared with the FDA in advance of the analyses, may be adequate to provide the primary evidence in support of a BLA submission." As a result, uniQure stated that "the timing of the BLA submission for AMT-130 is now unclear," but that it "plans to urgently interact with the FDA to find a path forward for the timely accelerated approval of AMT-130."

420. The Company added that the FDA's position "is a key shift from prior communications with the FDA in multiple Type B meetings over the past year" and that it "expected to receive final minutes within 30 days" of the November 2025 pre-BLA meeting.

421. On this news, the price of uniQure common stock plummeted $33.40 per share, or ***more than 49%***, from a close of $67.69 per share on October 31, 2025, to close at $34.29 per share on November 3, 2025.

422. Analysts and market commentators were surprised by the revelation of uniQure's fraud, particularly in light of the Company's positive representations about the U.S. and E.U. Phase I/II Trials' results, the FDA's approval of the ENROLL-HD natural history dataset, and the Company's projected BLA submission for AMT-130 in the first quarter of 2026. For example, Leerink Partners reported: "[T]his is confusing to us as QURE has been thoroughly aligned with the FDA over the past year, has breakthrough therapy designation (BTD) and the data update QURE presented in September was very strong." Chardan similarly reported: "uniQure management were very surprised by this development, as are we, especially in the wake of the excellent 3-year data the company announced in September for AMT-130. . . . [G]iven uncertainty

following today's update we are pushing back the potential launch of AMT-130 to 2028, which lowers our price target to $53 from $76." Goldman Sachs also lowered its valuation of uniQure common stock, stating: "As a result of [uniQure's announcement], the regulatory outlook for AMT-130 is unclear . . . We lower the probability-of-success for AMT-130 in Huntington's disease to 60% (from 90% prior)." According to Baptista Research, uniQure "now faces a credibility gap with investors and analysts," which "call[s] into question the company's previous guidance and preparedness for commercialization."

423. The decline in uniQure's common stock price between October 31, 2025 and November 3, 2025 was directly attributable to the market absorbing information that corrected, or reflected the materialization of risks concealed by, Defendants' material misrepresentations or omissions.

424. Lead Plaintiff and other Class members suffered economic losses as the price of uniQure's common stock fell in response to the disclosure of new information concealed by Defendants' misstatements and omissions on November 3, 2025. This price decline was a direct result of the materially false or misleading statements and omissions alleged in this Complaint. It was foreseeable that this disclosure would cause uniQure's common stock price to decline. Thus, Defendants' wrongful conduct, as alleged in this Complaint, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members.

## VII. SUMMARY OF ADDITIONAL SCIENTER ALLEGATIONS

425. As alleged in this Complaint, Defendants acted with scienter during the Class Period in that each knew or recklessly disregarded that their representations to the market regarding the import and viability of data from the AMT-130 U.S. and E.U. Phase I/II Trials, and AMT-130's available pathway to regulatory approval, were materially false and/or misleading.

Numerous additional facts, which are summarized below, contribute to a strong inference that, throughout the Class Period, each of the Defendants acted with scienter, including: (i) Defendants' awareness of the regulatory risks associated with AMT-130, including the limitations and deficiencies in the design and execution of the U.S. and E.U. Phase I/II Trials; (ii) Defendants' knowledge of the details regarding uniQure's discussions with the FDA regarding AMT-130; (iii) Defendants' awareness of the significant personnel changes at the FDA that exacerbated the regulatory risks associated with AMT-130 and undermined the non-binding agreement that uniQure had purportedly reached with the FDA prior to the start of the Class Period; (iv) Defendants' financial motive to issue false and misleading statements to the market regarding AMT-130; and (v) the fact that their misstatements concerned the most important aspect of uniQure's business.

### A. Defendants Were Aware of the Regulatory Risks Associated with AMT-130

426. As senior executives of a public company responsible for developing gene therapies (in the case of Kapusta and Abi-Saab)—and as a neuroscientist with nearly three decades of experience studying Huntington's disease (in the case of Tabrizi)—Defendants were fully aware of the FDA requirements surrounding gene therapy trials like the AMT-130 U.S. and E.U. Phase I/II Trials. In particular, Defendants understood the difference between exploratory Phase I/Phase II trials, which are designed to obtain preliminary evidence of proof of concept and efficacy, and confirmatory or "pivotal" Phase III trials, which would support FDA approval. For example, during a March 2022 Guggenheim conference, Defendant Kapusta acknowledged that "you have to do [P]hase I/II testing" "***prior*** to any registrational study," i.e., a confirmatory or pivotal trial.

427. Defendants also knew that the U.S. and E.U. Phase I/II Trials were designed to be exploratory, not confirmatory. For example, during uniQure's June 16, 2021 Annual General Meeting, Defendant Kapusta stated that the "primary objective" of the study was "to assess safety,

tolerability and . . . potential signals of efficacy." He described it as a "proof of concept" study that was designed "to inform us on proceeding with the Phase [III] trial." Kapusta likewise acknowledged in February 2024 that the Phase I/II trial "was not designed" to demonstrate efficacy at a statistically significant level. In September 2023, Kapusta again stated that he was hopeful data from the study would put uniQure "in a position to meet with the FDA" in 2024 "to talk about possible design of a registrational study and the potential registrational path forward." And even as late as July 9, 2024, uniQure described the results of the U.S. and E.U. Phase I/II Trials as "Exploratory Efficacy and Safety Data," with Abi-Saab confirming during a conference call held that same day that the results of the study provided "exploratory biomarker evidence."

428. Defendants understood that positive results from exploratory trials like the U.S. and E.U. Phase I/II Trials did not always translate into positive confirmatory trial results. For instance, Sarepta studied Elevidys, a gene therapy for DMD, in clinical trials that used an external propensity-weighted natural history control and submitted to the FDA for accelerated approval data that made the treatment effect of Elevidys appear large and highly significant. However, when Sarepta studied Elevidys in a confirmatory trial, known as EMBARK, in part against a concurrent, randomized, blinded placebo arm, the treatment effect present in the prior trials collapsed and the large, significant numbers that emerged from the EMBARK data were against propensity-weighted external control.

429. For instance, an experimental Parkinson's disease gene therapy, CERE-120, showed promise during an open-label Phase I trial, including a roughly 36% mean improvement in the off-medication Unified Parkinson's Disease Rating Scale ("UPDRS"), a widely used clinical tool to assess and track the severity of Parkinson's disease. However, during a subsequent double-blind, sham-surgery-controlled Phase II trial and a separate higher-dose Phase I/II trial, CERE-120

failed to show significant improvement in the prespecified primary endpoint when compared against the control group. Separately, a Phase I/II trial appeared to show that an experimental Huntington's disease drug sponsored by Roche, Tominersen, had successfully targeted and reduced mHTT, leading to a Phase III confirmatory trial that failed to demonstrate safety and efficacy of the drug. Thus, the reason the FDA requires at least one confirmatory trial is because, among other issues, efficacy signals demonstrated in exploratory trials are not always replicated in confirmatory trials.

430. Defendants were aware of this. For instance, during an October 2019 Genetic Medicines conference hosted by Chardan, Defendant Kapusta stated:

> The most important thing is that we know that many mute movement disorders have a very strong placebo effect. Parkinson's disease is a graveyard of gene and other cell therapies that have shown efficacy or promise in a Phase 1/2 study that is open label, only to show in a controlled study that there is no improvement.

431. As a result, Defendant Kapusta explained, the FDA, among other agencies, has "been very vocal that [it] do[es] want to see controlled data, even in a devastating disorder like Parkinson's or Alzheimer's or Huntington's" including "across multiple studies."

432. In addition, Defendants knew what had occurred with Tominersen. Tabrizi was the lead investigator for the Tominersen trials, and she was criticized for "creat[ing] a false expectation" with respect to Tominersen based on its Phase I study results by at least one industry executive, who also expressed concern that she had "done it again with uniQure." In addition, during a March 2024 Leerink conference, Kapusta specifically referenced Tominersen in response to an analyst query regarding his "optimis[m]" for a "straightforward" "regulatory path forward" for AMT-130 given that "the treatment community has been burned a couple times in the recent past with other things that look like they were very promising and then had safety problems in the

face of limited efficacy," noting that it was possible "to run a placebo-controlled study" that was "rather large" for Huntington's disease therapies.

433. Defendants also knew about significant deficiencies in the design of the U.S. and E.U. Phase I/II Trials. Defendants knew, for example, that U.S. and E.U. Phase I/II Trials were not adequately powered. As originally planned, the study included just 26 patients, and ultimately only 12 patients received high dose AMT-130. They also knew that the trial did not identify a primary efficacy endpoint or any secondary endpoints, nor did it pre-specify any hypotheses or analyses. Instead, all analyses were post-hoc in nature. Indeed, during a February 2024 Guggenheim biotechnology conference, Defendant Kapusta confirmed that the U.S. Phase I/II Trial "was not designed" or "powered" to demonstrate efficacy at a statistically significant level.

434. Defendants also knew that utilizing external natural history controls created significant risks of bias. During a February 5, 2025 Guggenheim SMID Cap Biotech Conference, for example, Kapusta stated:

> The FDA is very focused on how you ensure that you're mitigating biases when you are taking what is 30,000 patients of data, and you're now winnowing this down into something that is going to now become your comparator arm. Obviously, biases are less concerning when you have a – an active or internal control arm where you're going to be concurrently enrolling patients in a randomized and blinded manner. When you're looking at a retrospective historical control, how would you select that control and the biases that could come in? Like, for example, how do you handle data that's missing? What does it mean when somebody drops out of the database? They may drop out of the database because they got sicker. And if you don't have an approach to handling that, you can actually bias your data set either favorably or unfavorably.

435. A month later, during a March 3, 2025 TD Cowen healthcare conference, Kapusta reiterated his understanding of the problems that can arise when you conduct an open label study using an external control: "Keep in mind that . . . when you are thinking about accelerated approval, the biggest thing here is that you're utilizing an open label study and in an external control. So, the key things that the FDA wants to understand is how do you control for biases, right?" He then

stated that "the FDA understands that this is an open label study, but they do want the statistical analysis to be prospectively defined. And so . . . we should not be, continually doing comparisons against our proposed natural history to the actual data."

436. Defendants were also aware of the significant changes they made during the U.S. and E.U. Phase I/II Trials. For example, while Kapusta initially told investors that the Phase I/II trial was focused on surrogate biomarker endpoints including mHTT, NfL, and volumetric MRI data, Defendants knew by 2023 that the Phase I/II data with respect to those biomarkers was disappointing. In response, Defendants uniQure, Kapusta, and Abi-Saab made the conscious decision to de-emphasize those endpoints mid-study and to instead focus on intermediate clinical efficiency endpoints like cUHDRS. They also made the conscious choice to change the external natural history control multiple times during the Phase I/II study before settling on ENROLL-HD.

437. Defendants knew that mid-study changes like these created substantial risks related to FDA approval. For instance, at a November 2024 analyst conference discussing a functional endpoint, patient assessment using cUHDRS for one of the AMT-130 trials, Defendant Kapusta responded to an analyst query as to why this endpoint "wouldn't be [] approvable" as follows: "it could be an approvable endpoint, but . . . we didn't necessarily pre-specify the statistical analysis plan and the formation of the natural history [control] at the beginning of the study." As such, Defendant Kapusta explained, "while cUHDRS in my mind could be a very meaningful full approval endpoint, there are obviously limitations to how this protocol was set up and its intended objective of this study."

438. Defendants also knew that their discussions and purported agreements with the FDA in 2024 were not binding. Even before the Class Period began, during a December 2021 call, Defendant Kapusta acknowledged that while uniQure "had interactions with the [FDA]

periodically" regarding AMT-130 and a "number of discussions with respect" to the design of uniQure's clinical development program for AMT-130," there were "no promises" from the agency regarding any approval pathways for AMT-130.

439. Defendants further understood that the significant regime changes at the FDA in 2025 created additional regulatory risks for AMT-130. Defendants knew—because they were repeatedly asked about—Prasad's conservative stance towards accelerated approval for gene therapies, and it was widely known that the Prasad-led CBER had reversed course on multiple gene therapies that had been previously approved by the Marks-led CBER. This included therapies that had been approved based on trials that relied on natural history comparators and therapies that had been subject to prior agreements with the FDA. Yet despite being aware of these issues, Defendants Kapusta and Abi-Saab assured the market that they continued to have productive conversations with the FDA (including with Prasad), that they were not concerned that their interactions with Marks would "be flipped upside down by the new leadership," that AMT-130 was different, and that the data from the U.S. and E.U. Phase I/II Trials would "carry the day" "no matter who is the director of CBER."

440. Further, by the time Defendants Abi-Saab and Tabrizi participated in the October 30, 2025 HDSA webinar, uniQure knew that the FDA no longer agreed that the Phase I/II study results could support a BLA submission. For one thing, uniQure's pre-BLA meeting with the FDA occurred ***before*** this webinar, on October 29, 2025. In addition, as the Company explained to H.C. Wainwright analysts after the November 3 corrective disclosure, uniQure received written feedback from the FDA ***before*** the October 29 meeting that "focused heavily on methodological and statistical caveats related to open-label designs and post-hoc analyses," and did not address the "analyses uniQure had prespecified and shared with the FDA over the past year."

### B. Defendants Had Contemporaneous Knowledge of uniQure's Discussions with the FDA Regarding AMT-130

441. Defendants' public statements to the market between November 2024 and November 2025 demonstrate their contemporaneous personal knowledge of, and involvement in, uniQure's discussions with the FDA regarding AMT-130.

442. For example, before uniQure's November 2024 Type B meeting with the FDA, Kapusta described to analysts and investors the questions that he personally intended to pose to the FDA during the meeting, stating that "***my questions*** are going to be oriented around" "looking at potentially functional-oriented endpoints and compare that to a robust natural history comparator . . . to demonstrate therapeutic benefit." He then identified specific questions that he intended to ask the FDA during the meeting: "Specifically, what is the endpoint? Specifically, what's the follow-up period?"

443. After the meeting, on December 10, 2024, Kapusta and Abi-Saab confirmed their understanding of what was discussed during the meeting. For example, Abi-Saab stated that uniQure "made a case" to the FDA during the meeting "that cUHDRS [wa]s a likely endpoint to be able to predict potential for benefit and as such could serve as an intermediate clinical endpoint." In addition, both he and Kapusta claimed to understand what the FDA was thinking coming out of the meeting. Abi-Saab, for example, represented that the FDA was "feeling comfortable" with the use of cUHDRS as an intermediate clinical endpoint, while Kapusta represented that the FDA "understands the difficulty in administering a properly, internally controlled, blinded study" and has "accepted" that a natural history control could support accelerated approval.

444. In addition, in May 2025, Abi-Saab made further statements to the market about what "we [] discussed . . . with the FDA" in November, further confirming his personal knowledge of the discussions that occurred during the November 2024 meeting. He and Kapusta also made

representations to investors about what was ***not*** discussed during that meeting. For example, Kapusta explained on March 3, 2025 that while "we raised" the timing and design of a confirmatory trial "in our November meeting" and as part of the briefing book for that meeting, "the FDA was not at that moment ready to talk about it." Abi-Saab similarly stated that "we actually . . . had a proposal in place" for a confirmatory study but "[t]he FDA said we're not prepared to discuss what would the confirmatory study [] look like until we have a chance to review the data that you submit to us as part of the BLA submission. So, at this point, the agency is not ready to discuss this." Kapusta added that "there was no conversation about specific requirements" for the NfL biomarker during the November meeting, while Abi-Saab confirmed that "[t]he question of clinically meaningful difference" in cUHDRS "did not come up at all in our discussions" during the November meeting.

445. Defendants Kapusta and Abi-Saab similarly demonstrated their knowledge of what was discussed during the April 2025 Type B meeting with the FDA. Kapusta, for example, stated that "[w]e now have a clear regulatory path" coming out of the meeting, while Abi-Saab stated that "we are very pleased with the guidance provided by the FDA" during the meeting. Abi-Saab further explained that, during the meeting, "the FDA said that they would be open to evaluating the data from the current study" in lieu of a confirmatory study, but that those discussions "will take place only after they have a chance to review those data." He also again identified for the market topics that were not discussed during the meeting, stating, for instance that while uniQure had previously discussed whether changing NfL levels may be supportive of therapeutic benefit, "there was no additional discussion of this" during the April 2025 meeting and "no other discussion on any other endpoints." He likewise confirmed that issues like "magnitude of effect and p-value

. . . were not specifically discussed" and that there was not "any discussion" regarding clinical meaningfulness during the meeting.

446. Further, in their September 2025 statements to investors, Defendants again represented that they had knowledge of what was discussed between uniQure and the FDA. For example, Abi-Saab stated that "the agency was very clear" to uniQure that it wanted to see the data before discussing accelerated approval and "was very clear to us that even if they go down the path of accelerated approval . . . it's not going to require that we start that trial, have it 50% recruited or whatever to delay approval of the accelerated pathway."

447. Finally, Defendants' statements demonstrated their personal involvement in the October 29, 2025 discussions with the FDA. Kapusta and Abi-Saab, for example, each stated during uniQure's November 10, 2025 earnings call that "***we***" met with the FDA in late October, and Abi-Saab discussed the feedback received from the FDA during that meeting. Kapusta added that he assumed that the meeting minutes provided by the FDA would "reflect mostly the conversation that ***we*** had in Washington, D.C."

### C. Defendants Were Financially Motivated to Commit Fraud

448. Before and throughout the Class Period, Defendants knew that the market price of uniQure's common stock depended heavily upon the regulatory pathway for AMT-130. Indeed, in June 2023 and again in December 2023, uniQure's stock price declined precipitously after the Company announced mixed results from the AMT-130 Phase I/II study, with market participants indicating that they were "await[ing] clarity" on the AMT-130 regulatory front. In fact, in February 2024, Defendant Kapusta acknowledged his awareness of this dynamic, explained that he was "pissed off" and "extremely disappointed with [uniQure's] stock price performance," and identified "regulatory clarity" as one of his key focuses for 2024.

449. Defendants uniQure and Kapusta were financially motivated to mislead the market on September 24, 2025 because it allowed them to immediately profit off uniQure's inflated stock price. As alleged above, Kapusta generated nearly $8 million in profits from the sale of uniQure stock on September 24, 2025, while the Company raised hundreds of millions of dollars in cash from unwitting investors through an offering announced on September 24, 2025.

450. Further, before and during the Class Period, a significant portion of Defendants Kapusta's and Abi-Saab's cash compensation was tied to the development and approval of AMT-130. In 2024, for example, nearly half of their cash bonus compensation (51.6%) was tied to their ability to "[d]efine [the] registrational pathway for [uniQure's] Huntington's disease program."

451. In early 2025, uniQure's Board approved a compensation plan that was even more heavily dependent on the success of AMT-130. For 2025, the Board tied 60% of Defendant Kapusta's and Abi-Saab's bonus compensation to their ability to "[a]lign with [the] FDA on requirements supporting accelerated approval" for AMT-130, "[p]resent potentially pivotal data from [AMT-130] Phase I/II study," and "[p]repare for [AMT-130] BLA submission and commercialization."

452. In addition, in November 2024, the Board's Compensation Committee "awarded a one-time targeted performance grant" to Abi-Saab. According to the Company:

> The purpose of the 2024 Performance Grant was to incentivize the achievement of specific milestones related to the execution of Huntington's disease and mTLE-related program goals that are critical to our success and the generation of shareholder value. The 2024 Performance Grant is at-risk, can be fully assessed by the end of June 2026, and includes a performance cash bonus and performance share units. The target value of the performance cash is $284,000 and the target value of the performance share units is $584,000 (as of the date of grant, rounded to the nearest thousand). Dr. Abi-Saab's 2024 performance grant was a one-time grant that will not be a recurring component of Dr. Abi-Saab's or any other NEO's compensation.

453. Because this performance grant was considered "at-risk," it meant that if uniQure failed to achieve these specific milestones (75% of which were tied to AMT-130), Abi-Saab would forfeit the cash and shares granted to him.

454. In addition, Defendant Tabrizi has economic ties to uniQure that provide her with a similar financial incentive. Tabrizi was described during the Class Period as "a uniQure advisor," and she is identified on UCL's website as the "lead scientific advisor on uniQure's AMT 130 gene therapy trial." In 2024, Tabrizi co-authored a paper titled "Clinical Review of Juvenile Huntington's Disease," which contained a conflict of interest disclosure stating that, through the offices of "UCL Consultants Ltd, a wholly owned subsidiary of University College of London," Tabrizi has "undertaken consultancy services for . . . UniQure Biopharma" and that her "host clinical institution," University College London Hospitals NHS Foundation Trust, has "received funding to run clinical trials for . . . UniQure Biopharma." Tabrizi has continued to conduct consultancy services for uniQure through UCL through the present. In the materials prepared for a December 4, 2025 meeting titled "uniQure Topline Results: Unpacking the Outcomes So Far," Tabrizi disclosed that she has "undertaken consultancy services and [is] on SABs for uniQure," and she acknowledged that while the compensation for these services is "paid through UCL Consultants Ltd," it is used, at least in part, to fund Tabrizi's research. Additionally, in a December 2023 publication in the New England Journal of Medicine titled "Tominersen in Adults with Manifest Huntington's Disease," Tabrizi disclosed both that University College London Hospitals Trust received a research contract to run uniQure clinical trials and that she served as a consultant to uniQure in exchange for payments made to UCL Consultants Ltd and to Celtic Phenomena Ltd. Tabrizi is a director of Celtic Phenomena Ltd.

### D. Defendants' Fraud Concerned the Most Important Aspect of uniQure's Business

455. Before and throughout the Class Period, AMT-130 was uniQure's most important product. In its Form 10-K for the year-ended December 31, 2024, for example, uniQure described AMT-130 as its "lead product candidate," stating that it had "invested a significant portion of [its] development efforts and financial resources in[to] the development of [its] lead clinical product candidate, AMT-130 for the treatment of Huntington's disease." The 2024 Form 10-K further acknowledged that uniQure was "dependent upon the success" of AMT-130 and that "[a] failure of AMT-130 in clinical development, including inability to demonstrate sufficient safety or efficacy, or challenges associated with its regulatory approval, manufacturing or commercialization could adversely affect our business." Elsewhere, the 2024 Form 10-K stated that if AMT-130 failed, uniQure "could be prevented from or significantly delayed in achieving profitability and [its] business would be adversely affected." The 2025 Form 10-K similarly stated that uniQure was "dependent on the success of [its] lead product candidate, AMT-130," and that "[a] failure of AMT-130 in clinical development, including inability to demonstrate sufficient safety or efficacy, or challenges associated with its regulatory approval, manufacturing or commercialization could adversely affect our business."

456. In addition, in describing uniQure's "Mission and Strategy," the 2024 Form 10-K identified the key aspect of uniQure's strategy as: "Advance the development and commercialization of AMT-130[.]"

457. Consistent with these statements, uniQure spent more money on research and development expenses for AMT-130 than any of its other projects before and during the Class Period. During 2024, for example, uniQure spent nearly 40% of its total direct research and development expenses, or nearly $18 million, on AMT-130, with the remaining 60% being spread

across five different research projects. These figures ballooned in 2025, with uniQure spending over 61% of its total direct research and development expense, or more than $42 million, on AMT-130.

## VIII. CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

458. Lead Plaintiff brings this Action on behalf of itself and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired uniQure common stock from September 24, 2025 through October 31, 2025, inclusive. Excluded from the Class are Defendants, the officers and directors of uniQure, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

459. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, uniQure's common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiff at this time and could only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. During the Class Period, uniQure had more than 62 million shares of common stock outstanding available for trading on the Nasdaq. Record owners and other members of the Class may be identified from records maintained by uniQure and its transfer agent and may be notified of the pendency of this Action by mail, using a form of notice similar to that customarily used in securities class actions.

460. Lead Plaintiff's claims are typical of the claims of the other Class members, as all Class members purchased or otherwise acquired uniQure's common stock during the Class Period

at artificially inflated prices and were similarly affected by Defendants' wrongful conduct that violated the federal securities laws, as complained of herein.

461. Lead Plaintiff will fairly and adequately protect the interests of the other Class members and have retained counsel competent and experienced in prosecuting class actions and securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to the interests of other Class members.

462. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

463. Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a. Whether Defendants violated the federal securities laws through the acts alleged herein;

b. Whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts;

c. Whether and to what extent the market prices of uniQure's common stock were artificially inflated or distorted during the Class Period due to the misrepresentations or omissions of material facts complained of herein;

d. Whether the Defendants acted with scienter;

e. Whether reliance may be presumed under the fraud-on-the-market doctrine or the presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); and

f. Whether the Class members have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

464. The prosecution of separate actions by individual Class members would create risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other Class members who are not parties to the adjudications or substantially impair their ability to protect their interests.

465. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE

466. At all relevant times, the market for uniQure's common stock was efficient for the following reasons, among others:

a. uniQure's common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market, under the ticker symbol, "QURE";

b. As a regulated issuer, uniQure filed periodic public reports with the SEC;

c. uniQure regularly and publicly communicated with investors via established market communication mechanisms, including through quarterly investor and analyst conference calls, regular dissemination of

press releases on the national circuits of major newswire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. uniQure was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

467. As a result of the foregoing, the market for uniQure's common stock promptly digested current information regarding uniQure from all publicly available sources and reflected that information in the price of uniQure's common stock. All purchasers and acquirers of uniQure's common stock during the Class Period suffered similar injury through their purchases and acquisitions of uniQure's common stock at artificially inflated prices, and a presumption of reliance applies.

468. Further, at all relevant times, Lead Plaintiff and other Class members relied on Defendants to timely disclose material information as required by law. Lead Plaintiff and other Class members would not have purchased or otherwise acquired uniQure's common stock at artificially inflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning uniQure and its business, Lead Plaintiff and other Class members are entitled to the *Affiliate Ute* presumption of reliance.

## X. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

469. The statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

470. None of the statements complained of herein was a forward-looking statement. Rather, they were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; or (ii) omitted to state material, current or historical facts necessary to make the statements not misleading.

471. To the extent that any of the materially false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by uniQure were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

472. To the extent that the statutory safe harbor may apply to any materially false or misleading statement or portion of a statement alleged herein, Defendants are liable for those forward-looking statements because at the time each of those statements was made, Defendants did not actually believe the statements, had no reasonable basis for the statements, or were aware of undisclosed facts tending to seriously undermine the accuracy of the statements.

473. To the extent that Defendants issued any disclosures purporting to warn or caution investors of certain "risks," those disclosures were also materially false or misleading because they did not disclose that the risks that were the subject of the warnings had materialized, or Defendants

had actual knowledge of undisclosed material adverse facts that rendered the purportedly cautionary disclosures materially false or misleading.

## XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) Promulgated Thereunder Against All Defendants

474. Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This Count is asserted against Defendants uniQure, Kapusta, Abi-Saab, and Tabrizi pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other Class members.

475. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and the Class; and (ii) cause Lead Plaintiff and the Class to purchase or otherwise acquire uniQure common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

476. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of uniQure common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

477. During the Class Period, Defendants made false statements specified above, which they knew or severely recklessly disregarded to be false or misleading in that they contained

misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

478. Defendants had actual knowledge of the misrepresentations and omissions of material fact as set forth herein, or severely recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal uniQure's true condition from the investing public and to support the artificially inflated prices of uniQure's common stock.

479. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired uniQure common stock at inflated prices. Lead Plaintiff and the Class would not have purchased or otherwise acquired uniQure common stock at such prices, or at all, had they been aware that the market prices for uniQure common stock had been artificially inflated by Defendants' fraudulent course of conduct.

480. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases or acquisitions of uniQure common stock during the Class Period.

481. This claim is brought within the applicable statute of limitations.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Executive Defendants for Control of uniQure

482. Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This Count is asserted against Defendants Kapusta and Abi-Saab for control of uniQure pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other Class members.

483. The Executive Defendants acted as controlling persons of uniQure within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their

ownership and contractual rights, participation in, and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued or had the ability to prevent the issuance of the statements or cause the statements to be corrected.

484. In particular, each of the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

485. As alleged above, the Company and the Executive Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Executive Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Lead Plaintiff and other Class members suffered damages in connection with their purchases or acquisitions of the Company's common stock during the Class Period.

486. This claim is brought within the applicable statute of limitations.

## COUNT III
## Violations of Section 20(a) of the Exchange Act Against the Executive Defendants for Control of Tabrizi

487. Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This Count is asserted against Defendants Kapusta and Abi-Saab for control of Tabrizi pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other Class members.

488. The Executive Defendants acted as controlling persons of Tabrizi within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of uniQure's operations, the Executive Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Tabrizi, including the content and dissemination of her various false and/or misleading statements. The Executive Defendants were provided with or had access to copies of Tabrizi's reports and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued or had the ability to prevent the issuance of the statements or cause the statements to be corrected.

489. In particular, each of the Executive Defendants had direct and supervisory involvement in the day-to-day operations of Tabrizi's work in the U.S. and E.U. Phase I/II Trials and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

490. As alleged above, Tabrizi and the Executive Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Executive Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Lead Plaintiff and other Class members suffered damages in connection with their purchases or acquisitions of the Company's common stock during the Class Period.

491. This claim is brought within the applicable statute of limitations.

## XII. PRAYER FOR RELIEF

492. **WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

a. Determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages and equitable relief in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this Action, including reasonable counsel fees and expert fees; and

d. Awarding such other and further relief as the Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

493. Lead Plaintiff hereby demands a trial by jury.

Dated: July 15, 2026

Respectfully submitted,

*S/ Jennifer L. Joost*

Jennifer L. Joost (*pro hac vice*)
**KESSLER TOPAZ MELTZER & CHECK, LLP**
One Sansome Street
Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
jjoost@ktmc.com

-and-

Richard A. Russo, Jr. (*pro hac vice*)
Aubrie L. Kent (*pro hac vice*)
Marianne A. Uy (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
rrusso@ktmc.com
akent@ktmc.com
muy@ktmc.com

*Attorneys for Lead Plaintiff Oklahoma Firefighters Pension and Retirement System*